EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
NATHANIEL B. WALKER (Cal. Bar No. 224473)
Assistant United States Attorney
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0282
    Facsimile: (213) 894-0141
    E-mail:    nathaniel.walker@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>KENNETH WAYNE FROUDE,<br><br>A Fugitive from the Government of Canada. | No. CV 15-8623-JLS-E<br><br>GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF EXTRADITION |

On behalf of the government of Canada, complainant United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United

//

//

States Attorney Nathaniel B. Walker, hereby submits its supplemental memorandum in support of extradition in the above-captioned matter.

Dated: May 2, 2016          Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
NATHANIEL B. WALKER
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

The United States filed its memorandum in support of extradition on March 14, 2016. The fugitive, KENNETH WAYNE FROUDE ("FROUDE") filed his opposition on March 21, 2016. The United States filed its reply on April 4, 2016. The Court heard oral argument on April 11, 2016, following which, the Court ordered the United States to file supplemental evidence and argument to address specific questions the Court posed.

Specifically, the Court asked the United States to address: "1) Whether the dual criminality requirement is satisfied with respect to any of the charges related to the alleged violation of the Canadian long-term offender order under the provision of 18 U.S.C. section 751(a) concerning escape 'from any institution or facility in which he is confined by direction of Attorney General'; 2) Whether the dual criminality requirement is satisfied with respect to any of the charges related to the alleged violation of the Canadian long-term offender order by analogy to 18 U.S.C. section 1073; 3) The relationship of the Correctional Service of Canada to the Canadian government and, in particular, whether the Correctional Service of Canada is analogous to the United States Bureau of Prisons; 4) With respect to the community correctional centre from which Mr. Froude allegedly absconded on or about May 18, 2013 in violation of the long-term supervision order: (a) the identity of the person(s) and/or entity(ies) which operated the centre and the relationship, if any, of such person or entity to the Correctional Service of Canada or any other agency of the Canadian government; and (b) the conditions of confinement at that centre at the time Mr. Froude left the centre;

and 5) The identification of the person(s) or entity(ies) which set the conditions of Mr. Froude's long-term supervision order and the relationship, if any, of such person or entity to the Canadian government and to the Correctional Service of Canada."

In addition to the argument contained herein, the United States has attached for the Court's consideration the affidavit of Peter Glenn, the Manager of Community Operations for the Correctional Service of Canada ("CSC"), and supporting exhibits (collectively, Exhibit 1), and the affidavit of Vanessa Wynn-Williams, counselor to the CSC Legal Services Unit (Exhibit 2).

**II. ARGUMENT AND ANALYSIS**

    **A. Dual Criminality is Satisfied with Respect to 18 U.S.C. Section 751**

The Long Term Supervision Order ("LTSO") to which FROUDE was subject required him, <u>inter alia</u>, to: 1) reside at a Community Correctional Center ("CCC"); 2) remain in Canada; and 3) obey the law and keep the peace. For the reasons described throughout this supplemental filing, and as previously argued, dual criminality under the Extradition Treaty Between the United States of America and Canada, 27 U.S.T. 983, TIAS 8237 ("the Treaty"), exists between the first condition of the LTSO (as codified at Section 753.3(a) of the Criminal Code of Canada) and 18 U.S.C. Sections 751(a) and 4082, because the CSC is analogous to the United States Bureau of Prisons ("BOP"), the CSC owned and operated the CCC from which FROUDE escaped, and the residential condition of the LTSO was imposed by the sentencing judge when she imposed the LTSO, pursuant to a Canadian federal statute. Accordingly, both the Canadian and U.S. statutes criminalize the same basic conduct (i.e., leaving custody without

permission) to prevent the same basic evil (i.e., allowing convicted felons to remain at large without any supervision. Compare Supplementary Affidavit of Karen Shai, ¶ 9, previously filed April 4, 2016 (discussing long-term offender provision as a sentencing option for offenders "who pose an ongoing public threat") with United States v. Brown, 333 U.S. 18, 21 n.5 (1948) (discussing considerations that led to the adoption of the escape statutes, including discouraging conduct that endangers the welfare of the custodians and crimes that often follow an escape). The "essential character of the transaction is the same, and made criminal" by the laws of both countries, Wright v. Henkel, 190 U.S. 40, 58 (1903), and this is all that is required to satisfy the dual criminality requirement in an extradition proceeding.

Dual criminality is further met because Section 753.3 of the Criminal Code of Canada criminalizes any violation of an LTSO, including the general conditions that FROUDE remain in Canada, and obey the law and keep the peace. "The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical." Emami v. U.S. Dist. Court, 834 F.2d 1444, 1450 (9th Cir. 1987). Clearly, a parolee in the United States who had been ordered confined to a halfway house, and who left that facility without permission and went to Canada, would be subject to prosecution under 18 U.S.C. Sections 751 and 4082. United States v. Foster, 754 F.3d 1186, 1190 (10th Cir. 2014) (escape from court-ordered placement in a halfway house); United States v. Jones, 569 F.2d 499, 501-02 (9th Cir. 1978) (escape from halfway house). Similarly, a parolee who failed to return to a halfway house because he had been arrested for a new offense, not

because he had attempted to escape, would nonetheless be prosecutable under 18 U.S.C. Sections 751 and 4082. See United States v. Jones, 569 F.2d 499, 500 (9th Cir. 1978). In the latter example, such a defendant would have plainly failed to "obey the law and keep the peace." Again, the conduct of a particular fugitive is the key, and the treaty does not require identity between statutory elements[1] for offenses to be analogous. See Emami, 834 F.2d at 1450. Thus, sufficient analogy exists between all three general requirements of the LTSO and 18 U.S.C. Sections 751 and 4082, to satisfy the Treaty's dual criminality requirement.

**B.  Dual Criminality is Satisfied with Respect to 18 U.S.C. Section 1073**

Dual criminality also exists between the second condition of the LTSO – i.e., that FROUDE remain in Canada – and 18 U.S.C. Section 1073, Unlawful Flight to Avoid Prosecution. Where, as here, an individual intentionally crosses an international border to avoid the restrictions placed upon him by a criminal court, such conduct would violate either Criminal Code of Canada Section 753.3(a)[2] or 18 U.S.C. Section 1073.

---

[1] "A requesting country is not obligated to produce evidence on all elements of a criminal offense, nor to establish that its crimes are identical to ours." Kelly v. Griffin, 241 U.S. 6, 15 (1916); Brauch v. Raiche, 618 F.2d 843, 851 (1st Cir. 1980) ("[S]trict congruity of offenses is [not] necessary to meet the test of double criminality . . . the offenses of the two countries must be substantially analogous."). Furthermore, "extradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement because they are 'in the interest of justice and friendly international relationships.'" United States v. Lui Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (citing Factor v. Laubenheimer, 290 U.S. 276, 295 (1933)).

[2] Section 753.3(a) of the Canadian Criminal Code sets out the provision of an LTSO requiring an LTO like FROUDE to remain in Canada.

4

1    Section 1073 criminalizes, inter alia, "mov[ing] or travel[ing]
2 in interstate or foreign commerce with intent . . . to avoid
3 prosecution, or custody or confinement after conviction."  Section
4 1073 covers not only pre-conviction flight, but like the Canadian
5 LTSO, also covers post-conviction flight to avoid confinement.  See,
6 e.g., United States v. Alcarez Camacho, 340 F.3d 794, 797 (9th Cir.
7 2003) (failure to appear for sentencing).
8    Furthermore, not only does Section 1073 apply to criminal
9 defendants (pre- and post-conviction), it also extends to witnesses
10 who move in interstate or foreign commerce with intent to avoid
11 giving testimony in criminal proceedings, as well as persons who do
12 so to avoid service of process by a state agency.  See 18 U.S.C. §
13 1073.  Accordingly, the purpose of Section 1073 is to address not
14 only the threat to public safety posed by "roving criminals," United
15 States v. Brandenburg, 144 F.3d 656, 660 (3d Cir. 1944), but also
16 "the threat to the integrity and authority of the court posed by"
17 persons who refuse "to abide by lawful court orders," Alcarez
18 Camacho, 340 F.3d at 797 (internal citation and punctuation omitted).
19 Thus, just like the Canadian statute, which criminalizes, inter alia,
20 failure to remain in Canada in violation of a court-imposed LTSO,
21 Section 1073 criminalizes interstate or foreign travel with intent to
22 avoid custody or confinement, or compliance with a court order.
23 Therefore, dual criminality is satisfied under the Treaty because the
24 Canadian statute punishes the same conduct and addresses the same
25 purposes as Section 1073.
26    **C.   The CSC is Analogous to the United States Bureau of Prisons**
27    Peter Glenn, CSC community operations manager, explains in his
28 affidavit that the CSC "is a federal agency within the Government of

5

1 Canada's Public Safety portfolio." See Ex. 1, ¶ 3. The CSC was
2 established by Canadian federal statute, and is charged with, inter
3 alia, administering court-imposed sentences of two years or more.
4 Id. This work "involves managing institutions across Canada of
5 various security levels . . . and supervising offenders in the
6 community . . . under long-term supervision." Id. In this regard,
7 CSC is analogous to the United States BOP, which is charged with,
8 inter alia, management of penal and correctional institutions,
9 providing "suitable quarters" for persons "charged with or convicted
10 of offenses against the United States," establishing prerelease
11 planning procedures, and establishing re-entry planning procedures
12 educating federal prisoners on employment, health and nutrition,
13 personal finance and consumer skills. See 18 U.S.C. § 3621(a).
14 Thus, the CSC is analogous to the BOP in terms of the range of its
15 duties, and the source and scope of its powers.

**D. The CSC Owned and Operated the Center From Which FROUDE Escaped and FROUDE was Subject to Conditions Analogous to Court-Ordered Confinement in a U.S. Halfway House**

The Portsmouth Community Correctional Centre, currently named the Henry Trail Community Correctional Centre, is the facility from which FROUDE escaped. That CCC is and was owned and operated by CSC, and is/was subject to CSC's policies and procedures. See Ex. 1, ¶ 4. With respect to the personnel that operated the centre at the time of FROUDE's escape:

> Community Correctional Centre (CCC) teams include CCC
> Managers, who handle day-to-day operations and make sure
> that all policies are followed. CCC Managers also
> coordinate and supervise the case management process for

         the offenders residing at the CCC.  Parole Officers
         supervise offenders to ensure they are following their
         release conditions.  The Canadian Corps of Commissionaires
         provides security at CCCs 24 hours a day, seven days a
         week.  Commissionaires monitor the centres and make sure
         offenders comply with the centres' rules.  In addition,
         Psychologists, Mental Health Nurses, Social Workers,
         Employment Coordinators, Program Officers and Volunteer
         Coordinators may be available on site or located nearby.
Id. ¶ 5.  All the personnel affiliated with each CCC have either an
employment or contractual relationship with CSC.  Id.

The general conditions of confinement at the CCC at the time FROUDE escaped included the following: the residents were supervised twenty-four hours a day, seven days a week (see Ex. 1, ¶ 5; Ex. 1-A, at 9; Ex. 1-B, ¶ 14), all residents were counted and accounted for at least twice daily, sometimes at night (Ex. 1-B, ¶ 45; Ex. 1-D, at 8), the residents' rooms were searched for contraband and unauthorized items on a daily basis, sometimes with an assistance of a canine squad (Ex. 1-B, ¶ 50; Ex. 1-D, at 8), samples of residents' urine were collected and tested on a regular basis (Ex. 1-B, ¶ 53), and residents' arrivals and departures were routinely recorded (Ex. 1-B, ¶ 46; Ex. 1-D, at 11).  Also, no alcohol, drugs, weapons, or pornography was allowed at the facility.  Ex. 1-D, at 13.

In addition to the facility's general restrictions, residents' access to the outside community was determined on a case-by-case basis, by the risk to the community that each resident posed.  See Ex. 1, ¶ 9.  FROUDE's community access was "Restricted Community

Access," meaning that FROUDE "had no unaccompanied community access." Id.

### E. A Canadian Federal Judge and the Parole Board of Canada Set the Conditions of FROUDE's LTSO Pursuant to Statute

An LTO subject to an LTSO is required to be supervised in accordance with the Corrections and Conditional Release Act ("CCRA") Section 134.1. See Ex. 2, ¶ 5. That section provides that LTOs are subject to the standard conditions set forth in the Corrections and Conditional Release Regulations Section 161, which requires, inter alia, that individuals released from prison under an LTSO travel directly to the designated place of residence, remain in Canada within the territorial boundaries fixed by an LTO's parole supervisor, and "obey the law and keep the peace." See Affidavit of Karen Shai, Ex. B, previously filed on March 14, 2016. Such conditions are referred to as the "standard conditions" that apply to all LTOs subject to LTSOs. See Affidavit of Karen Shai, ¶ 17. Thus, the sentencing judge automatically set the general conditions of FROUDE's LTSO, pursuant to statute, when she designated him an LTO.

In addition, the CCRA empowers the Parole Board of Canada ("PBC")[3] to impose any conditions "that it considers reasonable and necessary in order to protect society and to facilitate the successful reintegration into society of the offender." See Ex. 2, ¶ 6. Such conditions of an LTSO are referred to as "special conditions" that may be imposed on LTOs on a case-by-case basis. See Affidavit of Karen Shai, ¶ 17. Accordingly, the PBC imposed the

---

[3] The PBC is part of the Canadian government, but is independent of the CSC.

special conditions[4] of FROUDE's LTSO, pursuant to its authority under the CCRA. See Ex. 2, ¶ 9.

## III. CONCLUSION

The United States respectfully requests, on behalf of the government of Canada, that this Court certify the extradition of FROUDE to the Secretary of State for surrender to the Canadian government.

---

[4] The special conditions the PBC specifically imposed upon FROUDE required him to avoid certain persons, have no contact with his victims, receive counseling, reside at a CCC approved by the CSC, abstain from alcohol and drugs, have no association with someone engaged in criminal activity, and report to his parole supervisor any and all contacts with women. See Affidavit of Lisa Manson, Exhibit B, previously filed on March 14, 2016.