# EXHIBIT 1

| | |
|---|---|
| CANADA | ) THE MATTER OF a request for the extradition of |
| PROVINCE OF ONTARIO | ) Kenneth Wayne FROUDE |
| CITY OF OTTAWA | ) from the United States to Canada to face |
| | ) prosecution for three counts of an offence contrary |
| | ) to the *Criminal Code* of Canada and to serve the |
| | ) remainder of a Long Term Supervision Order |

## AFFIDAVIT of PETER GLENN

I, Peter Glenn, of the city of Ottawa, in the Province of Ontario, MAKE OATH AND SAY AS FOLLOWS:

1. I am the Manager, Community Operations for the Correctional Service of Canada (CSC) and as such, I am familiar with the circumstances associated with this file.  In my position with CSC, I have access to and have reviewed CSC files relating to FROUDE, Kenneth Wayne ("FROUDE") in preparation of this affidavit.

2. This Affidavit is sworn in response to the April 11, 2016 Order of the Honourable Judge Charles F. Eick. It should be read in conjunction with the Affidavit sworn by Lisa Manson on May 19, 2015, the Affidavits sworn by Karen Shai on May 15, 2015 and March 30, 2016, and the Affidavit of Vanessa Wynn-Williams affirmed on April 27, 2016.

3. CSC is a federal agency within the Government of Canada's Public Safety portfolio, established pursuant to section 5 of the *Corrections and Conditional Release Act*, S.C. 1992, c. 20 (CCRA). CSC contributes to public safety by administering court-imposed sentences of two years or more. This work involves managing institutions across Canada of various security levels, preparing inmates for safe and timely release, and supervising offenders in the community on conditional release or under long-term supervision.

4.  The Portsmouth Community Correctional Centre (PCCC), now called the Henry Traill Community Correctional Centre (HTCCC), is a facility owned and operated by CSC that provides a structured living environment, programs, supervision and interventions for the purpose of safely reintegrating offenders into the community. Community Correctional Centres operate under CSC policies and procedures.

5.  Community Correctional Centre (CCC) teams include CCC Managers, who handle day-to-day operations and make sure that all policies are followed. CCC Managers also coordinate and supervise the case management process for the offenders residing at the CCC. Parole Officers supervise offenders to ensure they are following their release conditions. The Canadian Corps of Commissionaires provides security at CCCs 24 hours a day, seven days a week. Commissionaires monitor the centres and make sure offenders comply with the centres' rules. In addition, Psychologists, Mental Health Nurses, Social Workers, Employment Coordinators, Program Officers and Volunteer Coordinators may be available on site or located nearby. All of these individuals have an employment or contractual relationship with CSC.

6.  The policy on the classification of CSC's institutions is Commissioner's Directive 706, "Classification of Institutions". **Commissioner's Directive 706, as it appeared in May 2013, is attached to this affidavit as "Exhibit A".** Paragraphs 36 and 37 of Commissioner's Directive 706 address the security requirements of CCCs and the behaviour norms expected of offenders residing in them.

7.  The policies that describe the standards and requirements for the operation of CCCs and the supervision of offenders in the community are contained in Commissioner's Directives 714 and 715, "Community Correctional Centre Standards" and "Community Supervision Framework", respectively. **Commissioner's Directives 714 and 715, as they appeared in May 2013, are attached to this affidavit as "Exhibit B" and "Exhibit C", respectively.**

8.  In addition to the policies and procedures established by the above-mentioned Commissioner's Directives, the PCCC establishes procedures through an offender

handbook. **A copy of the offender handbook in use at the PCCC in May 2013 is attached to this Affidavit as "Exhibit D".** As described at page 11 of this handbook, offenders residing at PCCC were required to sign in and out of the PCCC using a log book located at the Commissionaire's Desk. This requirement was further to paragraph 5. e. of Commissioner's Directive 715.

9.  As described at page 12 of the PCCC offender handbook, access to the community by offenders is determined on an established schedule and applied on a case-by-case basis, based on risk. This is further to paragraph 18 of Commissioner's Directive 714. There are references in Mr. FROUDE's casework records in CSC's Offender Management System to "RCA", or "Restricted Community Access". In the instance of Mr. FROUDE, this meant that he had no unaccompanied community access.

10. At the time FROUDE went unlawfully at large, he was meeting with his parole officer eight times per month.  The role of a community parole officer is described at paragraph 4 of Commissioner's Directive 715-1, "Community Supervision".  **A copy of Commissioner's Directive 715-1, as it appeared in May 2013, is attached to this Affidavit as "Exhibit E".**

11. I certify the facts contained in this affidavit to be accurate to the best of my knowledge and belief.

SWORN before me at        )
Ottawa, in the Province      )
of Ontario, this 27th day      )
of April, 2016.             )
                           )
_____ )  _____
Commissioner of Oaths    )  Peter Glenn

C. SINGH
LSUC # 56653W

This is Exhibit _____*A*_____ referred to in the

affidavit of PETER GLENN

sworn before me, this 27th

day of April, 2016.

_____
A Commissioner for Taking Affidavits

C SINGH
LSUC #56653W

 Correctional Service Canada   Service correctionnel Canada

# COMMISSIONER'S DIRECTIVE

## 706

# DIRECTIVE DU COMMISSAIRE

# CLASSIFICATION OF INSTITUTIONS

# CLASSIFICATION DES ÉTABLISSEMENTS

Issued under the authority of the
Commissioner of the Correctional Service of Canada

Publiée en vertu de l'autorité du commissaire
du Service correctionnel du Canada

2012-06-13

*The most up-to-date version of this document resides on CSC's InfoNet. Individuals who choose to work with a paper copy of this document should verify that the printed version is consistent with the electronic version.*

*La dernière version de ce document se trouve dans le site InfoNet du SCC. Si vous préférez utiliser une version imprimée de ce document, assurez-vous que celle-ci correspond à la version électronique affichée dans ce site.*

Correctional Service
Canada

Service correctionnel
Canada

| TABLE OF CONTENTS | Paragraph Paragraphe | TABLE DES MATIÈRES |
|---|---|---|

| | | |
|---|---|---|
| Policy Objective | 1 | Objectif de la politique |
| Authorities | 2 | Instruments habilitants |
| Application | 3 | Champ d'application |
| Responsibilities | 4-8 | Responsabilités |
| Procedures | 9-37 | Procédures |
| Security Levels | 9 | Niveaux de sécurité |
| Security Requirements | 10 | Exigences en matière de sécurité |
| Minimum Security Institutions -- Male Inmates | 11-12 | Établissements à sécurité minimale -- Hommes |
| Security | 11 | Sécurité |
| Behavioural Norms | 12 | Normes de comportement |
| Healing Lodges/Healing Villages -- Male Inmates | 13-14 | Pavillons de ressourcement/villages de ressourcement -- Hommes |
| Security | 13 | Sécurité |
| Behavioural Norms | 14 | Normes de comportement |
| Medium Security Institutions -- Male Inmates | 15-17 | Établissements à sécurité moyenne -- Hommes |
| Security | 15 | Sécurité |
| Behavioural Norms | 16-17 | Normes de comportement |
| Maximum Security Institutions -- Male Inmates | 18-19 | Établissements à sécurité maximale -- Hommes |
| Security | 18 | Sécurité |
| Behavioural Norms | 19 | Normes de comportement |
| Special Handling Unit | 20-21 | Unité spéciale de détention |
| Security | 20 | Sécurité |
| Behavioural Norms | 21 | Normes de comportement |
| Multi-Level Institutions | 22 | Établissements à niveaux de sécurité multiples |

Correctional Service Canada     Service correctionnel Canada

| | | |
|---|---|---|
| Behavioural Norms | 22 | Normes de comportement |
| Women Offender Institutions | 23 | Établissements pour femmes |
| Security | 23 | Sécurité |
| Minimum and Medium Security – Women Offenders | 24-27 | Sécurité minimale et moyenne – Femmes |
| Security – Living Units | 25 | Sécurité – Unités résidentielles |
| Behavioural Norms | 26-27 | Normes de comportement |
| Maximum Security – Women Offenders | 28-30 | Sécurité maximale – Femmes |
| Security – Secure Unit | 28-29 | Sécurité – Unité de garde en milieu fermé |
| Behavioural Norms | 30 | Normes de comportement |
| Healing Lodges/Healing Villages – Women Offenders | 31-32 | Pavillons de ressourcement/villages de ressourcement – Femmes |
| Security | 31 | Sécurité |
| Behavioural Norms | 32 | Normes de comportement |
| Regional Treatment Centres | 33-35 | Centres régionaux de traitement |
| Security | 33-34 | Sécurité |
| Behavioural Norms | 35 | Normes de comportement |
| Community Correctional Centres | 36-37 | Centres correctionnels communautaires |
| Security | 36 | Sécurité |
| Behavioural Norms | 37 | Normes de comportement |
| Enquiries | 38 | Demandes de renseignements |
| Cross-References and Definitions | Annex/e A | Renvois et définitions |
| Security Classification of the Correctional Service of Canada's Institutions | Annex/e B | Classification de sécurité des établissements du Service correctionnel du Canada |

| Correctional Service Canada / Service correctionnel Canada | Number - Numéro: 706 | Date 2012-06-13 |
|---|---|---|
| Classification of Institutions / Classification des établissements | | Page: 1 of/de 15 |

## POLICY OBJECTIVE

1. To ensure the appropriate classification of the Correctional Service of Canada's (CSC) institutions and create an environment at all security levels that fosters:

   a. constructive interaction between staff and offenders and among offenders;

   b. the delivery of programs and activities designed to meet the needs of offenders; and

   c. the development and maintenance of responsible behaviour by offenders.

## AUTHORITIES

2. *Corrections and Conditional Release Act* (CCRA), sections 2, 3, 3.1, 4, 15.1, 28, 30 and 96*(z.6)*

## APPLICATION

3. This Commissioner's Directive applies to all staff in federal institutions.

## RESPONSIBILITIES

4. The Commissioner will:

   a. establish the classification of minimum, medium, maximum, and multi-level security institutions;

   b. establish behavioural norms and security requirements for each security level; and

   c. designate an institution as multi-level with distinctions between programming and privileges as extended to the different security levels.

5. The Assistant Commissioner, Correctional Operations and Programs, will maintain the list of CSC's institutions by security level. (Refer to Annex B – Security Classification of the Correctional Service of Canada's Institutions.)

## OBJECTIF DE LA POLITIQUE

1. Garantir la classification appropriée des établissements du Service correctionnel du Canada (SCC) et créer à tous les niveaux de sécurité un environnement qui favorise :

   a. des relations positives entre le personnel et les délinquants, ainsi qu'entre les délinquants eux-mêmes;

   b. la prestation de programmes et la réalisation d'activités conçus pour répondre aux besoins des délinquants;

   c. l'acquisition et le maintien d'un comportement responsable de la part des délinquants.

## INSTRUMENTS HABILITANTS

2. *Loi sur le système correctionnel et la mise en liberté sous condition* (LSCMLC), articles 2, 3, 3.1, 4, 15.1, 28, 30 et 96*z.6)*

## CHAMP D'APPLICATION

3. La présente directive du commissaire s'applique à tous les employés des établissements fédéraux.

## RESPONSABILITÉS

4. Le commissaire :

   a. attribuera l'une des classifications suivantes aux établissements : sécurité minimale, sécurité moyenne, sécurité maximale et niveaux de sécurité multiples;

   b. établira les normes de comportement et les exigences en matière de sécurité pour chaque niveau de sécurité;

   c. désignera certains établissements comme établissement à niveaux de sécurité multiples avec des distinctions entre les programmes offerts et les privilèges accordés aux délinquants selon les différents niveaux de sécurité.

5. Le commissaire adjoint, Opérations et programmes correctionnels, tiendra à jour la liste des établissements du SCC par niveau de sécurité (voir l'annexe B – Classification de sécurité des établissements du Service correctionnel du Canada).

| | Correctional Service Canada | Service correctionnel Canada | Number - Numéro: | Date | 2012-06-13 |
|---|---|---|---|---|---|
| | **Classification of Institutions / Classification des établissements** | | 706 | Page: | 2 of/de 15 |

6. The Regional Deputy Commissioner will review annually the security levels of the institutions to ensure that they are consistent with the regional inmate population profile.

7. The Institutional Heads of minimum security institutions and healing lodges/healing villages will ensure that the perimeters of the institutions are clearly indicated and communicated to all staff and offenders.

8. Offenders are expected to:

   a. conduct themselves in a manner that demonstrates respect for other persons and property;

   b. obey penitentiary rules and regulations; and

   c. participate in programs, activities and/or interventions identified in their Correctional Plans.

## PROCEDURES

### Security Levels

9. The classification of CSC's institutions will conform to the following security levels: multi-level, maximum, medium and minimum (refer to Annex B).

### Security Requirements

10. Dynamic and static measures will reflect the degree of control required to maintain the security and stability of the institution and to protect the public, staff and offenders.

### Minimum Security Institutions – Male Inmates

### Security

11. The perimeter of a minimum security institution will be defined but not normally directly controlled. Firearms will not be retained in the institution.

6. Le sous-commissaire régional examinera, une fois par année, les niveaux de sécurité attribués aux établissements afin de s'assurer que ces niveaux correspondent au profil de la population carcérale de la région.

7. Les directeurs des établissements à sécurité minimale et des pavillons de ressourcement/villages de ressourcement s'assureront que le périmètre de l'établissement est clairement indiqué et que l'information est communiquée à tout le personnel et à tous les délinquants.

8. On s'attend à ce que les délinquants :

   a. se comportent de manière respectueuse envers les autres et les biens;

   b. observent les règlements pénitentiaires;

   c. participent aux programmes, aux activités et/ou aux interventions indiqués dans leurs Plans correctionnels.

## PROCÉDURES

### Niveaux de sécurité

9. La classification des établissements du SCC sera conforme aux niveaux de sécurité suivants : niveaux de sécurité multiples, sécurité maximale, sécurité moyenne et sécurité minimale (voir l'annexe B).

### Exigences en matière de sécurité

10. Les mesures de sécurité active et passive correspondront au degré de contrôle nécessaire pour assurer la sécurité et la stabilité de l'établissement, et pour protéger le public, le personnel et les délinquants.

### Établissements à sécurité minimale – Hommes

### Sécurité

11. Le périmètre d'un établissement à sécurité minimale sera délimité, mais normalement ne sera pas contrôlé directement. Aucune arme à feu ne sera conservée dans l'établissement.

| ▓❈▓ Correctional Service Service correctionnel<br>Canada Canada | Number - Numéro: | Date 2012-06-13 |
|---|---|---|
| Classification of Institutions / Classification des établissements | 706 | Page: 3 of/de 15 |

**Behavioural Norms**

12. Minimum security inmates will:

   a. interact effectively and responsibly with minimal supervision; and

   b. demonstrate a high level of motivation towards self-improvement by actively participating in their Correctional Plans.

<u>Healing Lodges/Healing Villages – Male Inmates</u>

**Security**

13. The perimeters of healing lodges/healing villages will be defined by a boundary fence, signage or natural demarcations, but will not be directly controlled. Inmate movement and association will be regulated primarily through dynamic security involving frequent monitoring and a high degree of interaction between employees and offenders. Firearms will not be utilized for perimeter security, nor retained in healing lodges/healing villages. However, the Institutional Head may permit the use of firearms during emergency situations.

**Behavioural Norms**

14. In addition to any other provisions regarding behavioural norms for inmates, inmates within healing lodges/healing villages will demonstrate respect for Aboriginal traditional healing concepts and commitment to participating in Aboriginal programs and interventions that are consistent with their Correctional Plans.

<u>Medium Security Institutions – Male Inmates</u>

**Security**

**Normes de comportement**

12. Les détenus de niveau de sécurité minimale :

   a. interagiront de manière efficace et responsable avec les autres, avec peu de surveillance;

   b. manifesteront une grande motivation à s'améliorer en participant activement à leurs Plans correctionnels.

<u>Pavillons de ressourcement/villages de ressourcement – Hommes</u>

**Sécurité**

13. Les périmètres des pavillons de ressourcement/villages de ressourcement seront délimités par une clôture périmétrique, de la signalisation ou des démarcations naturelles, mais ne seront pas contrôlés directement. Les déplacements des détenus et les contacts entre eux seront réglementés principalement au moyen de mesures de sécurité active comportant une surveillance fréquente et un niveau élevé d'interaction entre les employés et les délinquants. Des armes à feu ne seront pas utilisées pour assurer la sécurité du périmètre ni conservées dans les pavillons de ressourcement/villages de ressourcement. Cependant, le directeur du pavillon/village de ressourcement peut autoriser l'utilisation d'armes à feu pendant des situations d'urgence.

**Normes de comportement**

14. En plus de toute autre disposition relative aux normes de comportement des détenus, les détenus des pavillons de ressourcement/villages de ressourcement feront preuve de respect à l'égard des concepts autochtones de guérison traditionnelle et manifesteront un engagement à participer aux programmes et aux interventions autochtones qui sont conformes à leurs Plans correctionnels.

<u>Établissements à sécurité moyenne – Hommes</u>

**Sécurité**



| Correctional Service Canada | Service correctionnel Canada | Number - Numéro: | Date | 2012-06-13 |
|---|---|---|---|---|
| **Classification of Institutions / Classification des établissements** | | 706 | Page: | 4 of/de 15 |

15. The perimeter of a medium security institution will be well defined, secure and controlled. Inmate movement and association will be regulated and supervised. Although firearms will be retained in the institution, they will not normally be deployed inside the perimeter.

### Behavioural Norms

16. Medium security inmates will:

   a. interact effectively and responsibly while subject to regular and often direct supervision; and

   b. demonstrate an interest and actively participate in their Correctional Plans.

17. To access a medium security institution offering a responsibility-based, small-group living environment, inmates will demonstrate:

   a. a capacity to manage individual responsibility for behaviour with minimal staff intervention; and

   b. a high level of motivation to participate in their Correctional Plans.

### Maximum Security Institutions – Male Inmates

### Security

18. The perimeter of a maximum security institution will be well defined, secure and controlled. Inmate movement and association will be strictly regulated and directly supervised. Firearms will be retained in the institution and may be deployed inside the perimeter.

### Behavioural Norms

19. Maximum security inmates will:

   a. interact effectively and responsibly, while subject to constant and direct supervision; and

   b. demonstrate at least a minimum interest in participating in their Correctional Plans.

15. Le périmètre d'un établissement à sécurité moyenne sera bien délimité, sécurisé et contrôlé. Les déplacements des détenus et les contacts entre eux seront réglementés et surveillés. Des armes à feu seront conservées dans l'établissement, mais ne seront pas normalement déployées à l'intérieur du périmètre.

### Normes de comportement

16. Les détenus à sécurité moyenne :

   a. interagiront de manière efficace et responsable avec les autres, tout en étant soumis à une surveillance régulière et souvent directe;

   b. manifesteront de l'intérêt pour leurs Plans correctionnels et participeront activement.

17. Pour être placés dans un établissement à sécurité moyenne qui offre un milieu de vie en petits groupes axé sur les responsabilités, les détenus manifesteront :

   a. une capacité d'assumer la responsabilité de leur comportement, avec un minimum d'intervention de la part du personnel;

   b. une grande motivation à participer à leurs Plans correctionnels.

### Établissements à sécurité maximale – Hommes

### Sécurité

18. Le périmètre d'un établissement à sécurité maximale sera bien délimité, sécurisé et contrôlé. Les déplacements des détenus et les contacts entre eux seront strictement réglementés et soumis à une surveillance directe. Des armes à feu seront conservées dans l'établissement et peuvent être déployées à l'intérieur du périmètre.

### Normes de comportement

19. Les détenus à sécurité maximale :

   a. interagiront de manière efficace et responsable, tout en étant soumis à une surveillance constante et directe;

   b. manifesteront au moins un intérêt limité à participer à leurs Plans correctionnels.

Correctional Service
Canada

Service correctionnel
Canada

| Number - Numéro: | Date | 2012-06-13 |
| --- | --- | --- |
| 706 | Page: 5 of/de 15 | |

**Classification of Institutions / Classification des établissements**

---

## Special Handling Unit

### Security

20. The perimeter of the Special Handling Unit will be well defined, secure and strictly controlled. Inmate movement and association will be strictly regulated and rigidly controlled. Firearms will be retained in the institution and may be deployed inside the perimeter.

### Behavioural Norms

21. Inmates in the Special Handling Unit will:

   a. interact in a non-violent and non-threatening manner while subject to enhanced supervision; and

   b. participate in correctional planning intended to modify their attitudes and stabilize their behaviours so they can function without serious incident in a maximum security institution.

## Multi-Level Institutions

### Behavioural Norms

22. The behavioural norms for inmates in a multi-level institution will reflect their security classification and/or the classification of the unit in which they are incarcerated and be in compliance with their Correctional Plans.

## Women Offender Institutions

### Security

23. The perimeter of women's institutions will be well defined, secure and controlled. Dynamic security will be emphasized. Firearms will not be utilized for perimeter security, nor retained in women's institutions. However, the Institutional Head may permit the use of firearms during emergency situations.

---

## Unité spéciale de détention

### Sécurité

20. Le périmètre de l'Unité spéciale de détention sera bien délimité, sécurisé et hautement contrôlé. Les déplacements des détenus et les contacts entre eux seront strictement réglementés et rigoureusement contrôlés. Des armes à feu seront conservées dans l'établissement et peuvent être déployées à l'intérieur du périmètre.

### Normes de comportement

21. Les détenus de l'Unité spéciale de détention :

   a. interagiront de façon non violente et non menaçante, tout en étant soumis à une surveillance renforcée;

   b. participeront à des activités de planification correctionnelle visant à modifier leurs attitudes et à stabiliser leurs comportements de manière à leur permettre de fonctionner sans incidents graves dans un établissement à sécurité maximale.

## Établissements à niveaux de sécurité multiples

### Normes de comportement

22. Les normes de comportement applicables aux détenus d'un établissement à niveaux de sécurité multiples correspondront à leur cote de sécurité et/ou à la classification de l'unité dans laquelle ils sont incarcérés et seront conformes à leurs Plans correctionnels.

## Établissements pour femmes

### Sécurité

23. Le périmètre des établissements pour femmes sera bien délimité, sécurisé et contrôlé. L'accent sera mis sur les mesures de sécurité active. Des armes à feu ne seront pas utilisées pour assurer la sécurité du périmètre ni conservées dans l'établissement. Cependant, le directeur de l'établissement peut autoriser l'utilisation d'armes à feu pendant des situations d'urgence.

---

| Correctional Service Canada | Service correctionnel Canada | Number - Numéro: | Date | 2012-06-13 |
|---|---|---|---|---|

**Classification of Institutions / Classification des établissements**

| Number - Numéro: 706 | Page: 6 of/de 15 |

---

### Minimum and Medium Security -- Women Offenders

24. Inmates at the minimum or medium security level will be incarcerated in a <u>living unit</u>.

### Security -- Living Units

25. Inmate movement and association will be regulated primarily through dynamic security involving regular monitoring and a high degree of interaction between staff and inmates.

### Behavioural Norms

26. Minimum security inmates will:

   a. interact effectively and responsibly while subject to regular supervision; and

   b. demonstrate a high level of motivation towards self-improvement by actively participating in their Correctional Plans.

27. Medium security inmates will:

   a. interact effectively and responsibly while subject to regular supervision; and

   b. demonstrate an interest and actively participate in their Correctional Plans.

### Maximum Security -- Women Offenders

### Security -- Secure Unit

28. There are enhanced static security measures in the <u>secure unit</u>, including closed pods and control post, cell accommodation and a secure yard. Movement and association within the unit are regulated and supervised.

29. An inmate classified at the maximum security level who is granted access to other areas of the institution will be under constant staff supervision.

### Sécurité minimale et moyenne -- Femmes

24. Les détenues qui ont une cote de sécurité minimale ou moyenne seront incarcérées dans une <u>unité résidentielle</u>.

### Sécurité -- Unités résidentielles

25. Les déplacements des détenues et les contacts entre elles seront réglementés principalement au moyen de mesures de sécurité active comportant une surveillance régulière et un niveau élevé d'interaction entre les employés et les détenues.

### Normes de comportement

26. Les détenues à sécurité minimale :

   a. interagiront de manière efficace et responsable avec les autres, tout en étant soumises à une surveillance régulière;

   b. manifesteront une grande motivation à s'améliorer en participant activement à leurs Plans correctionnels.

27. Les détenues à sécurité moyenne :

   a. interagiront de manière efficace et responsable avec les autres, tout en étant soumises à une surveillance régulière;

   b. manifesteront de l'intérêt pour leurs Plans correctionnels et y participeront activement.

### Sécurité maximale -- Femmes

### Sécurité -- Unité de garde en milieu fermé

28. Des mesures de sécurité passive renforcées sont en place dans l'<u>unité de garde en milieu fermé</u>, incluant des sous-unités et un poste de contrôle fermés, l'aménagement de cellules et une cour sécurisée. Les déplacements des détenues et les contacts entre elles au sein de l'unité sont réglementés et surveillés.

29. Une détenue qui a une cote de sécurité maximale et se voit accorder l'accès à d'autres secteurs de l'établissement sera soumise à une surveillance constante de la part du personnel.

---

| Correctional Service Canada / Service correctionnel Canada | Number - Numéro: | Date | 2012-06-13 |
|---|---|---|---|
| Classification of Institutions / Classification des établissements | 706 | Page: | 7 of/de 15 |

| Behavioural Norms | Normes de comportement |
|---|---|

**Behavioural Norms**

30. Maximum security inmates will:

    a. interact effectively and responsibly, while subject to constant and direct supervision; and

    b. demonstrate at least a minimum interest in participating in their Correctional Plans.

<u>Healing Lodges/Healing Villages – Women Offenders</u>

**Security**

31. The perimeter of a healing lodge/healing village will be defined but not directly controlled. The healing lodge/healing village accommodates women offenders classified at the minimum and/or medium security level.

**Behavioural Norms**

32. In addition to any other provisions regarding behavioural norms for inmates, inmates within healing lodges/healing villages will demonstrate respect for Aboriginal traditional healing concepts, and commitment to participating in Aboriginal programs and interventions that are consistent with their Correctional Plans.

<u>Regional Treatment Centres</u>

**Security**

33. When a <u>Regional Treatment Centre</u> is located within the perimeter of another institution, the security measures will be dependent on the security classification of the institution and on the location of the Centre within the institution.

34. In the case of a standalone Treatment Centre, the perimeter will be well defined, secure and controlled. Firearms will be retained in the Treatment Centre and will be utilized for perimeter security. However, they will only be deployed inside the Treatment Centre during emergency situations with the permission of the Executive Director.

**Normes de comportement**

30. Les détenues à sécurité maximale :

    a. interagiront de manière efficace et responsable, tout en étant soumises à une surveillance constante et directe;

    b. manifesteront au moins un intérêt limité à participer à leurs Plans correctionnels.

<u>Pavillons de ressourcement/villages de ressourcement – Femmes</u>

**Sécurité**

31. Le périmètre d'un pavillon de ressourcement/village de ressourcement sera délimité, mais ne sera pas contrôlé directement. Le pavillon de ressourcement/ village de ressourcement accueille des délinquantes qui ont une cote de sécurité minimale ou moyenne.

**Normes de comportement**

32. En plus de toute autre disposition relative aux normes de comportement des détenues, les détenues des pavillons de ressourcement/villages de ressourcement feront preuve de respect à l'égard des concepts autochtones de guérison traditionnelle et manifesteront un engagement à participer aux programmes et aux interventions autochtones qui sont conformes à leurs Plans correctionnels.

<u>Centres régionaux de traitement</u>

**Sécurité**

33. Quand un <u>centre régional de traitement</u> est situé à l'intérieur du périmètre d'un autre établissement, les mesures de sécurité dépendront du niveau de sécurité de l'établissement ainsi que de l'emplacement du centre de traitement à l'intérieur du périmètre de l'établissement.

34. Dans le cas d'un centre de traitement autonome, le périmètre sera bien délimité, sécurisé et contrôlé. Des armes à feu seront conservées dans le centre de traitement et seront utilisées pour assurer la sécurité du périmètre. Cependant, elles ne seront déployées dans le centre qu'en cas de situation d'urgence, sous réserve de l'autorisation du directeur exécutif.



Correctional Service
Canada

Service correctionnel
Canada

**Classification of Institutions / Classification des établissements**

| Number - Numéro: | Date | 2012-06-13 |
|---|---|---|
| 706 | Page: 8    of/de    15 | |

<table>
<tr><td>

**Behavioural Norms**

35. The behavioural norms for inmates at Regional Treatment Centres will reflect their security level and be in compliance with their treatment plan and Correctional Plans.

**Community Correctional Centres**

**Security**

36. Although Community Correctional Centres (CCC) are classified as minimum security institutions, due to their role in accommodating offenders on conditional release, they are not required to conform to all minimum security standards (CD 714 – Community Correctional Centre Standards).

**Behavioural Norms**

37. The behavioural expectations for offenders residing in a CCC will be consistent with those expected of other offenders who are subject to supervision in the community and be in compliance with their Correctional Plans.

**ENQUIRIES**

38. Strategic Policy Division
National Headquarters
Email: Gen-NHQPolicy-Politi@csc-scc.gc.ca

Commissioner

</td><td>

**Normes de comportement**

35. Les normes de comportement applicables aux détenus des centres régionaux de traitement correspondront à leur cote de sécurité et seront conformes à leurs plans de traitement et à leurs Plans correctionnels.

**Centres correctionnels communautaires**

**Sécurité**

36. Bien que les centres correctionnels communautaires (CCC) soient classés comme établissements à sécurité minimale puisqu'ils accueillent des délinquants en liberté sous condition, ils ne sont pas tenus de se conformer à toutes les normes de sécurité minimale (DC 714 – Normes régissant les centres correctionnels communautaires).

**Normes de comportement**

37. Le comportement attendu des délinquants qui habitent dans un CCC correspondra à celui qui est attendu des autres délinquants sous surveillance dans la collectivité et sera conforme à leurs Plans correctionnels.

**DEMANDES DE RENSEIGNEMENTS**

38. Division de la politique stratégique
Administration centrale
Courriel : Gen-NHQPolicy-Politi@csc-scc.gc.ca

Le Commissaire,

</td></tr>
</table>

*Original signed by / Original signé par*

Don Head

| Correctional Service Canada / Service correctionnel Canada | Number – Numéro : | Annex/e A |
|---|---|---|
| **Classification of Institutions / Classification des établissements** | 706 | Date 2012-06-13 / Page: 9 of/de 15 |

## ANNEX/E A

### CROSS-REFERENCES AND DEFINITIONS / RENVOIS ET DÉFINITIONS

#### CROSS-REFERENCES

CD 702 – Aboriginal Offenders
CD 705-6 – Correctional Planning and Criminal Profile
CD 705-7 – Security Classification and Penitentiary Placement
CD 708 – Special Handling Unit
CD 710-1 – Progress Against the Correctional Plan
CD 710-2 – Transfer of Inmates
CD 710-6 – Review of Inmate Security Classification

CD 714 – Community Correctional Centre Standards

CD 716 – Provincial Offenders Pre-Release Case Preparation
CD 800 – Health Services

#### DEFINITIONS

**Behavioural norms:** the expected behaviours of inmates at each security level. The degree to which individual behaviour compares to expectations indicates the need for intervention strategies.

**Community Correctional Centre (CCC):** a federally operated community-based residential facility that provides a structured living environment with 24-hour supervision, programs, and interventions for the purpose of safely reintegrating offenders into the community. These facilities, which may also have an enhanced programming component, accommodate offenders under federal jurisdiction who have been released to the community on unescorted temporary absences, day parole, full parole, work releases, statutory release, as well as those subject to long-term supervision orders.

#### RENVOIS

DC 702 – Délinquants autochtones
DC 705-6 – Planification correctionnelle et profil criminel
DC 705-7 – Cote de sécurité et placement pénitentiaire
DC 708 – Unité spéciale de détention
DC 710-1 – Progrès par rapport au Plan correctionnel
DC 710-2 – Transfèrement de détenus
DC 710-6 – Réévaluation de la cote de sécurité des détenus
DC 714 – Normes régissant les centres correctionnels communautaires
DC 716 – Préparation prélibératoire des cas des délinquants sous responsabilité provinciale
DC 800 – Services de santé

#### DÉFINITIONS

**Normes de comportement :** comportement attendu des détenus à chaque niveau de sécurité. La mesure dans laquelle le comportement individuel correspond aux attentes indique si des stratégies d'intervention sont requises.

**Centre correctionnel communautaire (CCC) :** établissement résidentiel communautaire qu'administre le gouvernement fédéral et qui offre un milieu de vie structuré avec surveillance 24 heures sur 24 ainsi que des programmes et des interventions en vue de réinsérer les délinquants dans la collectivité en toute sécurité. Ces établissements, qui peuvent également offrir des programmes enrichis, accueillent des délinquants sous responsabilité fédérale libérés dans la collectivité aux termes d'une permission de sortir sans escorte, d'une semi-liberté, d'une libération conditionnelle totale, d'un placement à l'extérieur ou d'une libération d'office, ainsi que des délinquants visés par une ordonnance de surveillance de longue durée.



Correctional Service Service correctionnel
Canada Canada

| | Number – Numéro : | Annex/e A |
|---|---|---|
| | | Date 2012-06-13 |
| Classification of Institutions / Classification des établissements | 706 | Page: 10 of/de 15 |

**Healing lodge/Healing village:** a minimum or multi-level security facility operated by CSC in cooperation with an Aboriginal community. These facilities may or may not be located on First Nations' reserve land. Healing lodges may also be facilities run by the Aboriginal community under section 81 of the CCRA when approved by the Minister.

**Living unit:** a house that accommodates minimum and medium security women (including the Structured Living Environment). Living units do not include cells or pods in the Secure Unit or the Segregation Unit.

**Regional Treatment Centre:** a multi-level security institution that operates as a provincially recognized hospital and/or psychiatric hospital mandated to accommodate offenders unable to function in parent institutions due to a mental disorder, cognitive impairment, and/or physical disability typically associated with aging, or who require specialized assessments.

**Secure Unit:** a unit that accommodates women classified as maximum security.

**Special Handling Unit (SHU):** a facility that incarcerates male inmates who pose an ongoing danger to the public, staff and/or other inmates, and who cannot be safely managed at any other maximum security institution.

**Women offender institution:** a multi-level institution containing clustered structures designed to address the needs of women offenders. Offenders classified at the minimum and medium security level are accommodated together in living units. Offenders classified at the maximum security level are accommodated in a separate, Secure Unit.

**Pavillon de ressourcement/village de ressourcement :** établissement à sécurité minimale ou à niveaux de sécurité multiples qu'administre le SCC en collaboration avec une collectivité autochtone. Ces établissements peuvent être situés dans une réserve des Premières-Nations, mais ne le sont pas nécessairement. Un pavillon de ressourcement peut aussi être un établissement dirigé par une collectivité autochtone et visé par un accord conclu aux termes de l'article 81 de la LSCMLC lorsque le ministre l'autorise.

**Unité résidentielle :** habitation où sont logées des détenues à sécurité minimale et moyenne (y compris l'hébergement en milieu de vie structuré). Les unités résidentielles excluent les cellules et les sous-unités de l'unité de garde en milieu fermé et de l'aire d'isolement.

**Centre régional de traitement :** établissement à niveaux de sécurité multiples qui fonctionne comme un hôpital/hôpital psychiatrique agréé par la province et dont le mandat consiste à accueillir des délinquants qui sont incapables de fonctionner dans leurs établissements d'origine en raison d'un trouble mental, d'une déficience cognitive et/ou d'une invalidité physique habituellement associée au vieillissement, ou qui requièrent des évaluations spécialisées.

**Unité de garde en milieu fermé :** unité où sont logées des détenues ayant une cote de sécurité maximale.

**Unité spéciale de détention (USD) :** établissement où sont incarcérés des détenus de sexe masculin qui présentent un danger persistant pour le public, le personnel et/ou les autres détenus et qui ne peuvent être gérés sans danger dans aucun autre établissement à sécurité maximale.

**Établissement pour femmes :** établissement à niveaux de sécurité multiples contenant des bâtiments groupés en grappes et conçus pour répondre aux besoins des délinquantes. Les délinquantes qui ont une cote de sécurité minimale ou moyenne sont logées ensemble dans des unités résidentielles. Les délinquantes qui ont une cote de sécurité maximale sont logées dans une unité de garde en milieu fermé séparée.



| Correctional Service Canada / Service correctionnel Canada | Number – Numéro : · 706 | Date 2012-06-13 Annex/e B |
|---|---|---|

Classification of Institutions / Classification des établissements

Page: 11 of/de 15

---

### ANNEX/E B

#### SECURITY CLASSIFICATION OF THE CORRECTIONAL SERVICE OF CANADA'S INSTITUTIONS
#### CLASSIFICATION DE SÉCURITÉ DES ÉTABLISSEMENTS DU SERVICE CORRECTIONNEL DU CANADA

| | |
|---|---|
| The names and security classifications of the CSC's institutions are listed below by region. | Les noms et les classifications de sécurité des établissements du SCC sont énumérés par région ci-dessous. |

| Name/Nom | Security Classification/Classification de sécurité |
|---|---|
| **ATLANTIC REGION/RÉGION DE L'ATLANTIQUE** | |
| **Institutions/Établissements** | |
| Atlantic/Atlantique | Maximum/Maximale |
| Dorchester Penitentiary/ Pénitencier de Dorchester | Medium/Moyenne |
| Nova Institution for Women/ Établissement Nova pour femmes | Multi-level/ Niveaux multiples |
| Shepody Healing Centre/ Centre de rétablissement Shepody | Multi-level/ Niveaux multiples |
| Springhill | Medium/Moyenne |
| Westmorland | Minimum/Minimale |
| **Community Correctional Centres/ Centres correctionnels communautaires** | |
| Carlton Annex Community Correctional Centre/ Annexe du Centre correctionnel communautaire Carlton | Minimum/ Minimale |
| Carlton Community Correctional Centre/ Centre correctionnel communautaire Carlton | Minimum/ Minimale |
| Newfoundland and Labrador Community Correctional Centre/ Centre correctionnel communautaire de Terre-Neuve et du Labrador | Minimum/ Minimale |
| Parrtown Community Correctional Centre/ Centre correctionnel communautaire Parrtown | Minimum/ Minimale |

---

 **Correctional Service** **Service correctionnel**
Canada        Canada

**Classification of Institutions / Classification des établissements**

| Number – Numéro : | | Annex/e B |
|---|---|---|
| | Date | 2012-06-13 |
| 706 | Page: | 12 of/de 15 |

## RÉGION DU QUÉBEC/QUEBEC REGION

### Établissements/Institutions

| | |
|---|---|
| Archambault | Moyenne/Medium |
| Centre fédéral de formation/<br>Federal Training Centre | Minimale/<br>Minimum |
| Centre régional de réception/<br>Regional Reception Centre[1] | Niveaux multiples/<br>Multi-level |
| Centre régional de santé mentale/<br>Regional Mental Health Centre | Niveaux multiples/<br>Multi-level |
| Cowansville | Moyenne/Medium |
| Donnaconna | Maximale/Maximum |
| Drummond | Moyenne/Medium |
| Joliette | Niveaux multiples/Multi-level |
| La Macaza | Moyenne/Medium |
| Leclerc | Moyenne/Medium |
| Montée Saint-François | Minimale/Minimum |
| Port-Cartier | Maximale/Maximum |
| Sainte-Anne-des-Plaines | Minimale/Minimum |

### Centres correctionnels communautaires/ Community Correctional Centres/

| | |
|---|---|
| Centre correctionnel communautaire Hochelaga/<br>Hochelaga Community Correctional Centre | Minimale/<br>Minimum |
| Centre correctionnel communautaire Laferrière/<br>Laferrière Community Correctional Centre | Minimale/<br>Minimum |
| Centre correctionnel communautaire Marcel Caron/<br>Marcel Caron Community Correctional Centre | Minimale/<br>Minimum |
| Centre correctionnel communautaire Martineau/<br>Martineau Community Correctional Centre | Minimale/<br>Minimum |
| Centre correctionnel communautaire Ogilvy/<br>Ogilvy Community Correctional Centre | Minimale/<br>Minimum |

---

[1] Includes the Special Handling Unit (maximum security) / Comprend l'Unité spéciale de détention (sécurité maximale)

 **Correctional Service** **Service correctionnel**
Canada                 Canada

| Number – Numéro : | Annex/e B | |
|---|---|---|
| 706 | Date 2012-06-13 | |
| | Page: 13 of/de 15 | |

### Classification of Institutions / Classification des établissements

| Centre correctionnel communautaire Sherbrooke/ Sherbrooke Community Correctional Centre | Minimale/ Minimum |
|---|---|

#### ONTARIO REGION/RÉGION DE L'ONTARIO

**Institutions/Établissements**

| Bath | Medium/Moyenne |
|---|---|
| Beaver Creek | Minimum/Minimale |
| Collins Bay | Medium/Moyenne |
| Fenbrook | Medium/Moyenne |
| Frontenac | Minimum/Minimale |
| Grand Valley Institution for Women/ Établissement pour femmes Grand Valley | Multi-level/ Niveaux multiples |
| Joyceville | Medium/Moyenne |
| Kingston Penitentiary/ Pénitencier de Kingston | Maximum/ Maximale |
| Millhaven | Maximum/Maximale |
| Pittsburgh | Minimum/Minimale |
| Regional Treatment Centre/ Centre régional de traitement | Multi-level/ Niveaux multiples |
| Warkworth | Medium/Moyenne |

**Community Correctional Centres/ Centres correctionnels communautaires**

| Hamilton Community Correctional Centre/ Centre correctionnel communautaire de Hamilton | Minimum/ Minimale |
|---|---|
| Keele Community Correctional Centre/ Centre correctionnel communautaire Keele | Minimum/ Minimale |
| Portsmouth Community Correctional Centre/ Centre correctionnel communautaire de Portsmouth | Minimum/ Minimale |

 Correctional Service Service correctionnel
Canada Canada

**Classification of Institutions / Classification des établissements**

| Number – Numéro : | Annex/e B |
|---|---|
| 706 | Date 2012-06-13 |
| | Page: 14 of/de 15 |

## PRAIRIES REGION/RÉGION DES PRAIRIES

### Institutions/Établissements

Bowden — Medium/Moyenne

Bowden Annex/
Annexe de Bowden — Minimum/
Minimale

Drumheller — Medium/Moyenne

Drumheller Annex/
Annexe de Drumheller — Minimum/
Minimale

Edmonton — Maximum/Maximale

Edmonton Institution for Women/
Établissement d'Edmonton pour femmes — Multi-level/
Niveaux multiples

Grande Cache — Medium/Moyenne

Grierson Institution/
Établissement Grierson — Minimum/
Minimale

Okimaw Ohci Healing Lodge/
Pavillon de ressourcement Okimaw Ohci — Multi-level/
Niveaux multiples

Pê Sâkâstêw Centre/
Centre Pê Sâkâstêw — Minimum/
Minimale

Regional Psychiatric Centre/
Centre psychiatrique régional — Multi-level/
Niveaux multiples

Riverbend — Minimum/Minimale

Rockwood — Minimum/Minimale

Saskatchewan Penitentiary/
Pénitencier de la Saskatchewan — Medium/Moyenne

Saskatchewan Penitentiary – Maximum Unit/
Unité de sécurité maximale – Pénitencier de la
Saskatchewan

Stony Mountain — Medium/Moyenne

Willow Cree Healing Lodge/
Pavillon de ressourcement Willow Cree — Minimum/
Minimale

**Community Correctional Centres/
Centres correctionnels communautaires**



Correctional Service    Service correctionnel
Canada    Canada

**Classification of Institutions / Classification des établissements**

| Number – Numéro : | Date | Annex/e B |
|---|---|---|
| 706 | | 2012-06-13 |
| | Page: | 15  of/de  15 |

| | |
|---|---|
| Osborne Community Correctional Centre/ Centre correctionnel communautaire Osborne | Minimum/ Minimale |
| Oskana Community Correctional Centre/ Centre correctionnel communautaire Oskana | Minimum/ Minimale |

## PACIFIC REGION/REGION DU PACIFIQUE

### Institutions/Établissements

| | |
|---|---|
| Ferndale | Minimum/Minimale |
| Fraser Valley Institution/ Établissement de la vallée du Fraser | Multi-level/ Niveaux multiples |
| Kent | Maximum/Maximale |
| Kwìkwèxwelhp Healing Village/ Village de ressourcement Kwìkwèxwelhp | Minimum/ Minimale |
| Matsqui | Medium/Moyenne |
| Mission | Medium/Moyenne |
| Mountain | Medium/Moyenne |
| Pacific/ Pacifique | Multi-level/ Niveaux multiples |
| Regional Treatment Centre/ Centre régional de traitement | Multi-level/ Niveaux multiples |
| William Head[2] | Minimum/Minimale |

**Community Correctional Centre/**
**Centre correctionnel communautaire**

| | |
|---|---|
| Chilliwack Community Correctional Centre/ Centre correctionnel communautaire de Chilliwack | Minimum/ Minimale |

---

[2] Minimum security institution with a PIDS/ Établissement à sécurité minimale ayant un SPDI

This is Exhibit _____B_____ referred to in the

affidavit of PETER GLENN

sworn before me, this 27th

day of April, 2016.

_____
A Commissioner for Taking Affidavits

C.SINGH
LSUC#56653W



Correctional Service   Service correctionnel
Canada   Canada

# COMMISSIONER'S DIRECTIVE    714    DIRECTIVE DU COMMISSAIRE



## COMMUNITY CORRECTIONAL CENTRE STANDARDS

## NORMES RÉGISSANT LES CENTRES CORRECTIONNELS COMMUNAUTAIRES

Issued under the authority of the
Commissioner of the Correctional Service of Canada

Publiée en vertu de l'autorité du commissaire
du Service correctionnel du Canada

2010-06-25

The most up-to-date version of this document resides on CSC's InfoNet under the heading Commissioner's Directives. Individuals who choose to work with a paper copy of this document should verify that the printed version is consistent with the electronic version on the Web site. This document may contain hyperlinks to other documents that are not available with the printed version.

La dernière version de ce document se trouve dans l'InfoNet du SCC, sous la rubrique Directives du commissaire. Si vous préférez utiliser une version imprimée de ce document, assurez-vous que celle-ci correspond à la version électronique affichée dans ce site. Ce document peut contenir des hyperliens qui se rapportent à d'autres documents qu'on ne peut se procurer avec la version imprimée.

Correctional Service
Canada

Service correctionnel
Canada

| TABLE OF CONTENTS | Paragraph<br>Paragraphe | TABLE DES MATIÈRES |
|---|---|---|
| Policy Objective | 1 | Objectif de la politique |
| Authorities | 2 | Instruments habilitants |
| Cross-References | 3 | Renvois |
| Roles and Responsibilities | 4-13 | Rôles et responsabilités |
| Policy | 14-15 | Politique |
| Intake Procedures and CCC Rules | 16-17 | Les procédures d'admission aux CCC et ses règlements |
| Curfews and Leave Privileges | 18 | Heures de rentrée et privilèges de sortie |
| Duty Log | 19-21 | Registre de service |
| Access to Medication | 22-27 | Accès aux médicaments |
| Health Care | 28 | Soins de santé |
| Personal Effects | 29-42 | Effets personnels |
| Control of Entry and Exit from CCCs | 43-44 | Contrôle des entrées et sorties des CCC |
| Counts | 40-47 | Dénombrements |
| Searches | 48-49 | Fouilles |
| Searching Rooms and Other Areas of the CCC | 50-51 | Fouille des chambres et autres secteurs du CCC |
| Management of Seized Items | 52 | Gestion des objets saisis |
| Urinalysis Testing | 53 | Prise et analyse d'échantillons d'urine |
| Planning and Management of Emergencies | 54-66 | Planification et gestion des situations d'urgence |
| Technical Security Systems | 67 | Systèmes techniques de sécurité |
| Community Liaison and Outreach | 68-70 | Liaison avec la collectivité |

ARCHIVED

 **Correctional Service** **Service correctionnel**
Canada                Canada

**COMMISSIONER'S DIRECTIVE**

**DIRECTIVE DU COMMISSAIRE**

| Number - Numéro: | Date | 2010-06-25 |
|---|---|---|
| 714 | Page: | 1 of/de 13 |

| COMMUNITY CORRECTIONAL CENTRE STANDARDS | NORMES RÉGISSANT LES CENTRES CORRECTIONNELS COMMUNAUTAIRES |
|---|---|

## POLICY OBJECTIVE

1. To contribute to the reintegration of offenders, and in turn the safety of the public, staff, contractors and offenders by establishing standards and requirements for the safe operation of Community Correctional Centres (CCCs).

## AUTHORITIES

2. _Corrections and Conditional Release Act_

   _Corrections and Conditional Release Regulations_

## CROSS-REFERENCES

3. CD 006 – Classification of Institutions
   CD 081 – Offender Complaints and Grievance
   CD 234 – Claims Against the Crown and the Offender Accident Compensation Program

   CD 259 – Exposure to Second-Hand Smoke
   CD 566-1 – Control of Entry to and Exit from Institutions
   CD 566-7 – Searching of Inmates
   CD 566-9 – Searching of Cells, Vehicles and other Areas of the Institution
   CD 566-11 – Urinalysis Testing in the Community
   CD 566-12 – Personal Property of Inmates
   CD 568-5 – Management of Seized Items
   CD 600 – Management of Emergencies
   CD 650 – Technical Security Systems
   CD 715 – Community Supervision Framework

   CD 715-1 – Community Transition and Post-Release Assessment
   CD 715-2 – Community Supervision and Monitoring

## OBJECTIF DE LA POLITIQUE

1. Contribuer à la réinsertion sociale des délinquants et, ainsi, à la sécurité du public, du personnel, des contractuels et des délinquants en établissant des normes et des exigences visant à permettre aux centres correctionnels communautaires (CCC) de mener leurs activités en toute sécurité.

## INSTRUMENTS HABILITANTS

2. _Loi sur le système correctionnel et la mise en liberté sous condition_
   _Règlement sur le système correctionnel et la mise en liberté sous condition_

## RENVOIS

3. DC 006 – Classification des établissements
   DC 081 – Plaintes et griefs des délinquants
   DC 234 – Réclamations contre l'État et Programme d'indemnisation des délinquants en cas d'accident
   DC 259 – Exposition à la fumée secondaire
   DC 566-1 – Contrôle des entrées et sorties des établissements
   DC 566-7 – Fouille des détenus
   DC 566-9 – Fouille de cellules, de véhicules et d'autres secteurs de l'établissement
   DC 566-11 – Prise et analyse d'échantillons d'urine dans la collectivité
   DC 566-12 – Effets personnels des détenus
   DC 568-5 – Gestion des objets saisis
   DC 600 – Gestion des cas d'urgence
   DC 650 – Systèmes techniques de sécurité
   DC 715 – Cadre de surveillance dans la collectivité
   DC 715-1 – Transition dans la collectivité et évaluation postlibératoire
   DC 715-2 – Surveillance dans la collectivité

| | | |
|---|---|---|
| ▓▚✦▓ | Correctional Service Canada | Service correctionnel Canada |

**Community Correctional Centre Standards /**
**Normes régissant les centres correctionnels communautaires**

| Number - Numéro: | Date | 2010-06-25 |
|---|---|---|
| 714 | Page: | 2  of/de  13 |

| | |
|---|---|
| CD 715-3 – Post-Release Decision Process | DC 715-3 – Processus décisionnel postlibératoire |
| CD 719 – Long Term Supervision Orders | DC 719 – Ordonnances de surveillance de longue durée |
| CD 800 – Health Services | DC 800 – Services de santé |
| CD 870 – Maintenance Allowance for Offenders | DC 870 – Indemnité de subsistance pour les délinquants |
| GL 714-1 – Consultation Guidelines for the Establishment and/or Relocation of Community Correctional Centres | LD 714-1 – Lignes directrices pour la tenue de consultations sur l'aménagement ou la réinstallation de centres correctionnels communautaires |

**ROLES AND RESPONSIBILITIES**

4. The Assistant Commissioner, Correctional Operations and Programs (ACCOP), will authorize Guidelines 714-1 – Consultation Guidelines for the Establishment and/or Relocation of Community Correctional Centres.

5. The District Director will ensure that CCCs are in compliance with all applicable federal, territorial, provincial, municipal and local legislation and regulations.

6. The District Director will ensure that guidelines are established for curfews, leave privileges and access to the community in accordance with National Parole Board (NPB) policies, as applicable. Any NPB special conditions regarding curfews or access to the community will take precedence over these guidelines.

7. The District Director will ensure that written procedures are established for alerting staff and contractors to offenders identified in paragraph 22 so that appropriate actions and interventions can be taken without delay.

8. The District Director will ensure that staff and contractors are made aware of offender activities through regular staff meetings and regular communication between staff members and contractors at shift changes.

9. The District Director will ensure that a Search Plan is established to meet the specific needs

**RÔLES ET RESPONSABILITÉS**

4. Le commissaire adjoint des Opérations et des programmes correctionnels (CAOPC) autorisera les Lignes directrices 714-1 – Lignes directrices pour la tenue de consultations sur l'aménagement ou la réinstallation de centres correctionnels communautaires.

5. Le directeur de district veillera à ce que les CCC respectent l'ensemble des lois et règlements fédéraux, territoriaux, provinciaux, municipaux et locaux pertinents.

6. Le directeur de district s'assurera que des lignes directrices sont établies sur les heures de rentrée, les privilèges de sortie et l'accès à la collectivité, conformément aux politiques de la Commission nationale des libérations conditionnelles (CNLC), selon le cas. Toute condition spéciale de la CNLC concernant les heures de rentrée ou l'accès à la collectivité aura préséance sur les lignes directrices.

7. Le directeur de district veillera à établir des procédures écrites pour aviser les employés et les contractuels de la présence des délinquants visés au paragraphe 22, afin que des mesures appropriées puissent être prises sans délai.

8. Le directeur de district s'assurera que les employés et les contractuels sont informés des activités des délinquants au moyen de réunions périodiques du personnel et de communications régulières entre les employés et les contractuels lors des changements de quart.

9. Le directeur de district veillera à l'élaboration d'un Plan de fouille qui satisfait aux besoins

| ▓❂▓ Correctional Service Service correctionnel | | Number - Numéro: | Date 2010-06-25 |
|---|---|---|---|
| Canada Canada | | 714 | Page: 3 of/de 13 |

Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

of the facility in accordance with CD 566-7 – Searching of Inmates.

10. The District Director will ensure that reasonable procedures are in place for the management of seized items in accordance with CD 568-5 – Management of Seized Items and for the control of items critical to the safety and security of the CCC.

11. The District Director will ensure that the CCC has written contingency plans (including up-to-date floor plans) for dealing with fire, medical emergencies (including an influenza pandemic), security incidents, and natural disasters, and personnel will be trained accordingly.

12. The District Director will ensure that a strategy is in place to accommodate the practice of Aboriginal spirituality and culture and other spiritual practices if required.

13. CCC staff and contractors will ensure that they are familiar with the law, policies and standards applicable to the operation of the CCC.

## POLICY

14. CCCs are federally operated community-based residential facilities that provide a structured living environment with 24-hour supervision, programs, and intervention for the purpose of safely reintegrating the offender into the community. These facilities, which may also have an enhanced programming component, accommodate offenders under federal jurisdiction who have been released to the community on unescorted temporary absences, day parole, full parole, work releases, statutory release, as well as those subject to long-term supervision orders.

15. In certain circumstances where specialized resources are in place, CCCs may accommodate offenders with special needs (including those with mental health problems, physical or cognitive disabilities) as well as older offenders (including those with chronic illnesses and palliative care needs). CCCs

particuliers de l'établissement, suivant la DC 566-7 – Fouille des détenus.

10. Le directeur de district s'assurera que des procédures raisonnables sont en place pour gérer les objets saisis, conformément à la DC 568-5 – Gestion des objets saisis, et pour contrôler les objets pouvant menacer la sécurité des CCC.

11. Le directeur de district veillera à ce que le CCC possède des plans d'urgence écrits (y compris des plans d'étage à jour) en cas de feu, d'urgence médicale (incluant une pandémie de grippe), d'incident de sécurité ou de catastrophe naturelle, et les employés seront formés en conséquence.

12. Le directeur de district veillera à établir une stratégie permettant le respect des pratiques propres à la spiritualité et à la culture des Autochtones et toute autre pratique spirituelle, au besoin.

13. Il incombe aux employés et aux contractuels du CCC de se familiariser avec la loi, les politiques et les normes ayant trait aux activités du CCC.

## POLITIQUE

14. Les CCC sont des établissements résidentiels communautaires gérés par l'administration fédérale et offrant un milieu de vie structuré avec une surveillance 24 heures sur 24 ainsi que des programmes et des interventions en vue de la réinsertion sociale sécuritaire du délinquant. Ces établissements, où des programmes spécialisés peuvent être dispensés, accueillent des délinquants sous responsabilité fédérale libérés dans la collectivité aux termes d'une permission de sortir sans escorte, d'une semi-liberté, d'une libération conditionnelle totale, d'un placement à l'extérieur ou d'une libération d'office, ainsi que les délinquants visés par une ordonnance de surveillance de longue durée.

15. Là où les ressources spécialisées sont en place, les CCC peuvent accueillir des délinquants qui ont des besoins spéciaux (y compris ceux ayant des problèmes de santé mentale ou des déficiences physiques ou cognitives) ainsi que des délinquants âgés (incluant ceux atteints de maladies chroniques ou nécessitant des soins

Correctional Service   Service correctionnel
Canada   Canada
Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

| Number - Numéro: | | Date | 2010-06-25 |
| 714 | | Page: | 4 of/de 13 |

facilitate the delivery of specialized programs and services to a mixed offender population.

INTAKE PROCEDURES AND CCC RULES

16. Offenders in CCCs will be provided with a copy of the CCC's rules and regulations at admission. Form CSC/SCC 1331 – Initial Interview Checklist signed by the offender will be maintained on his or her file.

17. The intake procedures will address the following areas at a minimum:

   a. supervision requirements (as per case management policies);

   b. procedures to follow to obtain dental or medical care (including prescriptions);

   c. determination of need for daily incidental allowance and the amount that will be provided (if any), in accordance with CD 870 – Maintenance Allowance for Offenders

   d. policies regarding room searches, exposure to second hand smoke, cellular telephones, etc.;

   e. disciplinary actions or sanctions that may be taken for failing to adhere to the rules and regulations of the CCC;

   f. sign-in and sign-out procedures, curfews and leave privileges (including overnight and weekend passes);

   g. personal effects policy, including handling of funds and property left at the CCC, as well as storage of personal possessions;

   h. guidelines regarding visitors;

   i. evacuation and emergency procedures;

palliatifs). Les CCC facilitent la prestation de programmes et de services spécialisés à une population diversifiée de délinquants.

LES PROCEDURES D'ADMISSION AU CCC ET SES RÈGLEMENTS

16. Dès leur admission au CCC, les délinquants recevront une copie des règlements du CCC. Le formulaire CSC/SCC 1331 – Liste de contrôle pour l'entrevue initiale, signé par le délinquant, sera conservé dans son dossier.

17. Les procédures d'admission porteront tout au moins sur les domaines suivants :

   a. les exigences de surveillance (en conformité avec les politiques de gestion des cas);

   b. les procédures à suivre pour l'obtention de soins dentaires ou médicaux (y compris les prescriptions);

   c. la détermination du besoin d'une allocation quotidienne et du montant à accorder (le cas échéant), selon la DC 870 – Indemnité de subsistance pour les délinquants;

   d. les politiques concernant les fouilles de chambres, l'exposition à la fumée secondaire, les téléphones cellulaires, etc.;

   e. les mesures et sanctions disciplinaires qui peuvent être appliquées suivant le non-respect des règlements du CCC;

   f. les procédures d'entrée et de sortie, les heures de rentrée et les privilèges de sortie (y compris les permissions de sortir pour la nuit et la fin de semaine);

   g. la politique concernant les effets personnels, y compris la façon de traiter les fonds et les biens laissés au CCC, ainsi que l'entreposage des biens personnels;

   h. les lignes directrices ayant trait aux visiteurs;

   i. les procédures d'évacuation et d'urgence;

Correctional Service Service correctionnel
Canada Canada
Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

| Number - Numéro: | Date | 2010-06-25 |
|---|---|---|
| 714 | Page: 5 | of/de 13 |

j. CD 081 – Offender Complaints and Grievances and related procedures (these will be posted in the CCC); and

k. any additional CCC rules and regulations specific to the individual facility.

## CURFEWS AND LEAVE PRIVILEGES

18. Restrictions on access to the community will be determined based on the policies and conditions imposed by the NPB in addition to the offender's behaviour and public safety concerns as evaluated by CCC staff.

## DUTY LOG

19. It is mandatory that the CCC duty log be maintained up to date. This log is also a formal record for documenting the following:

a. activities;

b. incidents;

c. offender movement; and

d. offender behaviour.

20. CCC staff and contractors coming on shift who have a need to know will be briefed verbally or in writing using the duty log before assuming responsibility for the shift.

21. CCC staff and contractors will be alerted to the following offenders to ensure that any required interventions can be made immediately:

a. offenders who have been convicted of an offence or offences causing death or serious harm to others;

b. offenders who are assessed as having a high potential for violent or suicidal behaviour;

j. la DC 081 – Plaintes et griefs des délinquants et les procédures connexes (qui seront affichées dans le CCC);

k. tout autre règlement propre au CCC concerné.

## HEURES DE RENTRÉE ET PRIVILÈGES DE SORTIE

18. Les restrictions concernant l'accès à la collectivité seront déterminées en fonction des politiques et des conditions imposées par la CNLC ainsi que du comportement du délinquant et des considérations liées à la sécurité publique, selon l'évaluation effectuée par le personnel du CCC.

## REGISTRE DE SERVICE

19. Le registre de service du CCC doit être tenu à jour. Il constitue un document officiel servant à consigner des renseignements au sujet :

a. des activités;

b. des incidents;

c. des déplacements des délinquants;

d. du comportement des délinquants.

20. Les employés et les contractuels du CCC qui commencent leur quart de travail et qui ont besoin de savoir recevront des consignes verbalement ou par écrit, par le biais du registre de service, avant d'entrer en fonction.

21. Les employés et les contractuels du CCC seront mis au courant de la présence des délinquants suivants afin que toute mesure requise puisse être prise sans délai :

a. les délinquants reconnus coupables d'une ou de plusieurs infractions ayant causé la mort ou un dommage grave à une autre personne;

b. les délinquants évalués comme présentant un risque élevé de comportement violent ou suicidaire;

<table>
<tr><td>▓▓ ⚜ ▓▓   Correctional Service   Service correctionnel<br>Canada   Canada<br>Community Correctional Centre Standards /<br>Normes régissant les centres correctionnels communautaires</td><td>Number - Numéro:<br><br>714</td><td>Date   2010-06-25<br><br>Page:   6   of/de   13</td></tr>
</table>

c. offenders whose medical or psychiatric history indicates a need for special attention;

d. offenders whose conviction has attracted considerable public attention; and

e. any Schedule 1 offender.

## ACCESS TO MEDICATION

22. Upon admission, the offender will be asked to identify any allergies or medical conditions that may require the urgent intervention of staff or contractors and/or emergency medical personnel.

23. Offenders are responsible for carrying on their person any medication that requires immediate and/or urgent use (e.g. nitroglycerine tablets or spray, inhalers for asthma, Epipens, etc.).

24. Methadone shall not be stored in a CCC. Offenders residing in a CCC must attend the pharmacy or methadone clinic to take methadone. Parole Officers must ensure that the community methadone prescriber is aware that methadone carries cannot be stored at the CCC.

25. All other medication will be stored in a secure area (either in a central location or in the offender's locked space). The location will be determined by the appropriate CCC staff on a case by case basis. Offenders are responsible for self-administering their own medication.

26. An individual medication log is required in those CCCs where health care staff are responsible for the administration of medication.

27. Offenders leaving the CCC on overnight leave privileges are responsible for requesting and taking with them the amount of medication required for the duration of the absence. Staff will remind offenders who may need assistance.

c. les délinquants ayant besoin d'une attention particulière, compte tenu de leurs antécédents médicaux ou psychiatriques;

d. les délinquants dont la condamnation a beaucoup retenu l'attention du public;

e. tout délinquant qui a commis une infraction mentionnée à l'annexe I.

## ACCÈS AUX MÉDICAMENTS

22. Lors de son admission, le délinquant se verra demander s'il souffre d'allergies ou de troubles médicaux pouvant nécessiter l'intervention du personnel ou des contractuels, ou encore des soins médicaux d'urgence.

23. Il revient au délinquant de veiller à avoir avec lui tout médicament qu'il doit rapidement prendre en cas d'urgence (p. ex., nitroglycérine en comprimés ou par pulvérisation, inhalateurs pour l'asthme et Epipen).

24. La méthadone ne doit pas être entreposée au CCC. Les délinquants qui résident dans un CCC doivent se rendre à la pharmacie ou à la clinique de traitement pour prendre leur dose. Les agents de libération conditionnelle doivent s'assurer que le médecin dans la collectivité qui prescrit la méthadone sait que les doses de méthadone ne peuvent être gardées au CCC.

25. Tous les autres médicaments seront entreposés en lieu sûr (soit dans un endroit central ou dans un espace verrouillé appartenant au délinquant). Le personnel compétent du CCC choisira l'endroit approprié au cas par cas. Les délinquants seront chargés de prendre eux-mêmes leurs médicaments.

26. Dans les CCC où l'administration des médicaments est confiée au personnel de soins de santé, il faut tenir un registre d'administration des médicaments pour chaque cas.

27. Les délinquants qui se voient accorder un privilège de sortie pour la nuit seront chargés de demander et d'apporter avec eux la quantité de médicaments qu'ils devront prendre pendant leur absence. Le personnel rappellera cela aux délinquants pouvant avoir besoin d'assistance.

Correctional Service   Service correctionnel
Canada   Canada

Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

| Number - Numéro: | Date | 2010-06-25 |
|---|---|---|
| 714 | Page: | 7 of/de 13 |

HEALTH CARE

28. The provision of health care to offenders residing in CCCs will be in accordance with CSC policies on health services and where applicable, provincial health care plans.

PERSONAL EFFECTS

29. Upon admission to the CCC, offenders will be informed verbally and in writing of procedures regarding personal property, the allowable amount of personal effects and procedures related to the storage, disposal and shipment to the next of kin or community contact after 30 days should the offender abscond.

30. Offenders will be advised that they are responsible for effects they have in their possession while residing at the facility. CSC is only responsible for those effects stored by the CCC.

31. Offenders will be advised that CSC is not responsible for any effects lost or stolen that are kept in an offender's room.

32. Offenders will be expected to store those effects that exceed the allowable limit and any other personal property outside of the CCC.

33. Offenders will be provided with an individualized locked storage space to securely store their effects. For security reasons, staff must have access to these storage spaces.

34. Property for storage is restricted to 0.085 cubic meter. Items that require additional space are left to the discretion of the appropriate CCC staff.

35. Effects stored by the CCC are to be kept in a secure locked room or secure storage units and will be recorded and tagged while stored.

36. Items removed from storage are recorded as removed, and are not permitted to be returned to storage, unless it is a result of a new release

SOINS DE SANTÉ

28. Les soins de santé offerts aux délinquants qui résident dans les CCC seront prodigués en conformité avec les politiques du SCC sur les services de santé et, s'il y a lieu, avec les régimes de soins de santé des provinces.

EFFETS PERSONNELS

29. Au moment de leur admission dans un CCC, les délinquants seront informés verbalement et par écrit des procédures concernant leurs effets personnels, de la quantité permise de tels d'effets ainsi que des procédures d'entreposage, d'aliénation et d'envoi des effets au plus proche parent ou au contact dans la collectivité après 30 jours si le délinquant se soustrait à la justice.

30. Les délinquants seront mis au courant qu'ils sont responsables des effets personnels en leur possession durant leur séjour à l'établissement. Le SCC n'est responsable que des effets personnels entreposés par le CCC.

31. Les délinquants seront informés que le SCC ne peut être tenu responsable des effets personnels perdus ou volés dans leur chambre.

32. Les délinquants devront entreposer les effets excédant la limite permise et tout autre effet personnel à l'extérieur du CCC.

33. Les délinquants se verront attribuer une aire d'entreposage personnelle verrouillable pour y ranger leurs effets personnels de façon sécuritaire. Par mesure de sécurité, le personnel doit pouvoir accéder à cette aire.

34. Les biens pouvant être entreposés ne doivent pas occuper plus de 0,085 mètre cube. Les cas ayant besoin de plus d'espace seront laissés à la discrétion du personnel compétent du CCC.

35. Les effets personnels entreposés par le CCC doivent être enregistrés, étiquetés et gardés dans une salle verrouillée ou un contenant sûr.

36. Lorsque l'on retire un objet de l'entreposage, il faut l'indiquer dans les registres. Cet objet ne doit pas être entreposé à nouveau, à moins que

Correctional Service   Service correctionnel
Canada                 Canada

Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

| Number - Numéro: | Date | 2010-06-25 |
|---|---|---|
| 714 | Page: | 8  of/de  13 |

or cancellation of suspension, or a seasonal item (e.g. bicycle).

37. When an offender's release is suspended, normally two approved staff members or contractors will remove and catalogue all effects using form CSC/SCC 0872 – Inmate Personal Property (Cell Property Removal), including those effects held in storage on behalf of the offender.

38. CCC staff and contractors will ensure that the effects recorded on form CSC/SCC 0872 – Inmate Personal Property (Cell Property Removal) [or other appropriate form used by the CCC for this purpose] are packed and either transported to the offender or next of kin in a safe and secure manner. If required, arrangements can be made to have next of kin retrieve the offender's effects at the CCC. Proof of identity as well as a signature from next of kin is required upon receipt of all effects.

39. Following the suspension of an offender release or walkaway from the CCC, any electronic equipment such as televisions, stereos, compact disc players, radios, cellular telephones, etc. will be checked when removed from the offender's room to determine their general working condition. The staff member or contractor will record the status of the electronic equipment on form CSC/SCC 0872 – Inmate Personal Property (Cell Property Removal) [or other appropriate form used by the CCC for this purpose].

40. CCC staff and contractors are responsible for items recorded on form CSC/SCC 0872 – Inmate Personal Property (Cell Property Removal) [or other appropriate form used by the CCC for this purpose]. Any loss or damage to the effects can be claimed by the offender in accordance with CD 234 – Claims Against the Crown and the Offender Accident Compensation Program.

41. In the event that there is no known next of kin

le délinquant soit remis en liberté, que l'on annule la suspension de sa liberté ou qu'il s'agisse d'un objet saisonnier (comme un vélo).

37. D'ordinaire, lorsque la liberté du délinquant est suspendue, deux employés ou contractuels compétents procéderont au retrait et à l'enregistrement de tous ses effets en utilisant le formulaire CSC/SCC 0872 – Effets personnels du détenu (Retraits de la cellule), y compris les effets entreposés au nom du délinquant.

38. Les employés du CCC et les contractuels veilleront à ce que les effets inscrits sur le formulaire CSC/SCC 0872 – Effets personnels du détenu (Retraits de la cellule) [ou autre formulaire pertinent utilisé à cette fin par le CCC] soient emballés et envoyés au délinquant ou à son plus proche parent de façon sûre et sécuritaire. Si nécessaire, il est possible de prendre des mesures pour que le parent le plus proche vienne les chercher au CCC. Une preuve d'identité ainsi qu'une signature du plus proche parent sont exigées à la réception des effets.

39. À la suite de la suspension de la liberté d'un délinquant ou lorsque ce dernier s'est enfui du CCC, tous les appareils électroniques comme les téléviseurs, les chaînes stéréophoniques, les lecteurs de disques compacts, les postes de radio et les téléphones cellulaires seront examinés lors de leur retrait de la chambre du délinquant afin d'en vérifier l'état de fonctionnement. L'employé ou le contractuel consignera l'état des appareils électroniques sur le formulaire CSC/SCC 0872 – Effets personnels du détenu (Retraits de la cellule) [ou autre formulaire pertinent utilisé à cette fin par le CCC].

40. Le personnel du CCC et les contractuels sont responsables des objets inscrits sur le formulaire CSC/SCC 0872 – Effets personnels du détenu (Retraits de la cellule) [ou autre formulaire pertinent utilisé à cette fin par le CCC]. Le délinquant peut présenter une demande d'indemnisation pour tout objet perdu ou endommagé suivant la DC 234 – Réclamations contre l'État et programme d'indemnisation des délinquants en cas d'accident.

41. Lorsqu'on ne connaît pas de proche parent ou

| ▓✚▓ Correctional Service Service correctionnel Canada Canada | Number - Numéro: | Date | 2010-06-25 |
|---|---|---|---|

Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

**714** — Page: **9** of/de **13**

---

or community contact, the offender's personal property is disposed of in accordance with underline{section 85} of the CCRR.

42. Offenders in CCC are permitted to use cellular telephones for communication purposes, at the discretion of the appropriate CCC staff.

### CONTROL OF ENTRY AND EXIT FROM CCCS

43. The CCC procedures will include:

   a. a process of authorization for, and recording of, entry and exit at scheduled times;

   b. procedures to monitor and control the movement of persons (offenders and visitors) in the CCC.

44. CCC offenders' approved visitors who have not reached the age of majority in the province in which the CCC is located will be identified and signed in by the child's parent or legal guardian with photo ID. CSC reserves the right to refuse access to the CCC.

### COUNTS

45. Staff and contractors will conduct, at a minimum, two counts during each 24-hour period, one of which shall be at the commencement of the midnight shift. All counts will ensure the presence of a live breathing body. All counts will be documented on the underline{Resident Count Sheet (form CSC/SCC 1296)}. In exceptional circumstances where it may be necessary to accommodate a woman offender in a CCC, female staff must be available to complete counts during the night shifts.

46. The CCC underline{Sign In / Sign Out Sheet (form CSC/SCC 1297)} will be used to record each resident's departures and arrivals. A system will be in place to safeguard the privacy of offender information.

---

de contact dans la collectivité pour le délinquant, il faut disposer des effets personnels de ce dernier en conformité avec underline{l'article 85} du RSCMLC.

42. Les délinquants qui résident dans un CCC peuvent utiliser des téléphones cellulaires aux fins de communication, à la discrétion du personnel compétent du CCC.

### CONTRÔLE DES ENTRÉES ET SORTIES DES CCC

43. Les procédures du CCC incluront :

   a. un processus d'autorisation et de consignation pour les entrées et les sorties selon l'horaire prévu;

   b. des procédures pour contrôler les allées et venues des personnes (délinquants et visiteurs) dans le CCC.

44. Les personnes qui sont autorisées à rendre visite aux délinquants mais qui n'ont pas atteint l'âge de la majorité dans la province où est situé le CCC seront identifiées et inscrites au registre par le parent de l'enfant ou par son tuteur légal, qui devra présenter une carte d'identité à photo. Le SCC se réserve le droit de refuser l'accès au CCC.

### DÉNOMBREMENTS

45. Les employés et les contractuels procéderont, tout au moins, à deux dénombrements au cours d'une période de vingt-quatre heures et l'un de ceux-ci doit être effectué au début du quart de nuit. Lors de tous les dénombrements, on s'assurera que les délinquants sont vivants. Tous les dénombrements seront consignés sur la underline{Fiche de dénombrement des résidents (formulaire CSC/SCC 1296)}. Dans des situations exceptionnelles où il est nécessaire d'héberger une délinquante dans un CCC, du personnel féminin doit être disponible pour effectuer les dénombrements pendant le quart de travail de nuit.

46. Le underline{Registre d'entrée / sortie (formulaire CSC/SCC 1297)} du CCC servira à consigner les départs et les arrivées de chaque résident. Un système sera mis en place pour protéger les renseignements personnels des délinquants.

---

47. Consistent with the applicable Standing Order, staff and contractors on the day and evening shifts will verify that the offenders in the facility are accounted for and alive. Such verifications will be recorded in the duty log.

**SEARCHES**

48. The CCC Search Plan will include, but not be limited to, all the elements outlined in Annex A of CD 566-7 – Searching of Inmates, the requirements of the CCRA and CCRR as well as all routine circumstances for searches specific to the facility.

49. CCCs are not required to have a section in their Search Plan concerning the routine searching of offenders.

**SEARCHING ROOMS AND OTHER AREAS OF THE CCC**

50. All routine searches of rooms and other areas of the CCC will be specified in the Search Plan. The CCC Search Plan will include, as a minimum, a **thorough visual inspection** of all offender-accessible areas within a 30-day period. A thorough visual inspection is defined as a routine inspection to visually detect contraband or unauthorized items which may jeopardize the safety or security of the facility. This does not normally include opening drawers, closets, etc. but may include inspecting under beds or behind dressers.

51. Routine searches will normally be conducted in the presence of another staff member or contractor.

**MANAGEMENT OF SEIZED ITEMS**

52. The CCC will have procedures in place for the seizure and control of contraband and unauthorized items. The CCC will designate a seizure control area for seized items.

47. Conformément à l'ordre permanent applicable, les employés et les contractuels de service pendant les quarts de jour et les quarts de soir vérifieront où se trouve chacun des résidents de l'établissement et qu'ils sont vivants. Ces vérifications seront consignées dans le registre de service.

**FOUILLES**

48. Le Plan de fouille du CCC inclura, sans s'y limiter, tous les éléments figurant à l'annexe A de la CD 566-7 – Fouille des détenus, il répondra aux exigences de la LSCMLC et du RSCMLC et il exposera l'ensemble des circonstances courantes pouvant donner lieu aux fouilles dans l'établissement.

49. Les fouilles ordinaires des délinquants n'ont pas besoin d'être prévues dans le Plan de fouille du CCC.

**FOUILLE DES CHAMBRES ET AUTRES SECTEURS DU CCC**

50. Toutes les fouilles ordinaires des chambres et autres secteurs du CCC seront prévues dans le Plan de fouille du CCC. Ce plan comprendra tout au moins une **inspection visuelle exhaustive** de tous les secteurs accessibles aux délinquants, par période de 30 jours. Une inspection visuelle exhaustive s'entend d'une inspection ordinaire visant à déceler visuellement des objets interdits ou non autorisés qui pourraient compromettre la sécurité de l'établissement. Une telle fouille exclut généralement l'ouverture des tiroirs, des placards ou d'autres compartiments, mais peut inclure une inspection sous les lits ou derrière les commodes.

51. Les fouilles ordinaires seront normalement menées en présence d'un autre membre du personnel ou d'un contractuel.

**GESTION DES OBJETS SAISIS**

52. Le CCC veillera à la mise en place de procédures pour saisir et contrôler les objets interdits et les objets non autorisés. Il faudra désigner un endroit dans le CCC où seront gardés les objets saisis.

Correctional Service   Service correctionnel
Canada                 Canada
Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

| Number - Numéro: | Date | 2010-06-25 |
|---|---|---|
| 714 | Page: | 11 of/de 13 |

## URINALYSIS TESTING

53. Urinalysis testing in CCCs will be conducted in accordance with CD 566-11 – Urinalysis Testing in the Community.

## PLANNING AND MANAGEMENT OF EMERGENCIES

54. The District Director will ensure that one CCC staff member will be identified as responsible for the coordination of all activities related to contingency planning in order to ensure an appropriate emergency response at each level.

55. A written protocol will be established for in-house arrests.

56. Reasonable procedures will be established for securing a crime scene until the arrival of the police.

57. The CCC contingency plans will be discussed regularly at staff meetings.

58. CCC staff and contractors who have a need to know will have access to the contingency plans.

59. The CCC contingency plans will be reviewed on an annual basis.

60. The CCC must have a reliable sign-in and sign-out system that ensures the means to verify the location and safety of CCC staff and contractors.

61. Staff and contractors will wear a personal portable alarm in the CCC.

62. The District Director will ensure liaison with local emergency personnel to enhance communication and facilitate their involvement in contingency planning.

## PRISE ET ANALYSE D'ÉCHANTILLONS D'URINE

53. La prise et l'analyse d'échantillons d'urine dans les CCC seront effectuées conformément à la DC 566-11 – Prise et analyse d'échantillons d'urine dans la collectivité.

## PLANIFICATION ET GESTION DES SITUATIONS D'URGENCE

54. Le directeur de district veillera à ce qu'un membre du personnel du CCC soit nommé responsable de la coordination de l'ensemble des activités liées à la planification d'urgence, afin d'assurer une réaction appropriée à tous les échelons lors d'une situation d'urgence.

55. Un protocole écrit sera établi pour le traitement des arrestations sur place.

56. Des procédures raisonnables seront établies pour contrôler l'accès à tout lieu où a été commis un crime, jusqu'à l'arrivée de la police.

57. Les plans d'urgence du CCC seront périodiquement examinés aux réunions du personnel.

58. Les employés et les contractuels du CCC qui ont besoin de savoir auront accès aux plans d'urgence.

59. Les plans d'urgence du CCC seront révisés annuellement.

60. Le CCC doit se doter d'un système fiable de contrôle des allées et venues, qui permet de savoir où se trouvent les employés et les contractuels du CCC et si ces derniers sont en sécurité.

61. Les employés et les contractuels porteront des dispositifs d'alarme personnels portatifs dans le CCC.

62. Le directeur de district assurera la liaison avec le personnel local affecté aux urgences en vue d'accroître les communications et de faciliter leur participation aux plans d'urgence.

| | Correctional Service | Service correctionnel | Number - Numéro: | | Date | 2010-06-25 |
|---|---|---|---|---|---|---|
| | Canada | Canada | | 714 | Page: | 12 of/de 13 |

Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

63. Applicable licenses or certificates will be posted in a public area. The CCC's premises and equipment will conform to applicable zoning, health, safety, building and fire codes and regulations.

64. There will be a first aid kit available for each shift with an inventory of medical contents approved by the St. John Ambulance or the Canadian Red Cross or equivalent. These contents will be inspected monthly.

65. There will be at least one staff member or contractor on each shift with valid first aid and CPR certification.

66. Offenders residing at a CCC will have access to a telephone. Emergency numbers will be posted next to all telephones in the facility.

## TECHNICAL SECURITY SYSTEMS

67. Technical security systems, such as alarms, closed circuit video equipment and other equipment will be subject to regular maintenance and inspection program.

## COMMUNITY LIAISON AND OUTREACH

68. The CCC will have an active approach in the community, and if applicable, will liaise with local community partners including police, Citizen Advisory Committees, advocacy groups, victims groups, citizens and other persons or agencies involved in the criminal justice system.

69. Where possible, offenders residing at the CCC will be encouraged and provided opportunities to participate in activities that involve giving back to the community.

63. Les licences ou certificats pertinents seront affichés dans une aire publique. Les locaux et le matériel des CCC respecteront tous les codes et règlements relatifs au zonage, à la santé, à la sécurité, à la construction et à la protection contre les incendies.

64. Il y aura, pour chaque quart, une trousse de premiers soins dont le contenu sera approuvé par l'Ambulance Saint-Jean, la Croix-Rouge canadienne ou un organisme équivalent. Ces trousses seront inspectées une fois par mois.

65. Il y aura au moins, à chaque équipe de travail au moins un employé ou un contractuel titulaire d'un certificat valide de secourisme et d'une attestation valide de compétence en RCR.

66. Les délinquants qui résident dans un CCC auront accès à un téléphone. Les numéros d'urgence seront affichés près de chacun des téléphones de l'établissement.

## SYSTÈMES TECHNIQUES DE SÉCURITÉ

67. Les systèmes techniques de sécurité, tels que les systèmes d'alarme, le matériel vidéo en circuit fermé et autres dispositifs, feront l'objet d'un programme périodique d'entretien et d'inspection.

## LIAISON AVEC LA COLLECTIVITÉ

68. Le CCC s'impliquera activement dans la collectivité et, s'il y a lieu, entretiendra des liens avec des partenaires communautaires locaux, y compris la police, les Comités consultatifs de citoyens, les organisations de défense de droits, les regroupements de victimes, les citoyens et d'autres personnes ou organismes associés au système de justice pénale.

69. Les délinquants qui résident au CCC seront, dans la mesure du possible, encouragés à participer à des activités visant à redonner à la collectivité, et on leur fournira des occasions en ce sens.

| | | Number - Numéro: | Date | 2010-06-25 |
|---|---|---|---|---|
| Correctional Service Canada | Service correctionnel Canada | 714 | Page: 13 of/de 13 | |

Community Correctional Centre Standards /
Normes régissant les centres correctionnels communautaires

70. Volunteers and volunteer activities will complement the resources made available to the offenders by the CCC. The CCC will effectively encourage volunteer involvement to assist and interact with individual offenders as appropriate.

70. Des bénévoles et des activités bénévoles appuieront les ressources mises à la disposition des délinquants par le CCC. Le CCC encouragera les bénévoles à interagir avec des délinquants et à les aider s'il y a lieu.

Commissioner,

Le Commissaire,

*Original signed by / Original signé par :*

Don Head



This is Exhibit _____ C _____ referred to in the

affidavit of PETER GLENN

sworn before me, this 27th

day of April, 2016.

A Commissioner for Taking Affidavits

C·SINGH
LSUC# 56653W

Correctional Service
Canada

Service correctionnel
Canada

# COMMISSIONER'S DIRECTIVE

# 715

# DIRECTIVE DU COMMISSAIRE



# COMMUNITY SUPERVISION FRAMEWORK

# CADRE DE SURVEILLANCE DANS LA COLLECTIVITÉ

Issued under the authority of the
Commissioner of the Correctional Service of Canada

Publiée en vertu de l'autorité du commissaire
du Service correctionnel du Canada

2012-06-13

*The most up-to-date version of this document resides on CSC's InfoNet. Individuals who choose to work with a paper copy of this document should verify that the printed version is consistent with the electronic version.*

*La dernière version de ce document se trouve dans le site InfoNet du SCC. Si vous préférez utiliser une version imprimée de ce document, assurez-vous que celle-ci correspond à la version électronique affichée dans ce site.*

Correctional Service
Canada

Service correctionnel
Canada

| TABLE OF CONTENTS | Paragraph Paragraphe | TABLE DES MATIÈRES |
|---|---|---|

Policy Objective | 1 | Objectif de la politique

Authority | 2 | Instrument habilitant

Application | 3 | Champ d'application

Responsibilities | 4-9 | Responsabilités

Procedures | 10 | Procédures

Enquiries | 11 | Demandes de renseignements

Cross-References and Definition | Annex/e A | Renvois et définition

Correctional Service
Canada

Service correctionnel
Canada

**Community Supervision Framework /
Cadre de surveillance dans la collectivité**

| Number – Numéro : | Date | 2012-06-13 |
|---|---|---|
| 715 | Page: | 1 of/de 7 |

## POLICY OBJECTIVE

1. To establish a framework for the supervision and support of offenders in the community that promotes their reintegration and active involvement in meeting the objectives of their Correctional Plan, with the protection of society as the paramount consideration.

## AUTHORITY

2. *Corrections and Conditional Release Act* (CCRA), sections 3, 3.1, 4, 5, 15.1, 26, 116, 117, 128, 135, 135.1, 136, 137 and 137.1

## APPLICATION

3. This Commissioner's Directive applies to staff responsible for community operations and/or who work in a community operational setting.

## RESPONSIBILITIES

4. The Regional Deputy Commissioner will ensure that:

   a. community supervision policies are effectively communicated to operational units;

   b. support to operational units is provided;

   c. operational reviews of policies and procedures are conducted on a regular basis;

   d. any policy gaps are promptly communicated to the Assistant Commissioner, Correctional Operations and Programs; and

   e. significant staff safety issues are dealt with as per the Employee Protection Program Guidelines.

5. The District Director will:

   a. establish a process to monitor compliance and the effective implementation of policies;

   b. maintain an up-to-date inventory of community resources and services and review it annually to identify gaps;

## OBJECTIF DE LA POLITIQUE

1. Établir un cadre pour la surveillance et le soutien des délinquants dans la collectivité qui favorise leur réinsertion sociale et les incite à participer activement à l'atteinte des objectifs de leur Plan correctionnel en faisant en sorte que la protection de la société demeure le critère prépondérant.

## INSTRUMENT HABILITANT

2. *Loi sur le système correctionnel et la mise en liberté sous condition* (LSCMLC), articles 3, 3.1, 4, 5, 15.1, 26, 116, 117, 128, 135, 135.1, 136, 137 et 137.1

## CHAMP D'APPLICATION

3. La présente directive du commissaire s'applique aux membres du personnel responsables des opérations dans la collectivité et/ou qui y travaillent.

## RESPONSABILITÉS

4. Le sous-commissaire régional veillera à ce que :

   a. les politiques régissant la surveillance dans la collectivité soient efficacement communiquées aux unités opérationnelles;

   b. un soutien soit offert aux unités opérationnelles;

   c. des examens opérationnels des politiques et des procédures soient effectués régulièrement;

   d. toute lacune observée dans les politiques soit communiquée sans délai au commissaire adjoint, Opérations et programmes correctionnels;

   e. les questions importantes concernant la sécurité du personnel soient réglées conformément aux Lignes directrices sur le Programme de protection des employés.

5. Le directeur de district :

   a. établira un processus pour vérifier la conformité aux politiques et leur mise en œuvre efficace;

   b. tiendra un répertoire à jour des ressources et des services communautaires et l'examinera annuellement pour en relever les lacunes;

| | | | Number – Numéro : | Date | 2012-06-13 |
|---|---|---|---|---|---|
| ▦ ❀ ▦ | Correctional Service Canada | Service correctionnel Canada | | | |
| | **Community Supervision Framework / Cadre de surveillance dans la collectivité** | | **715** | Page: | **2**  of/de  **7** |

c.  ensure that information is provided to the Victim Services Unit as per section 26 of the CCRA and CD 784 – Information Sharing Between Victims and the Correctional Service of Canada;

d.  ensure that all incidents involving community staff safety are documented, monitored and action is taken;

e.  ensure parole offices and Community Correctional Centres have a sign-in/sign-out system in place and up-to-date emergency plans;

f.  ensure policy gaps are promptly communicated to the Regional Deputy Commissioner;

g.  ensure supervision of offenders is maintained during staff absences;

h.  ensure communication processes are in place to manage the supervision of offenders residing in a community-based residential facility as per the contract between CSC and the agency;

i.  ensure the territorial boundaries for each parole office are clearly defined; and

j.  ensure that when volunteers are used to support reintegration efforts of offenders:

    i.  processes as per CD 775 – Volunteers and Volunteer Activities are followed,

    ii.  information is provided to the volunteer about the offender in order that any risk to their personal safety is minimized, and

    iii.  tandem supervision practices are respected, as applicable.

c.  veillera à ce que des renseignements soient fournis au Bureau des services aux victimes conformément à l'article 26 de la LSCMLC et à la DC 784 – Communication de renseignements entre les victimes et le Service correctionnel du Canada;

d.  s'assurera que tous les incidents ayant trait à la sécurité du personnel dans la collectivité sont consignés et surveillés et que des mesures sont prises afin d'y donner suite;

e.  veillera à ce que les bureaux de libération conditionnelle et les centres correctionnels communautaires possèdent un système de signature à l'arrivée et au départ ainsi que des plans d'urgence à jour;

f.  s'assurera que les lacunes dans les politiques sont signalées sans délai au sous-commissaire régional;

g.  veillera à ce que la surveillance des délinquants soit assurée durant les absences du personnel;

h.  s'assurera que des processus de communication sont en place pour gérer la surveillance des délinquants qui résident dans un établissement résidentiel communautaire, conformément au contrat conclu entre le SCC et l'organisme;

i.  s'assurera que le territoire relevant de chaque bureau de libération conditionnelle est clairement délimité;

j.  lorsque des bénévoles sont utilisés pour soutenir les efforts de réinsertion sociale des délinquants, veillera à ce que :

    i.  les processus décrits dans la DC 775 – Bénévoles et activités bénévoles soient suivis,

    ii.  des renseignements concernant le délinquant soient fournis au bénévole afin de réduire au minimum tout risque pour sa sécurité personnelle,

    iii.  les pratiques de surveillance en tandem soient respectées, selon le cas.

Correctional Service Canada / Service correctionnel Canada

**Community Supervision Framework /**
**Cadre de surveillance dans la collectivité**

| Number – Numéro : | Date | 2012-06-13 |
|---|---|---|
| 715 | Page: | 3 of/de 7 |

6. The Area Director will:

a. be aware of issues and events that could influence the re-entry of specific offenders into that community; and

b. manage contracts for residential and supervision services.

7. The Parole Officer Supervisor or Manager, Community Correctional Centre, will:

a. review and approve offender progress in relation to the Correctional Plan and decision-making reports and ensure reports are shared with the Parole Board of Canada in a timely manner;

b. conduct ongoing and regular <u>case conferences</u> with Parole Officers to identify and confirm the most effective supervision strategy that is consistent with the offender's Correctional Plan and in keeping with the protection of society as the paramount consideration;

c. ensure issues that have a possible impact on staff safety are identified and action is taken;

d. establish a process to ensure that the Case Documentation Checklist is complete;

e. review and manage intelligence information as required;

f. oversee the work of the Community Assessment and Parole Supervision (CAPS) contractors; and

g. ensure information is shared as required between CSC and private agencies.

6. Le directeur de secteur :

a. se tiendra au courant des sujets et des événements qui pourraient influer sur le retour de certains délinquants dans une collectivité;

b. gérera les contrats de services d'hébergement et de surveillance.

7. Le responsable des agents de libération conditionnelle ou le gestionnaire du centre correctionnel communautaire :

a. examinera et approuvera les rapports de décision et les rapports de suivi des progrès accomplis par le délinquant relativement à son Plan correctionnel, et veillera à ce que les rapports soient communiqués à la Commission des libérations conditionnelles du Canada en temps opportun;

b. tiendra régulièrement des <u>conférences de cas</u> avec les agents de libération conditionnelle pour définir et confirmer la stratégie de surveillance la plus efficace qui est conforme au Plan correctionnel du délinquant et qui reflète le fait que la protection de la société demeure le critère prépondérant;

c. s'assurera que les questions susceptibles d'avoir des répercussions sur la sécurité du personnel sont relevées et que des mesures sont prises pour y donner suite;

d. mettra en place un processus afin de s'assurer que la Liste de vérification de la documentation sur un cas est complète;

e. examinera et gérera les renseignements de sécurité selon les besoins;

f. supervisera le travail des contractuels chargés des Évaluations communautaires et de la surveillance de libérés conditionnels (ECSLC);

g. veillera à ce que l'échange de renseignements entre le SCC et les organismes privés soit effectué comme il se doit.

| | | Number – Numéro : | Date | 2012-06-13 |
|---|---|---|---|---|
| Correctional Service Canada  Service correctionnel Canada | **Community Supervision Framework / Cadre de surveillance dans la collectivité** | 715 | Page: 4 of/de 7 | |

8. The Security Intelligence Officer will:

  a. plan, coordinate and administer the security intelligence activities within the district. This includes the development and/or implementation of standards, procedures, strategies and practices pertaining to security intelligence and preventive security;

  b. disclose preventive security information to staff as required;

  c. prepare a gist of protected intelligence information as required;

  d. participate in release planning and consult with staff on supervision strategies for offenders as required, particularly in relation to risk assessments, security threat groups, and other cases as deemed necessary; and

  e. inform staff, management and partners of CSC intelligence procedures and requirements.

9. All staff members will ensure:

  a. safety needs are identified and promptly discussed and reviewed by their immediate supervisor;

  b. the Staff Safety Assessment is reviewed prior to the first meeting with an offender in the community (excluding contacts at a community-based residential facility) and the review is documented in a Casework Record;

  c. the sign-in/sign-out system is utilized for all community case management activities; and

  d. in normal circumstances, no offenders are interviewed when a staff member is alone in the parole office (no exceptions for offenders requiring tandem supervision).

8. L'agent du renseignement de sécurité :

  a. planifiera, coordonnera et administrera les activités liées au renseignement de sécurité au sein du district. Cela inclut l'élaboration et/ou la mise en œuvre de normes, de procédures, de stratégies et de pratiques concernant les renseignements de sécurité et la sécurité préventive;

  b. communiquera, s'il y a lieu, les renseignements de sécurité préventive au personnel;

  c. préparera, au besoin, un résumé des renseignements de sécurité protégés;

  d. participera à la planification de la mise en liberté et consultera le personnel sur les stratégies de surveillance des délinquants, au besoin, particulièrement en ce qui a trait aux évaluations du risque, aux groupes menaçant la sécurité et à d'autres cas lorsque cela est jugé nécessaire;

  e. informera le personnel, la direction et les partenaires des procédures et des exigences du SCC en matière de renseignement.

9. Tous les membres du personnel s'assureront :

  a. que les besoins en matière de sécurité sont cernés et font promptement l'objet d'une discussion avec leur supérieur immédiat ainsi que d'un examen par ce dernier;

  b. que l'Évaluation de la sécurité du personnel est examinée avant la tenue de la première rencontre avec le délinquant dans la collectivité (excluant les contacts dans un établissement résidentiel communautaire) et que cet examen est consigné dans le Registre des interventions;

  c. que le système de signature à l'arrivée et au départ est utilisé lors de toutes les activités de gestion de cas dans la collectivité;

  d. qu'en situation normale, aucun délinquant n'est interviewé lorsqu'un membre du personnel est seul dans le bureau de libération conditionnelle (sans exception dans le cas de délinquants assujettis à la surveillance en tandem).

Correctional Service
Canada

Service correctionnel
Canada

**Community Supervision Framework /**
**Cadre de surveillance dans la collectivité**

| Number – Numéro : | Date | 2012-06-13 |
|---|---|---|
| 715 | Page: | 5  of/de  7 |

## PROCEDURES

10. Community corrections activities are comprised of the following:

 a. Community Supervision (CD 715-1) – the activities that constitute the supervision and progress monitoring of an offender in the community and that are consistent with the offender's Correctional Plan;

 b. Post-Release Decision Process (CD 715-2) – the activities and processes required for formal decision making following release;

 c. Community Assessments (CD 715-3) – the processes and requirements relating to the completion of Community Assessments;

 d. Case Preparation and Supervision of Women Offenders with Children Residing at a Community-Based Residential Facility (CD 715-4) – the processes and requirements relating to the supervision of women offenders who apply to have children reside at a community-based residential facility;

 e. Pre-Release Case Preparation for Provincial/ Territorial Offenders and Federal Offenders Incarcerated in Provincial/Territorial Facilities (CD 712-5) – the process relating to the completion of day and full parole application for provincial/territorial offenders and federal offenders residing in provincial/territorial facilities (as applicable); and

 f. Long-Term Supervision Orders (CD 719) – the case preparation process for offenders subject to long-term supervision orders being released at warrant expiry date as well as the procedures following a breach of condition or increase in the level of risk.

## PROCÉDURES

10. Les activités correctionnelles dans la collectivité comprennent les éléments suivants :

 a. Surveillance dans la collectivité (DC 715-1) – les activités qui constituent la surveillance d'un délinquant et le contrôle de ses progrès dans la collectivité, et qui sont conformes à son Plan correctionnel;

 b. Processus décisionnel postlibératoire (DC 715-2) – les activités à mener et les processus à suivre pour prendre des décisions officielles après la mise en liberté;

 c. Évaluations communautaires (DC 715-3) – les processus et les exigences ayant trait à l'exécution des Évaluations communautaires;

 d. Préparation des cas et surveillance des délinquantes qui cohabitent avec des enfants dans un établissement résidentiel communautaire (DC 715-4) – les processus et les exigences ayant trait à la surveillance des délinquantes qui font une demande pour cohabiter avec des enfants dans un établissement résidentiel communautaire;

 e. Préparation prélibératoire des cas des délinquants sous responsabilité provinciale/ territoriale et des délinquants sous responsabilité fédérale incarcérés dans des établissements provinciaux/territoriaux (DC 712-5) – le processus à suivre pour présenter des demandes de semi-liberté et de libération conditionnelle totale dans le cas de délinquants sous responsabilité provinciale/territoriale et de délinquants sous responsabilité fédérale incarcérés dans des établissements provinciaux/territoriaux (lorsqu'il y a lieu);

 f. Ordonnances de surveillance de longue durée (DC 719) – la préparation des cas des délinquants visés par une ordonnance de surveillance de longue durée et libérés à la date d'expiration du mandat ainsi que la procédure à suivre après le manquement à une condition ou l'augmentation du niveau de risque.



Correctional Service
Canada

Service correctionnel
Canada

**Community Supervision Framework /
Cadre de surveillance dans la collectivité**

| Number – Numéro : | Date | 2012-06-13 |
|---|---|---|
| 715 | Page: | 6 of/de 7 |



| ENQUIRIES | DEMANDES DE RENSEIGNEMENTS |
|---|---|
| 11. Strategic Policy Division<br>National Headquarters<br>Email: Gen-NHQPolicy-Politi@CSC-SCC.GC.CA | 11. Division de la politique stratégique<br>Administration centrale<br>Courriel : Gen-NHQPolicy-Politi@CSC-SCC.GC.CA |
| Commissioner, | Le Commissaire, |

*Original signed by / Original signé par*

Don Head

| | Correctional Service Canada    Service correctionnel Canada | Number - Numéro: | Date | Annexe/e A 2012-06-13 |
|---|---|---|---|---|
| | **Community Supervision Framework / Cadre de surveillance dans la collectivité** | 715 | Page: | 7 of/de 7 |

## ANNEX/E A

### CROSS-REFERENCES AND DEFINITION / RENVOIS ET DÉFINITION

**CROSS-REFERENCES**

CD 001 – Mission of the Correctional Service of Canada
CD 700 – Correctional Interventions
CD 701 – Information Sharing
CD 705-2 – Information Collection
CD 705-6 – Correctional Planning and Criminal Profile
CD 712-1 – Pre-Release Decision Making
CD 712-4 – Release Process
CD 712-5 – Pre-Release Case Preparation for Provincial/Territorial Offenders and Federal Offenders Incarcerated in Provincial/Territorial Facilities

CD 715-1 – Community Supervision
CD 715-2 – Post-Release Decision Process
CD 715-3 – Community Assessments
CD 715-4 – Case Preparation and Supervision of Women Offenders with Children Residing at a Community-Based Residential Facility
CD 719 – Long-Term Supervision Orders
CD 775 – Volunteers and Volunteer Activities
CD 784 – Information Sharing Between Victims and the Correctional Service of Canada
Employee Protection Program Guidelines

Guidelines for Community Residential Facility (CRF) Contract Management

Guidelines for Private Home Placement (PHP) Contract Management

Treasury Board Secretariat Policy on Government Security

**DEFINITION**

**Case conference:** a formal meeting, consultation or discussion about an offender between two or more individuals.

**RENVOIS**

DC 001 – Mission du Service correctionnel du Canada
DC 700 – Interventions correctionnelles
DC 701 – Communication de renseignements
DC 705-2 – Collecte de renseignements
DC 705-6 – Planification correctionnelle et profil criminel
DC 712-1 – Processus de décision prélibératoire
DC 712-4 – Processus de mise en liberté
DC 712-5 – Préparation prélibératoire des cas des délinquants sous responsabilité provinciale/territoriale et des délinquants sous responsabilité fédérale incarcérés dans des établissements provinciaux/territoriaux
DC 715-1 – Surveillance dans la collectivité
DC 715-2 – Processus décisionnel postlibératoire
DC 715-3 – Évaluations communautaires
DC 715-4 – Préparation des cas et surveillance des délinquantes qui cohabitent avec des enfants dans un établissement résidentiel communautaire
DC 719 – Ordonnances de surveillance de longue durée
DC 775 – Bénévoles et activités bénévoles
DC 784 – Communication de renseignements entre les victimes et le Service correctionnel du Canada
Lignes directrices sur le Programme de protection des employés
Lignes directrices pour la gestion des contrats conclus avec les établissements résidentiels communautaires (ERC)
Lignes directrices pour la gestion des contrats conclus dans le cadre des placements dans une maison privée (PMP)
Politique sur la sécurité du gouvernement du Secrétariat du Conseil du Trésor

**DÉFINITION**

**Conférence de cas :** une réunion, consultation ou discussion officielle entre deux ou plusieurs individus à propos d'un délinquant.

This is Exhibit ____D____ referred to in the

affidavit of PETER GLENN

sworn before me, this 27th

day of April, 2016.

_____
A Commissioner for Taking Affidavits

C.SINGH
LSUC#56653W

# Handbook for Offenders in CCCs

# PORTSMOUTH COMMUNITY CORRECTIONAL CENTRE

1455 Bath Road
Box 7500
Kingston, Ontario
K7L 5E6

# TABLE OF CONTENTS

1. Purpose of Handbook .................................................................(page 3)

2. Operating Philosophy ................................................................(page 4)

3. General Information.................................................................(page 5)

4. Safety & Emergency Procedures.................................................................(page 9)

5. Regulations.................................................................(page 11)

6. Drug Policy.................................................................(page 16)

7. Correctional Investigator.................................................................(page 17)

8. Administrative services.................................................................(page 18)

9. Programs and Interventions.................................................................(page 21)

10. Declaration of Receipt and Understanding.................................................................(page 24)

Personal Property Agreement.................................................................Appendix 1

# 1. Purpose of Handbook

The purpose of this handbook is to highlight key aspects of managing your sentence in the community, setting out expectations regarding your stay at the CCC, including policies and regulations, and provide you with useful information about the CCC.

Relevant legislation and policy include:

-The *Corrections and Conditional Release Act* (CCRA), particularly sections 133, 134 and 135, and for offenders subject to a long-term supervision order (LTSO), particularly sections 134.1, 135.1 and 134.2 (1).

-*Corrections and Conditional Release Regulations* (CCRR), particularly section 161(1)

-Commissioner's Directive 714 – Community Correctional Centre Standards – including all cross-references mentioned.

- Overview of offender responsibilities:

An offender is expected to comply with all the standard and special conditions imposed by the Board, as well as the regulations and standards of the CCC to which they are assigned.
An offender is to behave respectfully towards other offenders, staff and caseworkers participating in CCC activities.
An offender is expected to take part in correctional programs and other planned pre- and post-release activities.
All offenders are accordingly requested to make use of the resources made available to them in order to become law-abiding citizens.

## 2. Operating Philosophy

The Correctional Service of Canada (CSC) is the federal government agency responsible for administering sentences of a term of two years or more, as imposed by the courts. CSC is responsible for managing institutions of various security levels and supervising offenders under conditional release in the community.

Mission

The Correctional Service of Canada, as part of the criminal justice system and respecting the rule of law, contributes to public safety by actively encouraging and assisting offenders to become law-abiding citizens, while exercising reasonable, safe, secure and humane control.

Definition and role of CCCs

CCCs are administered by the Correctional Service Canada (CSC).
In accordance with the *Corrections and Conditional Release Act* (CCRA), the Community Correctional Centre provides a living environment for the safe reintegration of offenders into the community as law-abiding citizens. The CCC must be managed in accordance with CSC policies and procedures, and its operations are subject to all federal legislation and regulations.

CCCs house offenders on day parole and offenders with residency conditions as part of unescorted temporary absences, parole, statutory release or long-term supervision orders, as well as offenders seeking support services.

## 3. General Information

- **CCC Contact information, accommodation, accessibility and amenities.**

  Portsmouth Community Correctional Centre is a 37-bed facility operated by the Correctional Service of Canada. It is a halfway house offering accommodation for men on statutory release, long-term supervision orders and full parole with residency. PCCC is located at 1455 Bath Road in Kingston, Ontario adjacent to the Collins Bay Institution and Frontenac Institution properties. It is close to major bus routes and is handicap accessible. There are kitchen and laundry facilities on site for resident use.

- **Role of each caseworker**

  - Role of the Manager of CCC:
  The CCC Manager plans, directs and manages all of the Centre's day-to-day activities. In conjunction with the other staff members, the director oversees the execution of the CCC's program, and coordinates and supervises the caseworkers' case management, monitoring and supervision activities.

  - Role of the parole officer (community) (PO(C)):
  The PO(C) supervises residents' activities in order to facilitate their reintegration into the community. In particular, the PO(C) participates in the intake of new residents, prepares the correctional plan progress report, conducts supervision interviews at the Centre and in the community, and prepares all supervision reports. Throughout the resident's time at the Centre, the PO(C) makes contacts with the community resources available to the resident, and develops control and assistance mechanisms in order to supervise the resident's release and continuously assess the risk posed by the resident.

  - Role of administrative support staff:
  The administrative services supervisor and the case management assistant are responsible for the Centre's administrative operations. They provide clerical support for case management activities and manage some aspects of the residents' financial requirements.

  - Role of Canadian Corps of Commissionaires supervisors:
  The Commissionaires provide around-the-clock security at the CCC, including weekends and statutory holidays. They monitor comings and goings, ensure the rules are followed, and note any positive or negative behaviour so that prompt action can be taken. Supervisors conduct rounds of the rooms, verify the identity of visitors, and may visually inspect contents of any bags the residents bring into the CCC. Supervisors are not authorized to make schedule changes, approve temporary absences or make case management decisions.

  - The term "resident" includes offenders who are on Parole, Statutory Release, subject to a Long Term Supervision Order (LTSO) or persons who are residing at the CCC on a voluntary basis.

○ **Purpose of residency at the CCC**

Assignment to a CCC results from a special condition imposed by the PBC designed to improve risk management while helping the offender reintegrate into society as a law-abiding citizen and promoting personal progress in addressing their problems.
The special condition stipulates that an offender assigned to a CCC is to take part in the Centre's program. For each offender, the CCC program includes full compliance with CCC rules, adherence to the correctional plan developed for the offender's release or LTSO, participation in correctional programs, and compliance with conditions and instructions related to the release or LTSO.  Residency at a CCC can also be for offenders on Day Parole.
Offenders requiring temporary shelter in a more structured environment can also benefit from support services in CCCs following an assessment by their case workers.

To the extent possible, CSC expects all residents to meet their objectives by participating in paid employment, a return to school or voluntary work.

○ **Schedules and access to the community**

Schedules will vary, depending on each resident's length of stay and status: unemployed, working, studying or retired.
Travel or temporary absence schedules may be changed at any time by the CCC professionals, depending on their assessment of each resident's attitudes and behaviour, compliance with conditions, risk level, and personal needs and circumstances. Offenders subject to a residency requirement are usually obliged to spend a minimum of seven consecutive hours in the CCC.

Access to the community:
CSC staff usually encourage access to the community that enables an offender to make a full commitment to job search or schooling. Each resident is to comply with the individual policies of each CCC.

Weekend overnight privileges may be granted on a gradual basis, in accordance with PBC decision-making policies. Approval is based on the resident's overall attitude, risk management considerations, and an assessment of the host resource.

Particularly at PCCC, the community access schedules are as follow:

-Schedule A: includes 6 daily health walks to Bath road
-Schedule B: 1200hrs-1500hrs
-Schedule C: 0900hrs-1700hrs
-Schedule D: 0700hrs-2200hrs
-Schedule E: 0700hrs-2200hrs

Evening Pass: 2330hrs approved in advance by a Parole Officer

6

Lateness:
A late return may lead to suspension of parole, statutory release or long-term supervision.

- Finances-maintenance allowance and pension to pay

  Residents with no source of income may be eligible to receive an allowance of $80.00 per week, the amount of which is set annually. The slip to apply for allowance must be filled out weekly and put in the appropriate box at the front entrance. Residents who do have an income—salary, retirement pension, allowance from a public or private agency or other independent source of income—are required to pay room and board. Each resident with income is responsible for paying room and board, and is subject to a penalty for failure to do so. This amount will be payable for the first of each month for the previous month. Residents earning less than $800 net per month are not required to pay rent. You cannot access the Food Bank, Social Assistance or ODSP while a resident at PCCC.

  Allowances are given on each Wednesday morning. Employment Status and Request for Allowance forms may be picked up from the Commissionaire's office and must be placed in the mail box located outside the Commissionaire's office by the Friday of the previous week.
  You will be expected to discuss your income, expenditures and personal budget with your Parole Officer on a regular basis.

- GST rebate

  Persons who are inmates in penitentiaries, including CCCs, for 90 days or more are not entitled to the GST rebate; the same applies to provinces that offer a provincial sales tax rebate. Under section 2. (1) of the CCRA, "inmate" means a person who is in a penitentiary pursuant to a condition imposed by the Parole Board of Canada in connection with day parole or statutory release.

  However, offenders under long-term supervision orders are entitled to the GST rebate and its provincial equivalent, if any, as they are not inmates within the meaning of the CCRA.

- Medications and health care

  All residents must have a valid health insurance card and a social insurance card upon release, and their names must be registered with the provincial drug plan. However, CSC pays CCC residents' drug expenses in full.

  You have seven calendar days to provide your health care card number to the nurse or to the Office Administrator.

  If you don't have an updated health care card, you have seven days following your arrival at PCCC to initiate the process by filling out the forms available at the Commissionaire's desk.

All drug prescriptions and invoices are to be turned over to the nurse or the Office Administrator

At PCCC, you have access to a nurse and a doctor. All residents requiring the services of Health Care are required to submit a paper request in the appropriate mailbox. Requests will be picked up by the on-site nurse and the appropriate action will be taken, based on the urgency of the request.

Consultation with an external doctor may occur only following a referral from PCCC's doctor. All prescriptions obtained through an outside doctor without the referral of the PCCC's doctor won't normally be covered. The exceptions to this process are when you were sent to the emergency room by staff or a Commissionaire or if after review, the doctor at PCCC approves the prescription.

Prescription controlled medication and medication identified by a special condition imposed by the PBC or the court, are kept in the commissionaires' office, where offenders are to report in order to take their medication as prescribed. The person on duty provides access to the dosette or container and the offender takes the dose.
The only medications not to be stored are those medications required for immediate use such as inhalers, epi-pens and nitro-glycerine.
Medications will be available between 0830 and 0900 hours and again from 1730 to 1800 hours. During these times offenders can sign out their boxes and access their medications as required for the next 24 hours.
There is an access sheet in each box to record when offenders have accessed their medication box. There is no requirement to record what was taken or how much.
Offenders leaving on weekend passes are reminded to take enough medication with them for the weekend.
Dental and optometry services will be provided in accordance with procedures established with health services. Programs relating to CD 821 – *Management of Infectious Diseases* can also be provided in a CCC. More specifically for PCCC, such a request has to be presented to the Office Administrator in writing.

All residents requiring the services of Health Care are required to submit a paper request in the appropriate mailbox. Requests will be picked up by the on-site nurse and the appropriate action will be taken, based on the urgency of the request.

- **Search, visual inspection and count plans**

Each CCC has a plan for periodic searches of the premises; some searches are conducted with the assistance of a CSC or other authorized canine squad.
Daily visual inspections of bedrooms and other areas are conducted. Rooms will be routinely searched at a minimum of once every 30 days. Counts are conducted with variable frequency, some of them at night; the commissionaires must ensure that each person counted is alive, and take whatever action is necessary to do so. Blindfolds are therefore not permitted.

8

## 4. Safety & Emergency Procedures

- Alarms, Fire Drills, Evacuation Plans
  Smoke or heat detectors are installed in the bedrooms and other areas of the CCC. It is your responsibility to report to the commissionaire's office when the alarm sounds, and follow the instructions issued. Evacuation drills may also be held during your stay in the CCC, and you are required to comply with instructions from staff.
  An emergency evacuation plan is posted on each floor, indicating where residents are to assemble following an evacuation.

  The unit doors are used for all entrance and exit from the unit, including during emergency situations. These doors are never locked from the inside; however they are alarmed after 0001 hrs.

- **Floor fire emergency officers**

  CX II Rob Cathcart
  Alternate: Marie Cossette, Manager, Community Correctional Centre

- **Notification of discovery of fire**

1. Spread an alarm to others in the building by shouting "FIRE", "FIRE", "FIRE"; and/or
2. Sound a fire alarm by activating the nearest alarm pull station; ensure that endangered personnel are moved to safety, and use the fire extinguisher to the extent of your ability and training to prevent fire from blocking your path to safety.
3. Partial or staged evacuation may be appropriate. The Floor Fire Emergency Officer of the area will assume control of evacuation and initial fire control.

- **Hearing a fire alarm signal**

1. Proceed to nearest exit.
2. If doors are encountered on the way to an exit, feel doorknob for heat before opening. If not hot, brace yourself against door and open slightly. If you feel air pressure or a hot draft, close the door quickly and then proceed to an alternate exit. If you encounter smoke, use an alternate exit.
3. Leave building using exit.
4. Do NOT use elevators.
5. Do NOT attempt to re-enter the building for the purpose of salvaging personal belongings.

- **Fire control**

1. Initial fire control and control of evacuation procedures in a fire area is the responsibility of the Floor Fire Emergency Officer.
2. When the Kingston Fire Department has been called to a fire in the CCC, the Senior Officer of the Fire Department responding shall assume complete control of all firefighting operations.

9

- Evacuation locations for staff and offenders

1. When an evacuation order is given all offenders are expected to exit their living units to meet in the Courtyard.  During normal working hours, residents can be directed to:

  a) Frontenac Institution
  b) Regional Correctional Staff College
  c) Cataraqui Town Centre (if for a brief period)
  d) Community/Family member's homes
   During non-working hours:
  a) Frontenac Institution
  b) Regional Correctional Staff College
  c) Community/Family member's homes
  In all cases, the exact location of each resident must be known and noted in sign in/out book.  In cases where a resident is on travel status during the incident, the resident shall be contacted to determine the feasibility of remaining where he is.

2. All staff are expected to exit the building and go to the Courtyard, or the staff parking lot area.

- Evacuation procedures for disabled

  In order to provide for the safe evacuation of persons who have mobility impairment (including employees, visitors, and offenders) in the event of a fire emergency, the following shall be adhered to.
1. A register shall be maintained.  It shall contain the location and number of disabled persons in the CCC and a brief description of the impairments.  The register shall be located in the Commissionaires Office.  The names of the individual should be registered, subject to the individual's agreement.
2. The disabled person is to identify themselves to their Floor Emergency Officer.   The Floor Emergency Officer is responsible to ensure that the disabled person is registered - this includes temporarily disabled individuals.
3. At least two monitors shall be assigned to each disabled person.
4. The procedures to be taken for the evacuation of the disabled shall be discussed with the disabled individual and the procedures for evacuation should be practiced to the extent possible.
5. The disabled person shall be made aware of the fire protection measures that are incorporated into the building by being provided with a pamphlet detailing such measures.

- CSC Tip Line 1-866-780-3784

10

## 5. Regulations

### Standards for daily activities

Upon arrival you will be given a tour of the facility and be introduced to our staff.  Your case management team (Parole Officer and Correctional Officer) will talk to you about your release plans.  You will complete a Correctional Officer Intake Interview, which includes at a minimum, overview of this handbook, house rules, review of resident contacts, emergency/next of kin contact and overview of responsibilities in case of fire emergency.  You will also complete a Parole officer intake Interview, which includes at a minimum, review of your release plan, conditions of release, including territorial boundaries, PBC Decision Sheet review, information about you rights with respect to Access to Information and Privacy Acts, review of personal documentation for release (Birth Certificate, SIN, Health Card, etc.).

You will be assigned to a unit and a room within that unit, which you will be given a key for.  A charge of $5.00 will be applied should you require a replacement key.  You will have access to dishes, cutlery and linens.

Rooms are assigned by Correctional Officers.  Any requests for changes must be directed to them.

Residents <u>may not visit other units</u> and may not visit other bedrooms within their own unit after 2300 hours.  During other times, if visiting in another bedroom within the unit, the door is to remain open.

You are normally expected to be in your room by 0200hours.  Respect others' rights to quiet time after 2300 hours.

You'll receive a notice for a monthly house meeting with the manager of the facility (normally first Wednesday of the month). Your attendance is expected unless you are excused ahead of time by a Correctional Officer (for work reasons for example). This is an opportunity to exchange information and to present items for suggestions or clarification.  Residents are also free to request a group meeting if they feel it will be useful.  This request will be made to in writing to the CCC Manager.

Before you leave PCCC you are expected to empty and clean your kitchen cupboard, remove your food from the fridge/freezer, clean your room area, wash your bedding, and turn in cutlery, dishes, linens, and keys to the commissionaire.

### Dress and behaviour

Residents are expected to be appropriately dressed at all times.  Shirts must be worn until 1700 hours during the work week, as well as when you are attending a group or program in the evenings or on weekends.  Shirts must be worn at the front entrance (security & visiting areas) and during any times when visitors are attending PCCC.

Your conduct in the community reflects on this CCC, its employees and other residents. Any involvement with law enforcement agencies must be reported immediately.

Disciplinary action will be taken when a resident violates any condition of release.  This may include reduced curfew and withdrawal of weekend privileges or suspension of your conditional release.

Residents are expected to plan their day, sign out to clearly specified locations and engage in pro-social activities.

### Procedures for entry, exit and movement in the community

Residents are required to utilize the log book located at the Commissionaire's Desk to sign in and out of PCCC.  A 24-hour clock is used and the <u>specific address/location</u> of

11

where you are going is required.  Failure to specify appropriate detail regarding your destination will lead to sanctions.  Locations must be specified with sufficient detail for staff to be able to verify your location.  You must also indicate the purpose of your activities in the community in the log book (i.e. work, job searching, volunteering, leisure, medical, programs).  Offenders are expected to plan their day in the community and accurately indicate their destination.  If there is an unexpected change of destination, you are required to call Portsmouth CCC to advise the Commissionaire on duty of the change. The Commissionaire will make the changes in your sign-out book.  It is not acceptable that you inform your Parole Officer or other staff at the PCCC after the fact of any changes to your destination.

## Typical schedule and consequences of lateness

Access to the community is determined on an established schedule and applied on a case-by-case basis, based on risk.

Schedule A:  No unaccompanied community access other than 6 daily walks to Bath Road.

Schedule B:  1200hrs-1500hrs

Schedule C:  0900hrs-1700hrs

Schedule D:  0700hrs-1900hrs

Schedule E:  0700hrs-2200hrs

Evening Pass:  must be pre-approved by the Parole Officer and curfew will be 2330. There are two daily sign-ins at 1200 hours and 1700 hours.  Special arrangements to accommodate your work schedule must be made through your Parole Officer.

There is a requirement to spend a minimum of seven hours per 24 hour period in the facility except during approved week-end passes.  It should be noted that these curfews are a privilege and may be reduced if they are abused.

Residents may be eligible for week-end passes for a maximum of three nights as follows:

Month 1 - 1 pass

Month 2 - 2 passes

Month 3 - 3 passes

Month 4 (and up) - weekly passes.

## Restricted areas

All residents are prohibited from associating with other PCCC residents in the community unless for program or employment purposes.

All residents are prohibited from attending the two Tim Horton's on Princess Street located at 312 Princess at Clergy St. and 681 Princess at MacDonnell St., as well as the McDonald's restaurant at 285 Princess Street.

Should staff discover that a resident has failed to accurately report his whereabouts or is associating with other PCCC offenders in the community, restrictions will be implemented and this may lead to suspension.

## Use of the kitchen, common areas and laundry

You must buy your own groceries and make your own meals.  You are responsible for keeping the kitchen clean and washing your dishes.  All items used are property of the Centre, and must be returned when you leave.

A colour television, with cable is available in the common area of each living unit.

Sleeping in the common room at any time is not permitted.

A washer and dryer are provided at no cost in the outbuilding.  You must do your own laundry.

## Visits and correspondence

Visitors must be on your approved visitors list and must provide photo identification.  All visitors must sign in at the Commissionaires' office.  They must be accompanied at all times.  Visitors are allowed between 0900 hours and 2200hours and are restricted to the main floor of the Administrative Building or the courtyard.  Children are to be supervised at all times and shall not disturb other residents.  Children 10 years and under shall be escorted to the washroom by a parent or guardian.  Washrooms are available to visitors by asking the Commissionaire.  All visitors are expected to park in the Visitors Parking area of Frontenac Institution.

## Offender participation in CCC maintenance

Household chores are to be performed daily to an acceptable standard.  Each unit is expected to maintain the cleanliness in their own area on an ongoing basis.
The kitchen area must be kept clean at all times by the individuals that use it.  This includes counter tops, stove/oven, refrigerators, sinks, dishes, cupboards, window sills and kitchen table.  It is the collective responsibility of those assigned to each unit area to keep it clean at all times.

## Authorized and prohibited items

No alcohol, drugs or weapons are permitted on Centre property.  Any form of pornography, in any media (magazines, DVDs, photographs, hand drawings) is strictly prohibited.  No pictures with nudity are to be displayed.
Portsmouth CCC follows standards of minimum institutions and as such abides by the same policies.  Computers are not currently authorized within the CCC.

## Furniture and signage in rooms

Residents are not permitted to re-arrange the floor plan of their respective rooms (i.e. moving beds, night stands or lockers).  The rooms are laid out in a particular fashion for specific reasons.
Resident sleeping areas are to be kept neat and tidy at all times (bed made, garbage emptied), void of excess dirty laundry and clutter.
At least weekly, a formal inspection will be conducted to review room cleanliness.  Living areas in unacceptable condition (unmade beds, dirty floors, unwashed sheets, dusty dressers, discarded clothing etc) will result in sanctions being imposed.

## Telephone use

Pay phones are available on the main floor of the Administrative Building.  Phones may be used between 0600 and 2400 hours.
Cell phones without camera capability (when purchased) are generally permitted but must be declared to your Parole Officer.  It is your responsibility to notify your Parole Officer of any change in cell phone information.  Offenders with cell phones must ensure that they are in compliance with any special conditions imposed by the Parole Board of Canada.
All cell phones used by residents are subject to scrutiny and review by CSC staff including call history, test messaging or other features on their phones.

13

Billing information and history must be made available upon request including any phones used, borrowed or shared by residents i.e. phone contracts and or billing to family members, friends etc.

Cellular phone use is prohibited while travelling between Portsmouth CCC and Bath Road.

Any breach of these guidelines may result in the confiscation of the cell phone(s) as contraband.

## Offender bicycle and vehicle standards

Residents may have bicycles at the Centre.  They are not allowed inside and must be parked in the designated area.  At no time should any resident leave their bicycle against the building or against the fence of the staff parking area.

You must get permission from your Parole Officer before buying or operating a motor vehicle.  Provided a legal or common-law relationship exists, residents may drive vehicles owed by their spouse or immediate family member, if a valid licence and appropriate insurance exist.  Resident's vehicles must be parked in the visitors parking area of Frontenac Institution unless otherwise arranged by your Parole Officer.

## Smoking Ban and consequences of offences

In accordance with CD 259, there is no smoking indoors or outdoors within the perimeter of correctional facilities, including community correctional centres.

Upon admission to the CCC you will be asked to identify if you are a smoker.  Tobacco lockers are available to all residents and are located outside of the main entrance. Residents utilizing the tobacco lockers will be issued a key to their individual locker and will be required to sign for it.  Access to the tobacco locker is only permitted after you have signed-out of the Centre and all tobacco products & lighters/matches must be placed into the tobacco locker as soon as you enter the front doors of PCCC and prior to signing back in.  There is a $5.00 charge for a replacement key.

Help Quitting Smoking

- Smoking is a highly addictive activity that many people find difficult to quit. To help you, CSC offers educational information that can increase your chances of quitting. For more information, please speak with your case management team.

Spiritual Accommodation

- The only exception to the non-smoking policy is for the accommodation of Aboriginal or other legitimate religious practices (smudging).

Commissioner's Directive 259

- Commissioner's Directive 259 explains the smoking ban in greater detail.

## CCC supplies and services/Policy on managing personal property

The administration of personal property is governed by CD 566-12, and the relevant regional procedure.

14

Effects stored by the CCC are to be recorded and tagged while stored and will be kept in a secure locked room; personal property kept in the room is not recorded.

During his stay at the Centre, the offender is responsible for his personal property in his possession.  CSC is only responsible for personal property stored by the CCC.

Because of space limitations, we ask that you limit your personal effects to the equivalent of 0.85 cubic metres (about two average-size boxes).

A lockable space is provided for residents to protect their valuables, but we do not recommend keeping valuables at the CCC.  The value of jewelry in storage should not exceed $300.  Neither the CCC nor CSC is responsible for the theft or loss of residents' personal property kept in the room (see Appendix 1).

Every offender must complete and sign the attached appendix to identify next of kin or a community contact to whom their personal property can be shipped following the suspension of parole or long-term supervision, and for ownership of certain personal property to be transferred to the CCC as per CD 566-12-Personal Property of Inmates.

A set of bedding will be loaned to every resident who so wishes.  Each resident is responsible for its upkeep and return upon departure.

Personal property is to be placed in the locker provided to each resident.

Offenders are ***not permitted more than $300 cash*** in their possession at the CCC at any one time, without the approval of their assigned parole officer.  Offenders who arrive from an institution with more than $300 in cash will work with their parole officer to ensure compliance with this policy as soon as reasonably possible.

The procedures in the event of suspension of Parole, Statutory release or Long-Term Supervision Order, are described in CD 566-12.

## Waste management and environmental practices

You are expected to contribute to your institution's attempt to maintain an environmentally friendly site. This happens by trying to conserve our natural resources and by maintaining community standards (Reduce your consumption, Reuse products, and Recycle what cannot be reused). Suggestions to further improve our environmental practices are encouraged.

## 6. Drug Policy

The Correctional Service of Canada has a zero tolerance policy regarding your involvement with drugs and alcohol.   All residents are expected to follow their terms and conditions of their parole and policies of CSC.

Our Approach
- Studies prove that providing a safe, drug-free institution is a fundamental condition for an offender's successful reintegration into society.

To help you, we focus on three areas:

- Prevention (making sure you know the serious consequences of drug use)
- Treatment (reducing the demand for drugs)
- Enforcement (reducing the supply of drugs into an institution)

Urinalysis Collection

- In accordance with the *Corrections and Conditional Release Act* and the *Corrections and Conditional Release Regulations*, urine samples may be taken from offenders under a condition to not use drugs, alcohol or other intoxicants.   You may also be asked to provide a sample if we believe you are under the influence of any unauthorized drugs or alcohol.

You've Been Caught -- Now What?

- If there are reasonable grounds to believe that you have been involved in drug-related activities or you have been charged with or convicted of a drug, alcohol, or substance related offence, or if the results of the urinalysis come back positive, you may face suspension or legal action.

What Else You Should Know

- Your involvement with drugs is not limited to drug usage; it also includes any related activities such as drug dealing, muscling, blackmail, financing, and assisting in the smuggling of drugs into the CCC.

CSC offers internationally recognized substance abuse programs geared to helping you overcome addiction. Research has shown that inmates who participate in the program are 45% less likely to generally re-offend and 63% less likely to violently re-offend and return to prison.

## 7. Correctional Investigator

The Correctional Investigator investigates complaints against authorities by federal inmates and offenders. The Office of the Correctional Investigator is completely independent of CSC.

- The main role of the investigator is to bring resolution to an offender's complaint in an objective and timely fashion. The Correctional Investigator also reviews and makes recommendations on CSC's current policies and procedures, ensuring that areas of concern are identified and addressed.

- The Correctional Investigator has access to all information and documents that are in CSC's possession.

Contacting the Correctional Investigator

- Please keep in mind that it is expected you will have used all other internal means to address your problem (See Complaints & Grievances, Section 8-c) before contacting the Office of the Correctional Investigator.

- Your communications with the Office of the Correctional Investigator are considered confidential and will be treated the same as contact with your legal counsel.

  - o  Toll-free number:       1-877-885-8848
  - o  Mailing Address:       The Correctional Investigator of Canada
    P.O. Box 3421 Station "D"
    Ottawa ON   K1P 6L4

What Else You Should Know

- You cannot face negative consequences for contacting the Office of the Correctional Investigator.

- The Correctional Investigator has full freedom of choice in deciding whether to conduct an investigation of your complaint.

17

# 8. Administrative Services

## a) Access to Information & Privacy

The *Access to Information Act* allows you to request and access information under the control of the federal government. The *Privacy Act* protects the privacy of your personal information held by the government, and also allows you to review what information CSC has on file under your name.  Additional information is available from your case management team.

### Exceptions

- Some file information may be withheld from you if it is determined that sharing it with you will jeopardize:

    - someone's safety;
    - the security of the institution; or
    - the integrity of an investigation.

- You will be notified in writing if any information was withheld from you, and you will have the right to formally challenge that decision.

### Correction of Wrong Information on Your File

- Requests for the correction of information in your file should be presented to your case management team. CSC is obligated to attempt to resolve any file discrepancies in a timely manner.

### Commissioner's Directive 701

- CD 701 covers all aspects of information sharing at CSC, and encompasses general requests for information, as well as requests to correct information in your personal file.

### What Else You Should Know

- If at any time you are not satisfied that CSC staff are following the access to information and privacy rules and regulations they must abide by, you may register a complaint with the Privacy Commissioner or the Information Commissioner:

    - Privacy Commissioner of Canada
      Place de Ville, Tower B
      112 Kent Street, 3rd floor
      Ottawa, Ontario  K1A 1H3

18

o   Information Commissioner of Canada
   Place de Ville, Tower B
   112 Kent Street, 7th floor
   Ottawa, Ontario  K1A 1H3

## b)   Complaints & Grievances

CSC must provide you with information on what steps you can take to resolve your complaint or grievance. The steps you can take are fair, fast, and available to every offender without negative consequences.

### Commissioner's Directive 081

- Before filing a complaint or grievance, it is recommended that you fully review CD 081: Offender Complaints and Grievances. This will ensure you are aware of your rights, as well as CSC's responsibilities.

- A national toll-free phone number is available to inquire about this process, or to ask specific questions about your third-level grievance. The number (1-800-263-1019) is also on the CCC's List of Common Access Telephone Numbers.

### What Else You Should Know

- Before beginning the complaint process, you should ensure that the subject of your complaint is within the jurisdiction of CSC to resolve. For example, CSC does not have the authority to resolve complaints about Parole Board of Canada decisions, matters relating to convictions and sentencing by the Courts, or matters relating to Claims Against the Crown for the loss of personal effects.

## c)   Harassment

The Correctional Service of Canada is committed to providing a living and working environment that is free of harassment and discriminatory behaviour. Each of us has the right to be treated with respect and dignity. Harassment is a serious offence and will be dealt with promptly.

## d)   Official Languages

In accordance with the *Official Languages Act*, you have the choice of using either official language (English or French) when communicating with or receiving services from the Correctional Service of Canada.

### Speak Another Language?

- Arrangements can be made for interpreters to provide assistance to inmates in languages other than English and French, especially for disciplinary hearings, conditional release hearings and other important matters during your sentence.

19

- o   Please note that you are allowed to use your native language in correspondence and conversation with visitors and other inmates, unless this is prohibited for valid security reasons.

## Complaints

- o   If you do not think that CSC is providing adequate services in your preferred official language, you may file a complaint with the Commissioner of Official Languages. You can call their office toll-free at 1-877-996-6368 for more information.

20

# 9. Programs and Interventions

Various programs are offered in the community based on the identified needs, and the conditions imposed by the PBC.

## a)  Correctional Programs

The main goal of correctional programs is to help ensure your successful return to society. There are different types of programs available to you. Each one has clearly defined goals and proven ways to measure your progress. The following is a list of correctional programs offered by CSC:

- Ask your case management team about the programs that are offered in the CCC's region based on assessed needs and set objectives as they relate to you.

- Programs including Aboriginal, maintenance, family violence, sex offender, substance abuse and violence prevention programs, as well as education and community employment programs can be offered.

Community Maintenance Program (CMP)
- The objective of the Community Maintenance Program is to provide aftercare to any offender who has completed either a National Correctional Program or an Aboriginal National Correctional Program, with the priority being the highest risk offenders. The strength of the CMP is that it allows the offenders to integrate the skills they developed in all their Correctional Programs into one self-management plan.

## b)  Psychological services

Psychologists can provide counselling for a wide range of behaviours that you may have, as well as those related to conditions imposed by the PBC.

If you are Aboriginal, please note that counselling services are also provided by Elders. Also, if you are seeing a psychologist, you have the right to be accompanied by an Elder or Aboriginal Liaison Officer.

## c)  Restorative Justice

Your crime is a violation of people and relationships. Restorative justice moves the focus of crime away from the impersonal (breaking the law), to the personal (harm caused to individuals and communities). It is about diminishing that harm. Restorative justice emphasizes healing in victims, offenders being accountable for their actions, and the involvement of concerned citizens in creating healthier, safer communities.

Restorative Opportunities Program

- Restorative Opportunities is a program that helps offenders (who have accepted responsibility for their actions) to communicate with the victims they have harmed. It gives you a chance to acknowledge the harm you may have caused, tell your story and hear first-hand how your crime has changed someone's life. This program can also help determine if any steps can be taken to repair the harm caused in a meaningful way.

- For more information, or if you wish to participate in the Restorative Opportunities program, please speak with your case management team or your chaplain.

## d)  Spiritual Services

Aboriginal Elders take care of the spiritual needs of Aboriginal offenders and those who wish to follow the traditional path, and chaplains can arrange for the spiritual needs of all other residents (Imams, rabbis, etc.).

Chaplaincy Support

- Should you desire, a chaplain is available to assist you with getting in contact with a religious society or a spiritual leader in the community to help you get settled after your release.

## e)  Victims Services

The Correctional Service of Canada is legally responsible to provide information about you to the victim(s) who have been impacted by your crime if they request it. Therefore, at a victim's request, CSC will provide them with information about you as allowed for in the *Corrections and Conditional Release Act* (section 26) and Commissioner's Directive 784.

Offenders Who are Victims of Crime

- You may have been a victim of a crime yourself. If this is the case and the person who harmed you is serving a sentence of two years or more, you can register with Victim Services to receive information about this person. You can contact Victim Services toll free at 1-866-806-2275 or speak to your parole officer.

Commissioner's Directive 784 and the CCRA

- Everything you need to know about a victim's rights and what CSC can disclose about you can be found in CD 784. If this is important to you, then you should also review section 26 of the *Corrections and Conditional Release Act*.

## f)  Volunteers

The main purpose of the volunteer program is to provide you with support in your return to the community. You can ask your case management team for more information about volunteer services associated with your CCC and with the district.

## 10. Inmate Declaration of Receipt and Understanding

I acknowledge that I have received a copy of this handbook.
I have read and understand all the rules and regulations outlined in this offenders' handbook.

Signed: _____

Witness:_____

Date:_____

Print inmate Name and Number:_____

\* If you have any questions, or for more detailed information on the content of this handbook, please speak to a member of your case management team.

23

Appendix 1


Personal Property


In accordance with the rules concerning CCC inmates' personal property contained in CD 566-12 and CD 714, I accept responsibility for the security and reasonable use of items I keep in my room. I release the CCC and CSC from all liability for any personal property in my possession if I become unlawfully at large.


Name and signature of resident:


FPS:

Date:


Next of kin or community contact identified:

The following person or persons is or are authorized to recover my personal property, including electronic devices, if my parole or supervision is suspended, or following my death:

Names, addresses and telephone numbers:

This is Exhibit _E_ referred to in the

affidavit of PETER GLENN

sworn before me, this 27th

day of April, 2016.

_____

A Commissioner for Taking Affidavits

C. SINGH
LSUC #56653W

 Correctional Service    Service correctionnel
Canada                  Canada

| COMMISSIONER'S DIRECTIVE 715-1 | In Effect: | 2013-04-30 |
| | Due for Review: | 2014-04-01 |

## Community Supervision

| PROGRAM ALIGNMENT | Community Supervision |
| OFFICE(S) OF PRIMARY INTEREST | Correctional Operations and Programs Sector |
| ONLINE @ | • http://infonet/cds/cds/715-1-cd-eng.pdf<br>• http://infonet/cds/cds/715-1-cd-fra.pdf<br>• http://www.csc-scc.gc.ca/text/plcy/cdshtm/715-1-cd-eng.shtml<br>• http://www.csc-scc.gc.ca/text/plcy/cdshtm/715-1-cd-fra.shtml |
| AUTHORITIES | • *Corrections and Conditional Release Act* (CCRA), sections 3.1, 4, 5, 18, 100, 115, 128, 129, 133 and 134<br>• *Corrections and Conditional Release Regulations* (CCRR), sections 161 and 162 |
| PURPOSE | • To provide direction on assessing and managing an offender's transition to the community following release<br>• To provide direction on the completion of Staff Safety Assessments and application of tandem supervision |
| APPLICATION | Applies to staff responsible for community supervision, including unescorted temporary absences and work releases |

## CONTENTS

| SECTIONS | |
| 1 - 5 | Responsibilities |
| 6 - 58 | Procedures |
| 6 - 14 | Staff Safety and Tandem Supervision |
| 15 - 20 | Release and Initial Interview |
| 21 - 27 | Assessment of the Level of Intervention and Confirmation of Program Referral(s) |

CD 715-1                          Community Supervision                          2013-04-30

| 28 - 39 | Monitoring Offender Progress |
| 40 - 42 | Case Conferences |
| 43 | Updating Offender Progress |
| 44 - 54 | Travel Permits |
| 55 - 57 | Relocation or Reassignment of Offender's Supervision |
| 58 | High Profile Offenders |
| 59 | Enquiries |
| Annex A | Cross-References and Definitions |
| Annex B | Staff Safety Assessment |
| Annex C | Rating Reassessment Framework |
| Annex D | Exchange of Information Agreement Between CSC and Passport Canada |
| Annex E | Correctional Plan Update – Community Progress – Report Outline |

## RESPONSIBILITIES

1.   The District Director will ensure:

   a.   policies and procedures for high profile offenders are followed pursuant to CD 701 – Information Sharing

   b.   processes outlined in CD 784 – Information Sharing Between Victims and the Correctional Service of Canada are respected

   c.   tandem supervision practices are respected

   d.   police receive relevant information pertaining to offenders' release activities

2.   The Area Director will:

   a.   ensure processes are in place to share offender related information with police

CD 715-1                              Community Supervision                              2013-04-30

    b.  approve any submission to reduce levels of intervention during the first 90 days of release for offenders granted one-chance statutory release and for offenders subject to long-term supervision orders released at warrant expiry date

    c.  review submissions for an <u>exception</u> to the application of the tandem supervision requirement

3.  The Parole Officer Supervisor or Manager, Community Correctional Centre, will:

    a.  ensure continuity of the Correctional Plan

    b.  review and approve the offender's Correctional Plan Update and any change to his/her level of intervention

4.  The Parole Officer will:

    a.  maintain and update the Correctional Plan in consultation with the offender

    b.  assist and support the offender to actively participate in meeting the objectives of his/her Correctional Plan

    c.  monitor the offender's behaviour, release conditions and compliance with court-ordered obligations

    d.  obtain all relevant information from community-based residential facilities as identified in the contract requirements

    e.  develop and implement interventions which address and respond to the offender's risk and needs

    f.  document all relevant information about the offender's circumstances, within established timeframes and parameters

5.  The offender is expected to:

    a.  participate in the consultation process for the maintenance of his/her Correctional Plan

    b.  actively participate in meeting the objectives identified in his/her Correctional Plan

## <u>PROCEDURES</u>

### <u>Staff Safety and Tandem Supervision</u>

6.  The Staff Safety Assessment (<u>Annex B</u>) will be completed prior to any <u>community supervision contact</u>, excluding contacts at a community-based residential facility, and no later than 10 working days following:

    a.  an offender's initial release (including releases following a revocation)

    b.  case reassignment

    c.  a change in release type, or

    d.  at any time the Parole Officer determines that factors have arisen that may have a possible impact on staff safety

7.  All staff members will ensure the Staff Safety Assessment is reviewed prior to the first meeting with an offender in the community (excluding contacts at a community-based residential facility) and the review is documented in a Casework Record.

8.  If tandem supervision is required, all community supervision contacts, except those at a community-based residential facility or in public areas, will occur with an authorized tandem partner. This includes transporting an offender in a vehicle.

9.  "Tandem partner" refers to the second individual authorized by policy or the District Director to complete tandem supervision. Authorized individuals include:

    a.  any CSC staff member

    b.  Peace Officers (including Police Officers, Provincial Probation/Parole Officers, and the Community Corrections Liaison Officer in locations where one is in place)

    c.  Community Assessment and Parole Supervision (CAPS) contractors

    d.  individuals authorized by the District Director by name

10.  These persons must meet both the following minimum standards:

    a.  enhanced reliability security clearance

    b.  have been briefed on the offender's criminal history and case dynamics as they relate to staff safety risk factors

11.  If, during the initial assessment or within the first 90 days, the tandem supervision criteria are met and there are no staff safety issues, the Area Director can make an exception to this requirement.

12.  Tandem supervision will be reviewed at least every 90 days until it is removed by the Area Director/Parole Officer Supervisor.

13.  If an offender's release has been suspended within a 90-day tandem supervision period and the suspension is subsequently cancelled, the Case Management Team will consider whether to continue or restart the active tandem supervision period.

14. Offenders who are active tandem supervision cases are not permitted to participate in private home placements.

### Release and Initial Interview

15. Within 24 hours of release, CSC will provide police with the following:

    a. an up-to-date offender photograph

    b. a copy of the release certificate, which includes the territorial boundaries noted under Special Instructions

    c. the Standard Profile

    d. the Parole Board of Canada Decision Sheet (if applicable)

16. The Parole Officer will meet the offender within one working day of arrival at the release destination.

17. When this deadline cannot be met due to exceptional circumstances (e.g. release to remote area where the Parole Officer or contractor only travels once per week), upon approval of the Parole Officer Supervisor, the meeting will take place as soon as possible and the reason for the delay will be documented in a Casework Record.

18. When the offender is in custody on remand or an immigration hold/removal order, the initial interview will occur within the first month of release. Where the offender remains in custody outside the release destination, arrangements will be made for the initial interview to be conducted within that timeframe.

19. During the initial interview, the Parole Officer will review the offender's Correctional Plan and current circumstances and complete the Initial Interview Checklist (CSC/SCC 1331).

20. Levels of intervention are determined according to the criteria indicated below:

    a. Level I (Intensive Supervision) – A minimum of eight face-to-face contacts per month between the Parole Officer and the offender is required when the following three criteria are met:

        i. the offender is on statutory release

        ii. his/her reintegration potential is rated as low at intake and at release

        iii. his/her static or dynamic factors are assessed as high

        or when one of the following criteria is met:

    iv.  the offender is granted one-chance statutory release, or

    v.  he/she is released from custody at warrant expiry date and subject to a long-term supervision order

b.  **Level A** – A minimum of four face-to-face contacts per month between the Parole Officer and the offender is required when the level of intervention on either static or dynamic factors is assessed as high

c.  **Level B** – A minimum of two face-to-face contacts per month between the Parole Officer and the offender is required when the highest level of intervention on either static or dynamic factors is assessed as medium

d.  **Level C** – A minimum of one face-to-face contact per month between the Parole Officer and the offender is required when the level of intervention on both static and dynamic factors is assessed as low

e.  **Level D** – A minimum of one face-to-face contact every two months between the Parole Officer and the offender **may** be approved for an offender who meets the following conditions:

    i.  he/she has been under supervision at level C for a minimum of one year, not including any time spent on day parole

    ii.  his/her Correctional Plan indicates that programming, counselling or other interventions are not required

f.  **Level E** – A minimum of one face-to-face contact between the Parole Officer and offender every three months may be approved for an offender who has been under level D supervision for a minimum of one year

### Assessment of the Level of Intervention and Confirmation of Program Referral(s)

21.  All offenders, except those assessed as requiring level I supervision or those offenders in custody on outstanding charges or an immigration hold/removal order, will be supervised at level A until the level of intervention is reviewed.

22.  The level of intervention for offenders in custody on outstanding charges or an immigration hold/removal order can be reduced to Level C by virtue of the offender being in a secure facility.

23.  The Parole Officer will review, with the Parole Officer Supervisor, the Correctional Plan, Community Strategy, level of intervention, program referrals and offender's adjustment to the community within 30 days of release. If there is no change to the level of intervention, key ratings or program referrals, the results of the review will be recorded in a Casework Record. Any change to the level of intervention and/or program referral(s) will be documented in a Correctional Plan Update as outlined in Annex E.

CD 715-1                              Community Supervision                              2013-04-30

24. If an offender was not reviewed for referral to the Community Corrections Liaison Officer at the time the Community Strategy was prepared, or if new information has become available since the preparation of the Community Strategy, the Parole Officer will use the criteria outlined in <u>CD 712-1 – Pre-Release Decision Making</u>, to determine the feasibility of referral to the Community Corrections Liaison Officer, in locations where one is in place. This will be part of the 30-day review of the Community Strategy.

25. For intensive supervision cases, the level of intervention will be reviewed again 90 days following release. Any change to the level of intervention will be documented in a Correctional Plan Update.

26. Offenders released on one-chance statutory release and those subject to long-term supervision orders who had been detained will be supervised at level I for at least 90 days following release. Any exceptions to this standard (e.g. where at the 30-day review, the Parole Officer and Parole Officer Supervisor assess that intensive supervision is not necessary) require approval by the Area Director and documentation in a Correctional Plan.

27. These cases will be reviewed prior to the end of the 90 days. A reduction in supervision will require documentation in a Correctional Plan Update. If there is no change, this review can be documented in a Casework Record.

**Monitoring Offender Progress**

28. The Parole Officer must meet with the offender at the required level of intervention, or more often if necessary, to assess progress against the Correctional Plan. Contacts with the offender will include community visits to ensure the Parole Officer gathers information about the offender in his/her environment.

29. When the level of intervention cannot be met due to exceptional circumstances or those beyond the Parole Officer's control, the level of intervention may be decreased following a <u>case conference</u> with the Parole Officer Supervisor. Where an exception is granted to not meet the level of intervention for a period of less than one month (e.g. hospitalization, illness, long-term remand, weather prohibits meeting with the offender), documentation is required in a Casework Record. Lengthier exceptions will be recorded in a Correctional Plan Update.

30. In cases where an emergency medical or compassionate leave is authorized by the Area Director, the Parole Officer will advise the Parole Board of Canada in writing as soon as possible.

31. The Parole Officer will establish a network of collateral contacts to verify offender reported information and to gather information on the behaviour of the offender, throughout the supervision period.

32. When deemed necessary, the Parole Officer will contact police to verify whether the collateral contact is known to police and/or identify the existence of a criminal record, if consent from the

CD 715-1                          Community Supervision                          2013-04-30

collateral contact is obtained as outlined in the <u>Consent CPIC Clearance Request</u> (CSC/SCC 1279-01).

33.  Where there are police reporting requirements, these will be verified by the Parole Officer.

34.  All relevant offender and collateral contacts will be recorded in Casework Records within seven days.  Casework Records will also be completed prior to a transfer of supervision.

35.  The Parole Officer will provide the offender with community resource information to facilitate the transition to the community and engagement in the Correctional Plan. Community Employment Centres and mental health services will be utilized where available and appropriate.

36.  The Parole Officer will obtain regular progress reports from individuals or agencies providing programming or counselling to the offender, in accordance with the Correctional Plan. This includes as applicable, methadone maintenance treatment, mental health and other program providers.

37.  The Parole Officer will promptly inform the police of:

     a.   suspicion of criminal activities

     b.   any modifications to release conditions

     c.   actions taken in response to police information received

     d.   any travel permits issued to the offender

     e.   any relevant changes to the offender's circumstances

38.  At any time during the release, the Parole Officer may make a referral to the Community Corrections Liaison Officer, in locations where one is in place, for the following reasons:

     a.  concerns regarding staff safety have become known

     b.  the offender is suspected of re-engaging in criminal activity

     c.  there have been repeated breaches during the supervision period

     d.  there is a lack of transparency in relation to special conditions

     e.  the offender is isolated or has special needs

     f.  there will be a <u>section 810</u> *Criminal Code* order at warrant expiry date and the offender requires monitoring for the final 90 days of the sentence

CD 715-1                Community Supervision              2013-04-30

g.  there are mental health issues that require additional monitoring

h.  the offender was released from a maximum security institution

39.  At any time during the release, the Parole Officer may make a referral to the Aboriginal Community Liaison Officer, in locations where one is in place, for access to Aboriginal community resources.

**Case Conferences**

40.  Regular case conferences, which include at a minimum the person supervising an offender and a Parole Officer Supervisor, will be held:

a.  to discuss release plans or a change in the release plan

b.  prior to completion of a Correctional Plan Update or an Assessment for Decision

c.  to reassess risk and review progress

d.  to discuss any required interventions, such as program referrals

41.  All case conferences must be documented in a Casework Record unless the information is contained within a Correctional Plan or an Assessment for Decision.

42.  If the initial release plan differs significantly from that approved by the Parole Board of Canada (PBC), the Parole Officer will submit a recommendation of "Change Condition" as noted in Annex B of <u>CD 715-2 – Post-Release Decision Process</u>.

**Updating Offender Progress**

43.  Using the Rating Reassessment Framework (<u>Annex C</u>), the Correctional Plan will be updated:

a.  to add or delete a program pursuant to <u>CD 726 – Correctional Programs</u>

b.  when there is a change in the type of release, when Day Parole is continued or where circumstances warrant a reassessment (e.g. change in key ratings)

<u>**Travel Permits**</u>

44.  A travel permit is required for all travel outside the established boundaries. Prior to approving travel outside the established boundaries, the Parole Officer will consider case specific factors that can include but are not limited to: purpose and length of travel, offender's current risk level, existence of high risk situations and/or triggers, progress and stability under supervision, security intelligence information, victim concerns, PBC decisions and applicable comments, and strategies to manage risk during the travel period.

45. The decision to approve travel may require consultation with the parole office and/or the police at the destination location.

46. A Community Assessment is normally completed prior to approving travel to a community contact unknown to the Parole Officer. If a Community Assessment is not completed, the rationale for approving the travel permit without a Community Assessment will be documented in a Casework Record.

47. In cases in which the offender has been granted a travel permit to a different supervision area and police reporting is required, the supervising Parole Officer will verify police reporting following the offender's return. In cases where the destination office is actively involved in the supervision of the offender (e.g. travel permits of a long duration), the destination office is responsible for verifying the police reporting. The contact with the police will be documented.

48. The Parole Officer will advise the Security Intelligence Officer of any travel requested by offenders with links to criminal organizations, gangs or security threat groups.

49. The established levels of intervention will be maintained during periods of travel.

50. The Parole Officer will advise the Victim Services Unit of travel by offenders with victim notification, normally five days prior to the event.

51. Travel will be confirmed by the Parole Officer following completion of the permit. When an offender is travelling to the same destination regularly, confirmation of travel need only occur based on case specific factors.

52. Requests for out-of-country travel require a referral and recommendation to the PBC to receive an exemption from the standard condition requiring the offender to remain in Canada. Refer to PBC Policy Manual and Exchange of Information Agreement Between CSC and Passport Canada, regarding out-of-country travel submissions. This does not apply to those offenders who have been granted a parole reduced status.

53. If there are reasonable grounds to believe the offender is a member of or affiliated with a criminal organization, gang or security threat group, the Parole Officer will forward relevant information to the Security Intelligence Officer, prior to submitting an out-of-country travel recommendation to PBC. The Security Intelligence Officer will advise the Preventive Security and Intelligence Branches at Regional and National Headquarters.

54. The Parole Officer will include the results of the security review in the submission to PBC. If travel is approved by PBC, the Security Intelligence Officer will provide the travel itinerary to the Preventive Security and Intelligence Branches at Regional and National Headquarters.

## Relocation or Reassignment of Offender's Supervision

55. Prior to transferring an offender to another supervising location, or reassigning the offender's case to another Parole Officer, the supervising Parole Officer will consider the offender's stability and case specific factors to ensure the transfer process is consistent with the goals of the Correctional Plan. Every effort will be made to avoid the transfer or reassignment of an offender who is in an unstable situation unless this will contribute to improved management of the offender's risk.

56. Prior to approving an offender's request for relocation, the Parole Officer will consult with the destination office regarding supervision requirements and a need for a Community Assessment. A case conference with the receiving Parole Officer will be held and documented prior to a transfer or reassignment.

57. Normally, where documents require translation, the sending office will translate the Criminal Profile Report, the Correctional Plan, the most recent Correctional Plan Update and Assessment for Decision, a current psychological/psychiatric report and any information impacting potential interventions, prior to the transfer of an offender.

### High Profile Offenders

58. If it is determined that an anticipated event is likely to generate significant public interest, a High Profile Memo will be completed pursuant to CD 701 – Information Sharing.

### ENQUIRIES

59. Strategic Policy Division
National Headquarters
Email: Gen-NHQPolicy-Politi@csc-scc.gc.ca

Commissioner,

Original Signed by:
Don Head

ANNEX A

CROSS-REFERENCES AND DEFINITIONS

CROSS-REFERENCES

CD 568 – Management of Security Information and Intelligence
CD 568-2 – Recording and Sharing of Security Information and Intelligence
CD 700 – Correctional Interventions
CD 701 – Information Sharing
CD 710-3 – Temporary Absences
CD 710-7 – Work Releases
CD 712-1 – Pre-Release Decision Making
CD 712-4 – Release Process
CD 712-5 – Pre-Release Case Preparation for Provincial/Territorial Offenders and Federal Offenders
Incarcerated in Provincial/Territorial Facilities
CD 715 – Community Supervision Framework
CD 719 – Long-Term Supervision Orders
CD 726 – Correctional Programs
CD 784 – Information Sharing Between Victims and the Correctional Service of Canada

Specific Guidelines for the Treatment of Opiate Dependence (Methadone/Suboxone)


DEFINITIONS

**Case conference**: a formal meeting, consultation or discussion about an offender between two or more individuals.

**Community supervision contact**: any supervision contact with the offender in the community.

**Contractor**: a person providing services of a prescribed class to the Correctional Service of Canada under a contract.

**Exception for tandem supervision**: the Area Director's authority to suspend the application of tandem supervision for offenders identified as meeting the established tandem supervision criteria, at the recommendation of the Case Management Team.

**Parole reduced status**: offenders who have had the majority of standard conditions removed by the Parole Board of Canada. Offenders who have been granted parole reduced status are only subject to three standard conditions, namely paragraphs 161(1)(a) and (c) and subparagraph 161(1)(g)(i) of the CCRR, which require them to report to their parole supervisor, obey the law and keep the peace, and notify the parole supervisor of any change in their address of residence.

**Tandem supervision**: the requirement to conduct community supervision visits with a second authorized individual.

CD 715-1         Community Supervision         2013-04-30

**Tandem supervision criteria**: tandem supervision is a requirement in cases which meet one (or both) of the following criteria:

a.    offenders who have a criminal history involving any sexual offence and/or death and are assessed as high risk at intake (level of intervention based on static factors)

b.    offenders who have a criminal history involving any sexual offence and/or death and are classified as maximum security upon release (offender security level)

CD 715-1                          Community Supervision                          2013-04-30

<u>ANNEX B</u>

<u>STAFF SAFETY ASSESSMENT</u>

**REASON FOR SAFETY ASSESSMENT:**          Initial     Reassessment     Reassignment

**OFFENDER:** _____ **FPS:** _____

**RELEASE TYPE AND DATE:** _____

**PAROLE OFFICER:** _____

<u>CONSIDER EACH FACTOR IN RELATION TO ITS IMPACT ON STAFF SAFETY</u>

<u>Offender Factors</u>

| | |
|---|---|
| 1. History of violence | Y/N |
| 2. History of weapons use | Y/N |
| 3. History of predatory behaviour | Y/N |
| 4. Relationship between intoxicants and violent behaviour | Y/N |
| 5. Previous hostility or assault on staff | Y/N |
| 6. Instability of intimate relationships | Y/N |
| 7. Mental health issues | Y/N |
| 8. Links to organized crime/gangs, etc. | Y/N |
| 9. Assigned Parole Officer meets the profile of the offender's victim(s) | Y/N |
| 10. Other | Y/N |

_____

_____

_____

<u>Environmental Factors</u>

| | |
|---|---|
| 11. Remote location | Y/N |
| 12. Availability of police | Y/N |
| 13. Criminal history – at location | Y/N |
| 14. Proximity to criminal/gang activity | Y/N |
| 15. Uncooperative/hostile collateral | Y/N |
| 16. Restricted access to outside intervention | Y/N |
| 17. Restricted cell phone coverage | Y/N |
| 18. Other | Y/N |

_____

_____

_____

CD 715-1 Community Supervision 2013-04-30

<u>TANDEM SUPERVISION CRITERIA</u>

19. Tandem supervision is a requirement in cases which meet one (or both) of the following criteria:

   a. offenders who have a criminal history involving any sexual offence
      and/or death and are assessed as high risk at intake
      (level of intervention based on static factors)                                 Y/N

   b. offenders who have a criminal history involving any sexual offence
      and/or death and are classified as maximum security upon release
      (offender security level)                                                        Y/N

**COMMUNITY VISIT STRATEGY (alternate interview location, police notification, emergency protocols, tandem supervision, etc.)**

_____

_____

_____


Parole Officer: _____

Supervisor: _____  Case Conference Date: _____

<u>EXCEPTION/REMOVAL (IF APPLICABLE)</u>

**Case Management Team Recommendation**

_____

_____


**Area Director Final Decision**                          Approved / Not Approved

**Rationale**

_____

_____


**Area Director/Parole Officer Supervisor:** _____  Date:_____

CD 715-1          Community Supervision          2013-04-30

<u>ANNEX C</u>

<u>RATING REASSESSMENT FRAMEWORK</u>

<u>Level of Intervention Based on Static Factors</u>

1.    A review of static factors (i.e. based on historical information related to risk that is available at the time of the offender's admission to federal custody, such as rating on the Statistical Information on Recidivism Scale, criminal history record, offence severity record, sex offence history, detention criteria) produces a reliable estimate of the probability and severity of re-offending. This estimate, originally determined at intake, appears as a rating of level of intervention based on static factors. The rating is normally accurate throughout the offender's period of incarceration and for the first six months of supervision on conditional release, at which time dynamic factors related to performance on release become increasingly dominant.

2.    The predictive accuracy of this rating can be improved in some cases by reviewing the following factors:

    a.    time since the offender's release

    b.    existence of collateral contacts that could assist in the supervision

    c.    significant disciplinary problems, suspensions or police intervention in the last year

    d.    offender's progress and motivation to participate in his/her Correctional Plan

3.    Only a significant and sustained change in the offender's performance or situation justifies an increase or a decrease in the level of intervention based on static factors. Guidelines for adjusting the level are as follows:

    a.    LOW

          ○    If the previous rating was LOW and there have been no significant changes in the above factors

          ○    If the previous rating was MEDIUM and there have been significant and sustained improvements in the above factors

    b.    MEDIUM

          ○    If the previous rating was MEDIUM and there have been no significant changes in the above factors

          ○    If the previous rating was HIGH and there have been significant and sustained improvements in the above factors

- If the previous rating was LOW and there has been significant and sustained deterioration in the above factors

c.  **HIGH**

- If the previous rating was HIGH and there have been no significant changes in the above factors

- If the previous rating was MEDIUM and there has been significant deterioration in the above factors

**Level of Intervention Based on Dynamic Factors**

4.  Reassessing the level of intervention based on dynamic factors begins with the reassessment of each of the dynamic factors, by examining each of the following areas:

    a.  progress related to the Correctional Plan

    b.  anything else that may affect the intensity of the dynamic factor (e.g. changes in personal situation, health, etc.)

5.  The rating for each dynamic factor may be as follows:

    **ASSET** – factor seen as an asset to community adjustment

    **NONE** – no immediate need for improvement

    **LOW** – low need for improvement

    **MODERATE** – medium need for improvement

    **HIGH** – high need for improvement

6.  Reassessment of the overall rating can then be conducted by examining the number and seriousness of the dynamic factors.

7.  The overall rating should only change if there are some changes in the reassessment of the dynamic factors. The overall rating may be:

    a.  **LOW**

        - No identified dynamic factors (e.g. factors seen as an asset to community adjustment and/or no immediate need for improvement)

        - Relatively few identified dynamic factors and rated as "low or medium need for improvement"

b.  HIGH

- Few identified dynamic factors but rated as "high need for improvement"

- Multiple dynamic factors identified (regardless of degree or severity of needs)

c.  MEDIUM

- Any combination of dynamic factor severity and number that lie outside of either the low or high scoring guidelines as identified above

8.  During the reassessment process, it is possible to identify new dynamic factors for which intervention may improve the chances for the offender's eventual reintegration.

**Accountability**

9.  Accountability is the level of involvement of the offender in his/her Correctional Plan in relation to the obligation to modify behaviours identified as being problematic. Attitude, behaviour, and insight are critical components to offender accountability.

10. The following criteria are used to assess an offender's level of accountability:

a.  level of acceptance of responsibility for his/her criminal behaviour

b.  level of remorse and victim empathy

c.  institutional adjustment and/or behaviour under community supervision

d.  conduct that demonstrates respect for other persons and property

e.  communication to his/her Parole Officer of his/her willingness to engage in his/her Correctional Plan

f.  active participation in setting and achieving the objectives of his/her Correctional Plan

g.  understanding of his/her offence cycle

h.  understanding and commitment to his/her relapse prevention

i.  meeting of court-ordered obligations

CD 715-1            Community Supervision            2013-04-30

**Overall Level of Accountability**

11. The guidelines for establishing the overall level of accountability are as follows:

     a. **LOW** – Offender rejects responsibility for his/her actions and fails to recognize his/her problems. Does not disclose emotional states, display guilt or victim empathy with evidence indicating a high level of denial and cognitive distortions

     b. **MODERATE** – Offender may not fully accept responsibility for his/her actions but recognizes some of his/her problems. Displays some guilt and victim empathy with some evidence of denial and cognitive distortions

     c. **HIGH** – Offender accepts responsibility for his/her actions and recognizes his/her problems. Willing to self-disclose, displays guilt and victim empathy with evidence indicating a low level of cognitive distortions

**Level of Motivation**

12. The criteria for reassessing motivation are:

     a. recognition that a problem exists with lifestyle, behaviour and resulting consequences

     b. level of comfort with problem and its impact on the offender's life

     c. level of feeling of personal responsibility for the problem(s)

     d. willingness to change, i.e. expression of wish to change, or of intention to fully participate in Correctional Plan

     e. possession of skills and knowledge required to effect change in behaviour, i.e. is ready to change

     f. level of external support from family, friends or other community members

     g. past history related to demonstrated change

13. The level of motivation can be assessed as:

     a. LOW

         • Offender strongly rejects the need for change or is unwilling to participate in recommended programs or other interventions

     b. MEDIUM

         • Offender may not fully accept overall assessment but will participate in recommended programs or other interventions

   c.  HIGH

      • Offender is self-motivated and will actively address problem areas

**Responsivity**

14. Responsivity is the presence of a characteristic(s) that influences the offender's capacity to benefit from the targeted intervention(s).

15. Responsivity indicators are identified as "Yes", "No" or "Unknown".

16. The following factors are used to assess an offender's responsivity:

   a.  language barriers interfere with learning, work or intervention

   b.  basic reading and/or writing skills are problematic

   c.  concentration problems are evident

   d.  introverted/shy

   e.  displays chronic antisociality

   f.  may have a learning disability

   g.  low self-esteem

   h.  intellectually disabled

   i.  may have other issues that would interfere with programming

   j.  suicide attempts/self-injury history

   k.  grief or loss

   l.  has unique cultural communication style

   m.  expresses interest in strengthening culture, or

   n.  any other factor

17. Overall responsivity is identified as "Yes" or "No".

**Engagement**

18. Engagement is the demonstrated willingness of an offender to:

   a.  actively participate in his/her assigned Correctional Plan

   b.   be free of criminal and gang activity while under sentence

   c.   display conduct that demonstrates respect

   d.   obey the penitentiary rules and/or supervision requirements

19. Determine the offender's engagement in his/her Correctional Plan. In order to be considered engaged, the offender must obtain a rating of either moderate or high in both accountability and motivation.

20. Engagement is identified as "Yes" or "No".

**Reintegration Potential**

21. The reassessment of the reintegration potential is based on the analysis of the offender's progress and the following elements:

   a.   score on the Statistical Information on Recidivism Scale

   b.   level of intervention, based on static factors

   c.   level of intervention, based on dynamic factors

   d.   level of motivation

   e.   release history (number, type, success or failure)

22. The reintegration potential should only change if the above have changed, and should be rated as:

   a.   **LOW**

       ◦  If the previous rating was LOW and there have been no significant changes in the above factors

       ◦  If the previous rating was MEDIUM and there has been significant deterioration in the above factors

   b.   **MEDIUM**

       •  If the previous rating was MEDIUM and there have been no significant changes in the above factors

       •  If the previous rating was HIGH and there has been significant deterioration in the above factors

Case 2:15-cv-08623-JLS-E   Document 28-1   Filed 05/02/16   Page 97 of 101   Page ID #:364

- ○ If the previous rating was LOW and there have been significant improvements in the above factors

c.  **HIGH**

- ○ If the previous rating was HIGH and there have been no significant changes in the above factors



- ○ If the previous rating was MEDIUM and there have been significant improvements in the above factors

CD 715-1                          Community Supervision                          2013-04-30

<u>ANNEX D</u>

<u>EXCHANGE OF INFORMATION AGREEMENT BETWEEN CSC AND PASSPORT CANADA</u>

1. Under the terms of the *Canadian Passport Order,* Passport Canada can withhold passports from Canadian citizens who are subject to a term of imprisonment or forbidden to leave Canada or the territorial jurisdiction of a Canadian court by conditions imposed with respect to any temporary absence, work release, parole, statutory release or other similar regime of absence or release from a penitentiary or prison or any other place of confinement granted under the *Corrections and Conditional Release Act*, the *Prison and Reformatories Act* or any law made in Canada that contains similar release provisions [subparagraph 9(d)(i) of the Order].

2. Passport Canada will consider issuing a passport to an offender only following a PBC decision allowing the offender to travel internationally. As part of the documentation submitted to Passport Canada, the applicant is required to submit the PBC Decision Sheet. There is no supporting documentation required from the supervising Parole Officer, since it is the applicant's responsibility to provide Passport Canada with all required documentation.

3. In the event that Passport Canada requires confirmation or clarification of information submitted by the applicant, contact will be made with Passport Canada CSC liaison person at National Headquarters. If necessary, further follow-up with the supervising Parole Officer will be initiated by the CSC liaison person.

4. If Passport Canada approves the issuance of a passport, a limited validity passport will be issued for the period of time that the offender is permitted to travel by the PBC, or for the minimum duration required to meet entry/exit requirements of the country of travel.

5. Where a limited validity passport is issued, the offender will sign an agreement with Passport Canada to return the passport to Passport Canada's Security Bureau upon return to Canada. The limited validity passport will be cancelled upon receipt by Passport Canada. A new passport will be required for each occasion that the PBC allows the offender to travel internationally.

6. Given that limited validity passports will be issued for offenders approved for international travel, it remains important that submissions to the PBC for this purpose specify as accurately as possible the duration of the offender's anticipated travel.

7. In cases where travel is approved by the PBC for emergency or compassionate reasons, Passport Canada can issue passports within a short timeframe on a case-by-case basis.

8. Unless Passport Canada is advised that the condition requiring an offender to remain at all times in Canada has been relieved by the PBC, a passport will be denied or a valid passport will be revoked.

9. Information from Passport Canada pertaining to a decision rendered is electronically communicated to CSC.

CD 715-1                        Community Supervision                        2013-04-30

10. The decision is in turn forwarded to the offender's current Institutional or Community Parole Officer via email. The notification includes the offender's name, FPS, date of decision and description. The description notes the decision rendered by Passport Canada (i.e. revoked, maintained, refused or issued).

11. Upon receipt of a decision by Passport Canada, the Parole Officer will be required to do the following:

    a. print the decision

    b. discuss the decision and any implications on the offender's risk management with his/her supervisor

    c. discuss this information and Passport Canada's decision with the offender

    d. complete a Casework Record under "Case Conference"

    e. place the printed decision notification on the offender's Case Management file

12. Every six months, Parole Officers will receive a report via email that will contain a list of all previous passport application decisions rendered with regard to offenders on their caseload.

13. If a Parole Officer does not receive such a report, this would simply mean that he/she does not have any offenders on his/her current caseload who have had a decision rendered on a passport application since the implementation of this initiative.

14. The foregoing does not apply to offenders with parole reduced status.

15. Offenders who have been granted parole reduced status are only subject to three standard conditions, namely paragraphs 161(1)(*a*) and *(c)* and subparagraph 161(1)(*g*)(i) of the CCRR, which require them to report to their parole supervisor, obey the law and keep the peace, and notify the parole supervisor of any change in their address of residence. As such, they are not subject to paragraph 161(1)(*b*) of the CCRR and therefore refusal or revocation of passport services would not be undertaken with reference to subparagraph 9(*d*)(i) of the *Canadian Passport Order*.

ANNEX E

CORECTIONAL PLAN UPDATE – COMMUNITY PROGRESS – REPORT OUTLINE

Section 1 – OBJECTIVES/EXPECTED GAINS

CASE STATUS

Referencing the Key Ratings Reassessment Framework in Annex C, update relevant information and succinctly summarize the progress towards meeting the objectives of the Correctional Plan, as required.

STATIC FACTOR ASSESSMENT RATING – Low, Medium or High

DYNAMIC FACTOR ASSESSMENT RATING – Low, Medium or High

ACCOUNTABILITY RATING – Low, Moderate or High

MOTIVATION RATING – Low, Medium or High

RESPONSIVITY FACTOR – Yes or No

ENGAGEMENT FACTOR – Yes or No

REINTEGRATION POTENTIAL RATING – High, Medium or Low

PSYCHOLOGICAL/PSYCHIATRIC/MENTAL HEALTH INFORMATION (if applicable)

OFFENCE CYCLE

Update, if required, the offence cycle, and comment on any changes regarding the offender's understanding of the cycle.

CORRECTIONAL AND SENTENCE PLANNING

In consultation with the offender, update goals and expected results that support progress against the Correctional Plan.

Summarize progress from the current review period and set/confirm the objectives for the next period. This is to be consistent with the overall continuum of sentence planning.

These objectives will be individualized, structured, time framed and focused on the next review period while setting the framework for managing the sentence. The objectives will be prioritized based on:

   a.   community adjustment and supervision
   b.   interventions required
   c.   public safety

    d.  safe reintegration
    e.  court-ordered obligations

## ASSESSMENT

Summarize the offender's risk as it relates to the elements of the proposed release plan consistent with the Correctional Plan, including any previous release history, the offender's involvement in the development of the plan and whether he/she is in agreement with the proposed plan.

## Section 2 – ANALYSIS OF CURRENT REQUEST

If a new Community Strategy is required, address the following:

- ✓ role played by this release in a long-term release strategy
- ✓ release details, i.e. proposed release destination (where applicable, indicate if the offender has expressed an interest in having an Aboriginal community involved in release planning pursuant to section 84 of the CCRA), accommodation, employment, finances and family support
- ✓ offender's outstanding risk factors requiring intervention

## RISK ASSESSMENT

Review and integrate into the risk assessment any victim related considerations including, but not limited to:

- ➢ risk management concerns regarding potential future victims
- ➢ information and comments from sentencing judge with regard to community supervision
- ➢ restriction on travel as a result of the proximity of the victim's residence
- ➢ victim requests for non-association and any threats made either before or after sentencing
- ➢ other information consented by the victim to share with the offender, that does not put the victim at risk

Do not document any information related to victim notification.

