1
2
3
4
5
6
7
8
9                       **UNITED STATES DISTRICT COURT**

10                     **CENTRAL DISTRICT OF CALIFORNIA**

11

12   IN THE MATTER OF THE          ) NO. CV 15-8623-JLS(E)
     EXTRADITION OF                )
13   KENNETH WAYNE FROUDE,         )
                                   )
14   a Fugitive from the          ) MEMORANDUM AND ORDER
     Government of Canada,         )
15                                 ) CERTIFYING EXTRADITABILITY
     _____)

16

17

18                          **BACKGROUND**

19

20       The Government of Canada has requested the extradition of Kenneth

21   Wayne Froude ("Froude").  Froude opposes extradition.

22

23       On September 23, 2015, the Government of the United States

24   ("Government") filed a sealed "Complaint for Arrest Warrant and

25   Extradition" pursuant to 18 U.S.C. section 3184 in <u>In the Matter of</u>

26   <u>the Extradition of Kenneth Wayne Froude</u>, CR 15-1770M.  Froude was

27   arrested in this District on October 1, 2015.

28   ///

On November 4, 2015, in the present action, the Government filed:
(a) "Government's Filing of (1) Request for Extradition, and
(2) Redacted Copy of Formal Extradition Papers" ("Request for
Extradition"); and (b) "Notice to Consolidate" the action with case
number CR 15-1770M.  On November 5, 2015, the matter was referred to
the undersigned Magistrate Judge.[1]

On March 14, 2016, the Government filed "Government's Memorandum
in Support of Extradition" ("Government's Memorandum").  On March 21,
2016, Froude filed "Kenneth Wayne Froude's Opposition to Government's
Request for Extradition" ("Opposition").  On April 4, 2016, the
Government filed a Reply.

The Court held an extradition hearing on April 11, 2016.  On the
same date, the Court issued a Minute Order requiring supplemental
submissions.  On May 2, 2016, the Government filed the "Government's
Supplemental Memorandum in Support of Extradition" with attached
exhibits ("Government's Supplemental Memorandum").  On May 26, 2016,
Froude filed "Kenneth Wayne Froude's Supplemental Brief, etc."
("Froude Supplemental Brief").

The Court has read and considered all of the documents submitted
in support of and in opposition to the Request for Extradition, and
has considered the evidence and arguments presented at the hearing.
///
///

---

[1]     The two matters were consolidated on November 5, 2015.

**FINDINGS AND CONCLUSIONS**

## I.  Jurisdiction

     This Court has jurisdiction to conduct extradition proceedings pursuant to 18 U.S.C. section 3184, Local Rule 72-1, and General Order No. 05-07 of the United States Court for the Central District of California.  The Court has jurisdiction over Froude pursuant to 18 U.S.C. section 3184.

## II.  Treaty

     The extradition treaty between the United States of America and the Government of Canada is in full force and effect.  See Treaty on Extradition between the United States of America and Canada signed at Washington on December 3, 1971, as amended by: (1) an exchange of notes on June 28, 1974 and July 9, 1974, T.I.A.S. No. 8237, 27 U.S.T. 983, 1976 WL 166697; (2) the Protocol Signed at Ottawa on January 11, 1988, Amending the Treaty, etc., which entered into force on November 26, 1991, 27 I.L.M. 423; and (3) the Second Protocol Amending the Treaty on Extradition Between the Government of the United States of America and the Government of Canada, signed at Ottawa on January 12, 2001, which entered into force on April 30, 2003 ("the Treaty") (Request for Extradition, Ex. A, Declaration of Anna Cavnar, ¶ 3, and exhibits thereto, ECF Dkt. No. 1-3, pp. 3, 7-44).

///

///

///

III.  **Identity**

The Kenneth Wayne Froude appearing before this Court is the same Kenneth Wayne Froude sought by the Government of Canada.

IV.  **Request for Extradition; Procedural Requirements**

The Request for Extradition filed with this Court by the Government of Canada complies with the requirements of the Treaty.

V.  **Asserted Grounds for Extradition**

Pending in Canada against Froude are three criminal counts concerning Froude's alleged failure to comply with the terms of a Long-Term Supervision Order ("LTSO"), in asserted violation of Canada Criminal Code section 753.3(1).  The three counts charge: (1) failing to reside at a Community Correctional Centre or Community-Based Residential Facility approved by the Correctional Service of Canada; (2) failing to remain at all times in Canada within the territorial boundaries fixed by his parole supervisor; and (3) failing "to obey the law and keep the peace."[2]

The Government of Canada also seeks Froude's extradition to enforce the 3,409 day term remaining to be served under the LTSO.

---

[2]  The Government of Canada is not seeking extradition on an additional charge of failing to comply with Canada's Sex Offender Information Registration Act (<u>see</u> Shai Aff., ¶ 4, ECF Dkt. 1-4, p. 6).

**VI.   Limited Nature of Present Proceedings**

In Vo v. Benov, 447 F.3d 1235 (9th Cir.), cert. denied, 549 U.S. 935 (2006), the Ninth Circuit emphasized the very limited role of the court in extradition proceedings.

> An extradition court - in this case the magistrate
> judge-exercises very limited authority in the overall
> process of extradition.  As we have explained,
> "[e]xtradition is a matter of foreign policy entirely within
> the discretion of the executive branch, except to the extent
> that the statute interposes a judicial function."
> [citations].  Extradition from the United States is
> initiated when the nation seeking extradition makes a
> request directly to the State Department.  [citation].
> "After the request has been evaluated by the State
> Department to determine whether it is within the scope of
> the relevant extradition treaty, a United States Attorney
> . . . files a complaint in federal district court seeking an
> arrest warrant for the person sought to be extradited."
> [citation].  Upon the filing of a complaint, a judicial
> officer (typically a magistrate judge) issues a warrant for
> an individual sought for extradition, provided that an
> extradition treaty exists between the United States and the
> country seeking extradition and the crime charged is covered
> by the treaty.  18 U.S.C. § 3184.  After the warrant issues,
> the judicial officer conducts a hearing to determine whether
> there is "evidence sufficient to sustain the charge under

1    the provisions of the proper treaty or convention," id., or,

2    in other words, whether there is probable cause.

3

4  Vo v. Benov, 447 F.3d at 1237.

5

6         Thus, in determining whether the crime is extraditable and

7  whether probable cause exists, the Magistrate Judge "has no

8  discretionary decision to make." Prasoprat v. Benov, 421 F.3d 1009,

9  1012 (9th Cir. 2005), cert. denied, 546 U.S. 1171 (2006) (citation and

10  internal quotations omitted).  "If the judge or magistrate judge

11  concludes that 'the crime is extraditable,' and that 'there is

12  probable cause to sustain the charge,' the judge or magistrate judge

13  must certify the extradition." Manta v. Chertoff, 518 F.3d 1134, 1140

14  (9th Cir. 2008) (citation omitted).  "Once a magistrate judge confirms

15  that an individual is extraditable, it is the Secretary of State,

16  representing the executive branch, who determines whether to surrender

17  the fugitive." Blaxland v. Commonwealth Director of Public

18  Prosecutions, 323 F.3d 1198, 1208 (9th Cir. 2003).

19

20         "The only purpose of the extradition hearing is for the

21  magistrate judge to determine whether the crime is extraditable and

22  whether there is probable cause to support the charge." Prasoprat v.

23  Benov, 421 F.3d at 1014.  If the evidence is sufficient, "the

24  inquiring magistrate judge is required to certify the individual as

25  extraditable to the Secretary of State and to issue a warrant." Id.

26  at 1012.  It is the Secretary of State "who ultimately decides whether

27  to surrender the [individual] to the requesting country." Vo v.

28  Benov, 447 F.3d at 1237 (citations, footnote and internal quotations

6

omitted).

        "An extradition proceeding is not a trial; the relevant
determination is confined to whether a prima facie case of guilt
exists that is sufficient to make it proper to hold the extraditee for
trial."  Emami v. United States District Court for the Northern
District of California, 834 F.2d 1444, 1452 (9th Cir. 1987).  "The
function of the committing magistrate is to determine whether there is
competent evidence to justify holding the accused to await trial, and
not to determine whether the evidence is sufficient to justify a
conviction."  Collins v. Loisel, 259 U.S. 309, 316 (1922); Barapind v.
Enomoto, 400 F.3d 744, 752 (9th Cir. 2005) (citation and quotations
omitted).  An extradition proceeding thus "makes no determination of
guilt or innocence," but is "designed only to trigger the start of
criminal proceedings against an accused," and "guilt remains to be
determined in the courts of the demanding country."  Sainez v.
Venables, 588 F.3d 713, 717 (9th Cir. 2009), cert. denied, 560 U.S.
958 (2010) (citation and internal quotations omitted).  The country
seeking extradition need not produce all of its evidence, and the
Magistrate Judge does not determine whether there exists sufficient
evidence to convict.  Id. at 717; Quinn v. Robinson, 783 F.2d 776, 815
n.41 (9th Cir.), cert. denied, 479 U.S. 882 (1986) (noting "well-
established rule that extradition proceedings are not to be converted
into a dress rehearsal for a trial") (citation and internal quotations
omitted).

///

///

///

7

**VII.   <u>Government's Evidence</u>**

Evidence submitted by the Government demonstrates the following:

On March 9, 2006, the Superior Court of Justice in London, Ontario, Canada, sitting with a jury, found Froude guilty of one count of breaking and entering with the intent to commit sexual battery, one count of sexual assault using a weapon and one count of uttering threats to cause bodily harm (Request for Extradition, Ex. B, Affidavit of Law of Karen Shai ["Shai Aff."], ¶ 26, ECF Dkt. No. 1-4, p. 11; Affidavit of Facts of Lisa Manson ["Manson Aff."] ¶ 3, ECF Dkt. No. 1-4, pp. 78-79). These crimes occurred in 2004 (<u>id.</u>). On May 5, 2008, Justice Rady of the Superior Court of Justice designated Froude as a Long-Term Offender pursuant to Canadian Criminal Code section 753.1(1) (Shai Aff., ¶ 27, ECF Dkt. No. 1-4, at p. 11, & Ex. G thereto, ECF Dkt. No. 1-4, pp. 42-49; Manson Aff., ¶ 3, ECF Dkt. No. 1-4, p. 79, & Ex. A thereto, ECF Dkt. No. 1-4, pp. 87-89).

Then, as now, section 753.1(1) authorized a judge to designate an offender as a Long-Term Offender when:

a.  It would be appropriate to impose a sentence of imprisonment of two years or more for the offense for which the offender has been convicted;

b.  There is a substantial risk that the offender will reoffend; and

///

8

> c.  There is a reasonable possibility of eventual control of
> the risk in the community.

(Shai Aff., ¶ 13, ECF Dkt. No. 1-4, p. 8 & Ex. A thereto, ECF Dkt. No. 1-4, p. 15).

Under the version of section 753.1(3) applicable in 2004, if a court found an offender to be a Long-Term Offender, the court was required to:

> a.  Impose a sentence for the offense for which the offender
> has been convicted, which sentence must be a minimum punishment
> of imprisonment for a term of two years; and

> b.  Order the offender to be supervised in the community,
> for a period not exceeding ten years, in accordance with section
> 753.2 and the *Corrections and Conditional Release Act*.

(Shai Aff., ¶ 15, ECF Dkt. No. 1-4, pp. 8-9 & Ex. A, ECF Dkt No. 104, p. 16).

On May 16, 2008, Judge Rady sentenced Froude to thirty months in prison and imposed the maximum long-term supervision term of ten years (Shai Aff., ¶ 27, ECF Dkt. No. 1-4, p. 11 & Ex. H thereto, ECF Dkt. No. 1-4, pp. 51-55).  Froude appealed the prison sentence but did not appeal the Long-term Offender designation or the imposition or duration of the LTSO (Shai Aff, ¶ 29, ECF Dkt. No. 1-4, p. 11).  The Court of Appeal for Ontario dismissed Froude's appeal (Shai Aff., ¶ 29

& Ex. I thereto, ECF Dkt. No. 1-4, pp. 58-60).

Following the completion of his thirty month prison term, Froude commenced service of the LTSO on November 12, 2010 (Manson Aff., ¶ 5, ECF Dkt. No. 1-4, p. 80).  Froude was subject to certain conditions as a Long-Term Offender.  As pertinent here, regulations promulgated under Canada's Corrections and Conditional Release Act required that Froude: (1) on release, "travel directly" to his "place of residence" as set forth on his release certificate and report immediately to his parole supervisor; (2) "remain at all times in Canada within the territorial boundaries fixed by the parole supervisor"; and (3) "obey the law and keep the peace" (Shai Aff., ¶ 17, ECF Dkt. No. 1-4, p. 9 & Ex. B thereto, ECF Dkt. No. 1-4, pp. 19-21).  The Long-Term Supervision Certificate issued on November 12, 2010, contained these provisions, and further required Froude, among other things, to: (1) reside at a Community Correctional Centre or a Community-Based Residential Facility approved by the Correctional Service of Canada ("CSC");[3] and (2) disclose to his parole supervisor any and all contacts with females with whom Froude associated or attempted to associate (Manson Aff., ¶ 5, ECF Dkt. No. 1-4, pp. 80-81 & Ex. B thereto, ECF Dkt. No. 1-4, pp. 91-94).

///

///

---

[3]     The CSC is the Canadian federal government agency responsible for administering prison sentences of a term of two years or more, managing institutions of various security levels and supervising offenders under both conditional release and long-term supervision as ordered by the court (Manson Aff. ¶ 2, ECF Dkt. No. 1-4, p. 78).

1    Froude commenced service of his LTSO on November 12, 2010, upon
2  his release from the Kingston Penitentiary (Manson Aff., ¶ 7, ECF Dkt.
3  No. 1-4, p. 81).  Froude was directed to take up residence at the
4  Portsmouth Community Correctional Centre ("PCCC") on that day (id.).
5  On release from the penitentiary, however, Froude refused to be
6  accompanied by staff to the PCCC and was issued a taxi chit instead
7  (Manson Aff., ¶ 7, ECF Dkt. No. 1-4, p. 81).  Froude then convinced
8  the taxi driver to take Froude downtown rather than to the PCCC
9  (Manson Aff., ¶ 7, ECF Dkt. No. 1-4, p. 81).  Froude was arrested by
10  police before he could disappear into a downtown crowd (id.).
11  Froude's post-release conduct breached the conditions of his LTSO
12  requiring him to travel directly to his place of residence and to
13  report immediately to his parole supervisor (Manson Aff., ¶ 7, ECF
14  Dkt. No. 1-4, p. 81).

15

16    On February 14, 2011, while at the Quinte Detention Centre,
17  Froude made a collect telephone call to a female correctional officer
18  (Manson Aff., ¶ 7, ECF Dkt. No. 1-4, p. 81).  The officer hung up
19  after recognizing Froude's name as that of a recent releasee from the
20  penitentiary (Manson Aff., ¶ 7, ECF Dkt. No. 1-4, pp. 81-82).  Two
21  employees at the Quinte Detention Centre confirmed that Froude had
22  called the woman and had not disclosed the call to his parole
23  supervisor (Manson Aff., ¶ 7, ECF Dkt. No. 1-4, p. 82).  Froude
24  thereby breached the condition of the LTSO requiring him to disclose
25  to his parole supervisor any and all contacts with females with whom
26  he associated or attempted to associate (Manson Aff., ¶ 7, ECF Dkt.
27  No. 1-4, p. 82).
28  ///

On March 25, 2011, as a result of the foregoing incidents, Froude was convicted of harassment and of failing to comply with conditions of the LTSO (Manson Aff., ¶ 8, ECF Dkt. No. 1-4, p. 82 & Ex. C thereto, ECF Dkt. No. 1-4, pp. 96-99).  Froude received an additional sentence of nineteen months (id.).  This additional sentence interrupted the LTSO term (id.).

On April 12, 2012, Froude was released from the penitentiary on "statutory release" (Manson Aff., ¶ 9, ECF Dkt. No. 1-4, p. 82).  The next day, April 13, 2012, Froude's whereabouts became unknown and a Warrant of Apprehension, Suspension and Recommitment to Custody was issued (Manson Aff., ¶ 9, ECF Dkt. No. 1-4, p. 82).  Froude remained at large for 96 days until he was apprehended in the United States and returned to Canada (Manson Aff., ¶ 9, ECF Dkt. No. 1-4, p. 82).  On October 24, 2012, the Parole Board of Canada revoked Froude's statutory release (Manson Aff., ¶ 9, ECF Dkt. No. 1-4, pp. 82-83).

On November 22, 2012, Froude was released again on statutory release (Manson Aff., ¶ 9, ECF Dkt. No. 1-4, p. 83).  Following a brief period during which Froude's statutory release was temporarily suspended, on January 28, 2013, Froude resumed service of the LTSO as a resident of the PCCC (Manson Aff., ¶¶ 9, 11, ECF Dkt. No. 1-4, p. 83).  An amended Long-Term Supervision Certificate was issued on March 21, 2013, which reflected the conditions contained in the original certificate and also reflected a new expiration date of September 18, 2022 (Manson Aff., ¶ 8, ECF Dkt. No. 1-4, p. 82 & Ex. D, ECF Dkt. No. 1-4, pp. 101-05).

///

In the early morning hours of May 18, 2013, PCCC officers conducted bed checks during which they looked through the small window in Froude's door and saw what appeared to be Froude asleep in his bed (Manson Aff., ¶ 15, ECF Dkt. No. 1-4, p. 84).  At approximately 11:30 a.m., a parole officer received an anonymous text message from a PCCC resident reporting that Froude had left the PCCC during the previous night (Manson Aff., ¶ 16, ECF Dkt. No. 1-4, p. 84).  An officer then checked Froude's room and saw that the bed had been "dummied," _i.e._, a comforter and shirt had been used to make it appear as if Froude were asleep in the bed (Manson Aff., ¶ 17, ECF Dkt. No. 1-4, p. 84).  A check of the entire facility and surrounding property for Froude was unsuccessful (Manson Aff., ¶ 15, ECF Dkt. No. 1-4, p. 84).

In Canada, failure or refusal to comply with long-term supervision is an "indictable offense,"[4] carrying a maximum prison term of ten years (Shai Aff., ¶ 18, ECF Dkt. No. 1-4, p. 9 & Ex. C, ECF Dkt. No. 1-4, p. 23).  See Canada Criminal Code section 753.3(1); R. v. Ipeelee, 2012 SCC 13, ¶ 45, 2012 CarswellOnt 4375 (Supreme Court of Canada 2012).  On May 18, 2013, a Warrant of Apprehension, Suspension and Recommitment to custody of Long-Term Supervision was issued for Froude's arrest (Manson Aff., ¶ 10, ECF Dkt. No. 1-4, p. 83 & Ex. E thereto, ECF Dkt No. 10-4, pp. 106-09).  This warrant remains outstanding (Manson Aff., ¶ 10, ECF Dkt. No. 1-4, p. 83).

///

---

[4]    In Canada an "indictable offense" is the equivalent of a felony in the United States.  See 1128712 Ontario Inc. and Perin, Re, 2006 CarswellNat 7000, ¶ 16 (Canada Labour Code Part III) (Mar. 18, 2006).

An Information issued on April 29, 2015, charged Froude with, inter alia, the following three breaches of the LTSO: (1) failure to reside at a Community Correctional Centre or Community-Based Residential Facility approved by CSC; (2) failure to remain at all times in Canada within the territorial boundaries fixed by his parole supervisor, and (3) failure "to obey the law and keep the peace" (Shai Aff., ¶ 21, ECF Dkt. No. 1-4,¶ 21 & Ex. C, ECF Dkt. No. 1-4, pp. 25-28; Manson Aff., ¶ 18, ECF Dkt. No. 1-4, p. 84).[5] On April 29, 2015, a Canadian Justice of the Peace issued a warrant for Froude's arrest (Shai Aff., ¶¶ 24-25, ECF Dkt. No. 1-4, p. 10 & Ex. E thereto, ECF DKt. No. 1-4, pp. 30-33).

As of May 18, 2013, when Froude left the PCCC, Froude had served only 244 days of long-term supervision (Manson Aff., ¶ 19, ECF Dkt. No. 1-4, p. 84).  If and when returned to Canada, Froude will be subject to: (1) completion of the remaining 3,409 days of long-term supervision; and (2) prosecution for the alleged breaches of the LTSO (Manson Aff., ¶ 19, ECF Dkt. No. 1-4, p. 84).

**VIII.   <u>Extraditability and Probable Cause Determinations</u>**

Article 12, section 1 of the Treaty provides: "A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other

---

[5]    The Information also charged Froude with failing to comply with the Sex Offender Information Registration Act, Canada Criminal Code section 490.019, a charge as to which the Government of Canada does not seek extradition.

than that for which extradition has been granted. . . ."  Under the
Treaty and the "rule of specialty," this Court must determine the
propriety of each alleged ground for extradition.  See Caplan v.
Vokes, 649 F.2d 1336, 1343 (9th Cir. 1981) (under the "principle of
speciality," an extradition court must determine "whether each
specific charge forms the basis for extradition, as the defendant may
be prosecuted only on extraditable charges"); see also United States
v. Van Cauwenberghe, 827 F.2d 424, 428 (9th Cir. 1987), cert. denied,
484 U.S. 1042 (1988) (under the "rule of specialty," a requesting
nation may not prosecute an extradited individual for any offense
other than that for which the surrendering nation agreed to
extradite).  With respect to each of the asserted grounds for
extradition, the Court must determine whether the offense is
extraditable under the terms of the Treaty and whether probable cause
exists to sustain the charge.  See Prasoprat v. Benov, 421 F.3d 1009,
1012 (9th Cir. 2005), cert. denied, 546 U.S. 1171 (2006).

## A.  Extradition for the Completion of Long-Term Supervision

The Treaty provides that, where the individual whose extradition
is sought has been convicted, the extradition request must be
accompanied "by the judgment of conviction and sentence passed against
him in the territory of the requesting State, by a statement showing
how much of the sentence has not been served, and by evidence proving
that the person requested is the person to whom the sentence refers"
(Treaty, Art. 9, § 4).  The Treaty does not expressly define the
meaning of the term "sentence" as used therein.
///

Froude argues that, because the Treaty does not specifically provide for extradition for the purpose of completing long-term supervision, such extradition is permitted only if a long-term supervision order is part of the "sentence" imposed in the judgment of conviction (Opposition, p. 4).[6]  Froude further argues that the Government's submissions fail to show that Froude's "sentence" included a long-term supervision term under Canadian law.  Froude argues that his "sentence" consisted solely of the prison term which has expired.[7]  As discussed below, Froude's arguments must be rejected.

The interpretation of a treaty "begins with its text."  <u>Medellin v. Texas</u>, 552 U.S. 491, 507-08 (2008) (citation omitted); <u>see also</u> <u>Air France v. Saks</u>, 470 U.S. 392, 396-97 (1985) ("The analysis must begin, however, with the text of the treaty and the context in which the written words are used.") (citation omitted).  A court must "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties."  <u>Air France v. Saks</u>, 470 U.S. at 399 (citations omitted).

A court should construe an extradition treaty liberally, "more liberally than a criminal statute or the technical requirements of criminal procedure."  <u>Factor v. Laubenheimer</u>, 290 U.S. 276, 293-98

---

[6]   The Government has met its burden to provide the judgment of conviction and sentence, as well as evidence proving that Froude is the person to whom the sentence refers.

[7]   The evidence suffices to establish probable cause to believe that Froude has failed to complete service of his long-term supervision.

1    (1933).

2

3        In choosing between conflicting interpretations of a treaty

4        obligation, a narrow and restricted construction is to be

5        avoided as not consonant with the principles deemed

6        controlling in the interpretation of international

7        agreements.  Considerations which should govern the

8        diplomatic relations between nations, and the good faith of

9        treaties, as well, require that their obligations should be

10       liberally construed so as to effect the apparent intentions

11       of the parties to secure equality and reciprocity between

12       them.

13

14   Id. at 293.

15

16       "No treaty can determine all its own applications." Collins v.

17   Weinberger, 707 F.2d 1518, 1522 (D.C. Cir. 1983).  "Interpretation,

18   clarification and implementation are always necessary, and it is the

19   executive branch, in agreement with the other party to the treaty,

20   which bears primary responsibility for these functions." Id.  "Courts

21   should defer to such executive actions provided they are not

22   inconsistent with or outside the scope of the treaty." Id.  "Respect

23   is ordinarily due the reasonable views of the Executive Branch

24   concerning the meaning of an international treaty." El Al Israel

25   Airlines, Ltd. v. Tseng, 525 U.S. 155, 168 (1999).  "Although not

26   conclusive, the meaning attributed to treaty provisions by the

27   Government agencies charged with their negotiation and enforcement is

28   entitled to great weight." Sumitomo Shoji America, Inc. v. Avagliano,

1  457 U.S. 176, 183 (1982) (citation and footnote omitted); see United

2  States v. Lombera-Camorlinga, 206 F.3d 882, 887 (9th Cir.) (en banc),

3  cert. denied, 531 U.S. 991 (2000) (courts ordinarily respect the State

4  Department's interpretation of a treaty that it negotiated).

5

6       In support of its contention that Froude's "sentence" included

7  the LTSO, the Government relies on, inter alia, the "Supplementary

8  Affidavit of Karen Shai" attached to the Government's Reply ("Shai

9  Supp. Aff."). Shai, a Canadian Barrister and Solicitor who has held

10 the position of Counsel in the Crown Law Office - Criminal, Ministry

11 of the Attorney General for the Province of Ontario since 1998,[8]

12 opines that, "[a]s a matter of law in Canada, the LTSO forms part of

13 the sentencing for a designated Long-Term Offender" (Shai Supp. Aff.,

14 ¶ 9, ECF Dkt. No. 23-1, P. 6, quoting R. v. Johnson, 2003 SCC 46, 2003

15 CarswellBC 2354, at ¶ 44 (Supreme Court of Canada 2003), which

16 described an LTSO as a "sentencing option[]").

17

18      Froude contends that the "Warrant of Committal on Conviction"

19 reflecting the judgment and sentence does not include the LTSO

20 (Opposition, p. 4) (see Manson Aff., Ex. A, ECF Dkt. No. 1-4, pp. 87-

21 89). According to Froude, the first two pages of that document "make

22 no reference whatsoever to the LTSO" (Opposition, p. 4). Froude is

23 mistaken. The first page of the "Warrant of Committal on Conviction"

24 bears a check in the box next to the words "Long-Term Offender"

25 (Manson Aff., Ex. A, ECF Dkt. No. 1-4, p. 87). Further, as Froude

26 acknowledges, the third page bears the handwritten statement "Mr.

27

28          [8]   Shai Aff, ¶ 1, ECF Dkt. No. 1-4, P. 5.

Froude is found to be a long term offender *10 years*" (Manson Aff., Ex. A, ECF Dkt. No. 1-4, p. 89).

Froude also argues that his "sentence" did not include the LTSO because the court assertedly made the LTSO before imposing the prison term.  Froude points out that the statute governing long-term supervision orders provides that a determination whether an individual should be subject to long-term supervision is made in part by reference to the "sentence" that will be imposed.  See Canada Criminal Code § 753.1(1).[9]  Froude argues that Canada treats the imposition of long-term supervision independently from the "sentence" imposed upon conviction, and that the transcript of Froude's sentencing purportedly shows the court used the word "sentence" to mean a prison term (Opposition, pp. 6-7).

The present version of Canada Criminal Code section 753.1(3) undercuts Froude's argument.  This statute, which amended the former version in 2008,[10] provides in pertinent part:

///

///

///

---

[9]    Froude further asserts that the "warrant of apprehension" does not seek Froude's arrest for failure to serve a "sentence" (Opposition, p. 6).  However, while the Treaty requires the Government to submit, inter alia, a warrant of arrest when the extradition request relates to a person who has not yet been convicted, there is no such requirement with respect to persons, such as Froude, who already have been convicted (see Treaty, Art. 9, § 4).

[10]    See S.C. 2008, c. 6 § 44(1).

1     **Sentence for long-term offender**

2

3     . . .

4

5        (3) If the court finds an offender to be a long-term

6     offender, it shall

7

8        (a) impose a sentence for the offence for which the offender

9     has been convicted, which must be a minimum punishment of

10     imprisonment for a term of two years; and

11

12        (b) order that the offender be subject to long-term

13     supervision for a period that does not exceed 10 years.

14

15 Thus, the title of the present statute supports the conclusion that a

16 "sentence" can include an LTSO.

17

18     Froude further relies on two definitions of "sentence" in

19 Canadian statutes: (1) section 2(1) of the Corrections and Conditional

20 Release Act, which defines the term "sentence" for purposes of the

21 Part governing Institutional and Community Corrections to mean "a

22 sentence of imprisonment"; and (2) section 673 of the Criminal Code,

23 which, for purposes of the Part governing appeals, defines "sentence"

24 by reference to various statutes which do not include the LTSO

25 statute.  With respect to (1), however, the "Part" to which the

26 definition of "sentence" applies does not include the LTSO statute

27 ///

28 ///

(which is contained in the Criminal Code).[11]  With respect to (2), the Criminal Code contains a separate provision for appeal of an LTSO.  See Criminal Code § 759(1).  Inclusion of a separate provision for appeal does not exclude the possibility that an LTSO is a component of a criminal "sentence."

Canadian case law does not address the precise issue presented here, i.e., whether for purposes of extradition to complete service of an LTSO a "sentence" includes the LTSO.  In other contexts, Canadian cases contain inconsistent statements regarding whether an LTSO is part of the "sentence."  Froude cites R. v. L.M., 2008 SCC 31, 2008 CarswellQue 4417 (Supreme Court of Canada 2008) (Opposition, pp. 7-8).  There, the Supreme Court of Canada held that a court could not take into account a long-term offender's period of community supervision in determining the appropriate length of incarceration.  Id. at ¶ 50.  The Court distinguished "between sentencing per se and the procedure for imposing a period of post-sentence supervision."  Id. at ¶ 38.  In so doing, the Court used the term "sentence" to mean a sentence of imprisonment.  See id. at ¶¶ 43, 44, 46, 49; see also McMurray v. National Parole Board, 2004 FC 462 ¶ 25 (Fed. Ct. of Canada 2004) ("Long-term supervision does not form part of the offender's sentence") (citing no authority for this proposition).

More recently, however, the Supreme Court of Canada has stated that long-term supervision is an "exceptional sentence[]" in Canada's

---

[11]     The Code also provides that those subject to an LTSO are "offenders" for purposes of specified provisions of the Part.  See Corrections and Conditional Release Act § 2.1.

21

criminal justice system. <u>R. v. Steele</u>, 2014 SCC 61, ¶ 1, 2014 CSC 61, 2014 CarswellMan 589 (Supreme Court of Canada 2014). "Part XXIV [of the Criminal Code] outlines the process by which an offender may be designated as . . . a long-term offender and be sentenced accordingly." <u>Id.</u> Additionally, in <u>R. v. Johnson</u>, 2003 SCC 46, 2003 CarswellBC 2354 ¶ 2 (Supreme Court of Canada 2003), the Supreme Court of Canada considered "the interaction between the dangerous offender provisions and the [then] new long-term offender provisions, <u>both of which govern the sentencing of offenders who pose an ongoing public threat</u>") (emphasis added). The Court used language describing the "<u>sentencing sanctions</u> available under the long-term offender provisions" and the "<u>sentencing options</u> available under the long-term offender provisions." <u>Id.</u> ¶¶ 32, 40) (emphasis added). The Court further stated that the "introduction of the long-term offender provisions expands the range of <u>sentencing options</u> available to a sentencing judge who is satisfied that the dangerous offender criteria have been met." <u>Id.</u> at ¶ 44 (emphasis added); <u>see also</u> <u>R. v. Hudec</u>, 2016 SKPC 16, 2016 CarswellSask 87 (Saskatchewan Provincial Ct. 2016) ("The two aspects of a long-term offender sentence - namely the period of imprisonment, and the period of community supervision - are different, and I must be careful to consider them separately when deciding on the appropriate sentence. . . . *The period of imprisonment and long-term supervision orders are two separate components of the sentence; each serve different functions and are to be determined using somewhat different criteria.*") (citation omitted; ruling that defendant's sentence should "include" an LTSO); <u>R. v. Hopley</u>, 2015 BCCA 499, 2015 CarswellBC 3552 (British Columbia Court of Appeal 2015) (court must consider statutory principles and objectives

of sentencing in determining whether to impose LTSO); R. v. Smarch,
2014 YKTC 51, 2014 CarswellYukon 101 ¶ 140 (Yukon Territory
Territorial Ct. 2014) ("[I]f the court is satisfied that there is a
reasonable expectation that an indeterminate sentence is not required
to protect the public from the commission by the offender of murder or
a serious personal injury offence in the future, two other sentencing
options remain.  These are a determinate sentence of two years or more
with up to a ten year long-term-supervision order, or simply an
appropriate determinate sentence"); R. v. McDonald, 2013 ONSC 1143,
2013 CarswellOnt 1935 ¶ 89 (Ontario Superior Court of Justice (2013)
(LTSO is an "essential component of an appropriate and fit sentence");
Normandin c. Canada (Procureur Général), 2005 CAF 345, 2005
CarswellNat 4428 ¶ 66 (Fed. Crt. of Appeal 2005), leave to appeal
refused, 2006 CarswellNat 2479 (Supreme Court of Canada 2006)
(referencing "the 'long-term supervision' component" of defendant's
sentence); R. v. Archer, 2005 WL CarswellOnt 257 ¶ 12 (Ontario Ct. of
Appeal 2005) ("there is no question that dangerous offender and long-
term offender proceedings form part of the sentencing process")
(citation omitted).  It is thus apparent that in many contexts
Canadian law deems the "sentence" to encompass the LTSO.

     The only United States case to address an issue similar to the
issue presented herein is In re Extradition of Robertson, 2012 WL
5199152 (E.D. Cal. Oct. 19, 2012) ("Robertson").  In Robertson, Canada
requested Robertson's extradition to serve the remainder of his term
under an LTSO and to stand trial on three charges of violating the
LTSO.  Robertson argued, inter alia, that he had completed serving his
criminal "sentence" and that the LTSO was a separate administrative

order allegedly not part of the "sentence."  Deeming the issue to be a "close one," the Robertson Court stressed that American courts "cannot become enmeshed in the technicalities of foreign criminal processes" and that American courts "are strongly discouraged from reviewing whether the demanding country has complied with its own law." Id. at *9-11.  The Robertson Court stated that "to make the legal determination that under the laws of Canada the LTSO imposed on Robertson at the time of his sentencing by the trial judge was, in fact, not part of his sentence would run afoul of these principles." Id. at *11.  The Robertson Court deemed sufficient to show extraditability: a diplomatic note seeking Robertson's extradition to serve "the remainder of a sentence"; the judgment of conviction reflecting imposition of the LTSO at the time of sentencing; and undisputed evidence of identity.  Id..  The Robertson Court declined "to make a determination regarding the law of Canada, with respect to what forms of supervision are included in a criminal sentence under the laws of that country that is at odds with the representations of the government requesting extradition."  Id.


    This Court does not share the concerns expressed by the Robertson Court.  In this Court's view, adjudication of the issue presented does not threaten enmeshment with "the technicalities of foreign criminal processes," and adjudication does not require a review of whether Canada "has complied with its own law."  Rather, the issue presented is one of Treaty interpretation, i.e., determination of the meaning of the term "sentence" as used in the Treaty.  Such meaning may or may not be the same as the meaning of the term "sentence" as used in various contexts within Canadian law.  This Court examines Canadian

24

law usage not for internal consistency, but only to the extent such
usage may bear on the intent and shared expectations of the Treaty
partners and, hence, the proper interpretation of the Treaty.

Significantly, Canada's Extradition Act provides, with respect to
a person extradited from Canada: "Subject to a relevant extradition
agreement, the extradition of a person who has been sentenced to
imprisonment or another deprivation of liberty may only be granted if
the portion of the term remaining is at least six months long or a
more severe punishment remains to be carried out."  Extradition Act, §
3(3) (emphasis added).  According to the Canada Supreme Court, the
purpose of the Act "is to ensure that the law of the land conforms to
the treaty."  United States v. McVey, 1992 CarswellBC 318 ¶ 10
(Supreme Ct. of Canada 1992) (construing United States extradition
treaty).  Accordingly, the quoted section of Canada's Extradition Act
strongly suggests that the term "sentence" in the Treaty is intended
to encompass "deprivation[s] of liberty" other than actual prison
incarceration.

The actual performance of the Treaty partners also supports the
conclusion that the term "sentence" encompasses long-term supervision.
See Factor v. Laubenheimer, 290 U.S. 276, 294-95 (1933) ("In
ascertaining the meaning of a treaty we may look beyond its written
words . . . to [the treaty partners'] own practical construction of
it").  Canadian courts extradite persons to the United States for
completion of the service of a period of probation or supervised
release.  See United States v. Gillingham, 2004 CarswellBC 902 § 22,
2004 BCCA 226 (British Columbia Court of Appeal 2004), leave to appeal

refused, 2004 CarswellBC 2717 (Supreme Court of Canada 2004)
(individual who received probation in Montana but violated in Canada
could be extradited to the United States to complete service of his
sentence; "a fugitive alleged to have been convicted of an extradition
crime includes a criminal who has been convicted and not yet served
his complete sentence, including any term of probation following
detention") (citations and internal quotations omitted); United States
v. Allison, 1918 CarswellNS 74 (Nova Scotia County Court 1918)
(issuing extradition warrant for defendant who "broke[] his parole" in
the United States where conviction was for an extraditable crime;
noting absence of authority on the issue).  In the United States, a
term of supervised release is "a part of the sentence."  See 18 U.S.C.
§ 3583(a).  Nothing suggests that the Treaty partners contemplated a
one-sided Treaty which would authorize extradition from Canada to
complete terms of supervised release but not extradition to Canada to
complete terms of long-term supervision.  See Factor v. Laubenheimer,
290 U.S. at 293 (treaty obligations should be "liberally construed so
as to effect the apparent intention of the parties to secure equality
and reciprocity between them").


     As previously discussed, the principle of liberal construction
applies in the context of extradition.  The Court has borne this
principle in mind while considering, inter alia: (1) the Supplementary
Affidavit of Karen Shai stating that an LTSO is part of sentencing for
a designated long-term offender; (2) the ""Warrant of Committal on
Conviction" reflecting Froude's long-term offender designation;
(3) the title of the present version of Canada Criminal Code section
753.1(3) ("Sentence for long-term offender"); (4) Canadian law deeming

an LTSO to comprise part of a criminal sentence; (5) the language of Canada's Extradition Act authorizing, subject to treaty, the extradition of a person who has been sentenced to "imprisonment or another deprivation of liberty"; (6) "the meaning attributed to [the] treaty provisions by the Government agencies charged with their negotiation and enforcement";[12] and (7) the performance of the Treaty partners in extraditing individuals from Canada to the United States for completion of the service of probation or supervised release. After all such considerations, the Court has concluded that the Treaty authorizes extradition to Canada for purposes of completing the service of long-term supervision.  Accordingly, the Court will certify extradition on this ground.

## B.   **Extradition for Alleged Violations of the LTSO**

### 1.   **Probable Cause Determination**

The Government also seeks extradition on the basis of three alleged violations of the LTSO: (1) failing to reside at a Community Correctional Centre or Community-Based Residential Facility approved by CSC; (2) failing to remain at all times in Canada within the territorial boundaries fixed by the parole supervisor; and (3) failing to "obey the law and keep the peace."  The Court finds that the evidence establishes probable cause to believe that Froude committed

///

///

---

[12]   See Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 183 (1982).

1  each of the three violations alleged.[13]

2

3       **2.  Dual Criminality**

4

5       "Under the principle of 'dual criminality,' no offense is

6  extraditable unless it is criminal in both countries."  In the Matter

7  of the Extradition of Russell, 789 F.2d 801, 803 (9th Cir. 1986)

8  (citation omitted).  "Dual criminality exists if the 'essential

9  character' of the acts criminalized by the laws of each country are

10 the same and the laws are 'substantially analogous.'"  Manta v.

11 Chertoff, 518 F.3d 1134, 1141 (9th Cir. 2008).  In determining whether

12 dual criminality exists, the Court must consider "the totality of the

13 conduct alleged."  Man-Seok Choe v. Torres, 525 F.3d 733, 737 (9th

14 Cir. 2008), cert. denied, 555 U.S. 1139 (2009) (citation and internal

15 quotations omitted).  Neither the names nor the elements of the

16 offenses need be identical.  Id.; Manta v. Chertoff, 518 F.3d at 1141;

17 Emami v. United States District Court for the Northern District of

18 California, 834 F.2d 1444, 1450 (9th Cir. 1987) (dual criminality

19 exists if the "substantive conduct each statute punishes is

20 functionally identical"); see also Kelly v. Griffin, 241 U.S. 6, 14

21 (1916) (perjury extraditable although Canadian law did not require

22 that the false swearing be material); In the Matter of the Extradition

23 of Russell, 789 F.2d at 803-04 (dual criminality satisfied although

24 _____

25       [13]    Froude does not appear to dispute the existence of
26 probable cause, but contends rather that the asserted grounds for
   extradition for violation of the LTSO are legally insufficient.
27 Froude argues that these violations would not constitute felonies
   in the United States.  This argument implicates the "dual
28 criminality" issue, discussed infra.

Australian law did not require proof of overt act for conspiracy to commit fraud, where affidavits alleged overt acts sufficient to justify a charge in the United States).  "When the laws of both the requesting and the requested party appear to be directed to the same basic evil, the statutes are substantially analogous."  <u>Man-Seok Choe v. Torres</u>, 525 F.3d at 738.  Dual criminality "is an essential element of the government's burden of proof to establish a basis for extradition."  <u>In the Matter of the Extradition of Platko</u>, 213 F. Supp. 2d 1229, 1236 (S.D. Cal. 2002) (citations and internal quotations omitted).

The Treaty expressly incorporates these principles.  Article 2 of the 1971 Treaty, as replaced by the 1988 Protocol, provides: "Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment" (Shai Aff., Ex. A, ECF Dkt. No. 1-4, p. 21).

> **a.    <u>Alleged Failure to Reside at a Community Correctional Centre or Community-Based Residential Facility Approved by the CSC</u>**

The Government analogizes the alleged violations of the LTSO to the offense of escape criminalized in 18 U.S.C. sections 751(a) and 4082 (Government's Memorandum, pp. 23-24).  Section 751(a) provides:

> Whoever escapes or attempts to escape from the custody of
> the Attorney General or his authorized representative, or

1    from any institution or facility in which he is confined by

2    direction of the Attorney General, or from any custody under

3    or by virtue of any process issued under the laws of the

4    United States by any court, judge, or magistrate judge, or

5    from the custody of an officer or employee of the United

6    States pursuant to lawful arrest, shall, if the custody or

7    confinement is by virtue of an arrest on a charge of felony,

8    or conviction of any offense, be fined under this title or

9    imprisoned not more than five years, or both; or if the

10   custody or confinement is for extradition, or for exclusion

11   or expulsion proceedings under the immigration laws, or by

12   virtue of an arrest or charge of or for a misdemeanor, and

13   prior to conviction, be fined under this title or imprisoned

14   not more than one year, or both.

15

16   Under 18 U.S.C. section 4082(a), "[t]he willful failure of a

17   prisoner to remain within the extended limits of his confinement or to

18   return within the time limits prescribed to an institution or facility

19   designated by the Attorney General" is deemed to be an escape from the

20   custody of the Attorney General.

21

22   In arguing an absence of dual criminality, Froude cites United

23   States v. Burke, 694 F.3d 1062 (9th Cir. 2012) ("Burke").  In Burke,

24   the defendant completed his term of imprisonment and then absconded

25   from a residential reentry center ("RRC") in which he had been

26   required to reside by a court-ordered condition of his supervised

27   release.  The Burke Court held that the defendant had not been "in the

28   custody of the Attorney General or his authorized representative"

within the meaning of section 751.  The <u>Burke</u> Court reasoned that, at
the time the defendant left the RRC, he was neither serving a prison
sentence nor incarcerated at the RRC under conditions equivalent to
custodial incarceration.  <u>Id.</u> at 1064.  Rather, the conditions of
Burke's RRC "were much more analogous to probation than they were to
imprisonment."  <u>Id.</u> (citation and internal quotations omitted).  The
<u>Burke</u> Court acknowledged the Circuit's earlier decisions in <u>United</u>
<u>States v. Keller</u>, 912 F.2d 1058 (9th Cir. 1990), <u>cert. denied</u>, 498
U.S. 1095 (1991) ("<u>Keller</u>") and <u>United States v. Jones</u>, 569 F.2d 499
(9th Cir.), <u>cert. denied</u>, 436 U.S. 908 (1978) ("<u>Jones</u>").  In these
earlier decisions, the Circuit had held that a defendant who failed to
report to a halfway house (<u>Keller</u>) or absconded from a halfway house
(<u>Jones</u>) had committed offenses under sections 751 and 4082.  The <u>Burke</u>
Court distinguished <u>Keller</u> and <u>Jones</u> on the ground that the defendants
there had been in the custody of the Federal Bureau of Prisons at the
time of their escapes.  <u>Burke</u>, 694 F.3d at 1065.  In particular, the
<u>Burke</u> Court distinguished <u>Jones</u> on the ground that the defendant in
<u>Jones</u> had been committed to a "pre-release or halfway house program by
designation of the Attorney General."  <u>Burke</u>, 694 F.3d at 1065
(quoting <u>Jones</u>, 569 F.2d at 500).  By contrast, the defendant in <u>Burke</u>
"had completed his prison term and was no longer in BOP custody when
he left [the RRC]."  <u>Id.</u>  The <u>Burke</u> Court deemed this distinction
"crucial."  <u>Id.</u>[14]

///

///

---

[14]    The <u>Burke</u> Court also distinguished <u>Jones</u> on the ground
that the court in that case did not specifically address the
meaning of "custody" under section 751.  <u>Burke</u>, 694 F.3d at 1065.

1     Contrary to Froude's argument, <u>Burke</u> does not control the present
2  case.  As discussed above, Froude's LTSO <u>was</u> a part of his sentence.
3  As discussed below, Froude was in the custody of the Canadian
4  equivalent of the United States Attorney General at the time of his
5  escape from the PCCC.  Thus, <u>Jones</u>, not <u>Burke</u>, is instructive here.
6
7     The Government has submitted the affidavit of Peter Glenn, the
8  Manager of Community Operations for CSC (<u>see</u> Affidavit of Peter Glenn,
9  attached to the Government's Supplemental Memorandum as Ex. 1) ("Glenn
10  Aff.").  According to Glenn, CSC is a Canadian federal agency
11  established pursuant to the Corrections and Conditional Release Act,
12  and the CSC administers court-imposed sentences of two years or more
13  (Glenn Dec, ¶ 3, ECF Dkt. No. 28-1, p. 2).  <u>See also</u> Correctional and
14  Conditional Release Act, § 5 ("There shall continue to be a
15  correctional service in and for Canada, to be known as the
16  Correctional Service of Canada, which shall be responsible for (a) the
17  care and custody of inmates; (b) the provision of programs that
18  contribute to the rehabilitation of offenders and to their successful
19  reintegration into the community; (c) the preparation of inmates for
20  release; (d) parole, statutory release supervision and long-term
21  supervision of offenders; and (e) maintaining a program of public
22  education about the operations of the Service.").  The United States
23  Bureau of Prisons ("BOP") is an agency whose director is appointed by,
24  and serves directly under, the United States Attorney General.  <u>See</u> 18
25  U.S.C. §§ 4041, 4042.  The BOP administers federal penal and
26  correctional institutions under the direction of the Attorney General
27  (<u>id.</u>).  The CSC is the equivalent of the "Attorney General" within the
28  meaning of sections 751(a) and 4082.  <u>See</u> <u>United States v. Rocha-Leon</u>,

32

187 F.3d 1157, 1159 (9th Cir. 1999) (because "ultimate responsibility for federal prisoners remains with the Attorney General," "federal prisoners are still within the 'custody' of the Attorney General for purposes of section 751(a), albeit indirectly").  CSC's work includes managing institutions of various security levels across Canada, preparing inmates for safe and timely release and supervising offenders in the community on conditional release or under long-term supervision (Glenn Dec., ¶ 3, ECF Dkt. No. 28-1, p. 2).  Community Correctional Centres operate under CSC policies and procedures (Glenn Dec., ¶ 3, ECF Dkt. No. 28-1, p. 2).  The PCCC[15] is owned and operated by the CSC and provides a structured living environment, programs, supervision and interventions for the purpose of integrating offenders safely into the community (Glenn Dec., ¶ 4, ECF Dkt. No. 28-1, p. 3).

Thus, unlike the defendant in Burke who was not in the custody of the BOP, Froude was in the custody of the CSC, Canada's equivalent of the Attorney General and the BOP.  Froude's escape from the PCCC constituted an escape from the custody of the CSC and was "functionally identical" to escape "from the custody of the Attorney General or his authorized representative" within the meaning of the first clause of 18 U.S.C. section 751(a).  For the same reasons, Froude's escape from the PCCC was also "functionally identical" to "willful failure . . . to remain within the extended limits of his confinement" within the meaning of section 18 U.S.C. 4082(a).

///

---

[15]   Now called the Henry Traill Community Correctional Centre (Glenn Dec., ¶ 4).

1    The Government also analogizes the alleged Canadian offense to
2    flight to avoid custody or confinement after conviction in violation
3    of 18 U.S.C. section 1073.   Section 1073 provides, in pertinent part:

5        Whoever moves or travels in interstate or foreign commerce
6        with intent either (1) to avoid prosecution, or custody or
7        confinement after conviction, under the laws of the place
8        from which he flees, for a crime, or an attempt to commit a
9        crime, punishable by death or which is a felony under the
10       laws of the place from which the fugitive flees . . . shall
11       be fined under this title or imprisoned not more than five
12       years, or both.

14   Froude contends the evidence does not show he fled with the
15   intent to avoid prosecution or confinement (Froude Supplemental Brief,
16   p. 8).   However, the Government has proven Froude's prior flight to
17   the United States as well as the circumstances of his most recent
18   flight.   Froude's history of contumacious behavior permits the
19   inference that Froude fled with the intent to avoid prosecution or
20   confinement.   Cf. Man-Seok Choe v. Torres, 525 F.3d 733, 741 (9th Cir.
21   2008), cert. denied, 555 U.S. 1139 (2009) (upholding magistrate
22   judge's finding of dual criminality, where statute of limitations on
23   United States offense was tolled during period accused fled from
24   justice; evidence showed alien secretly flew from Korea to the United
25   States with knowledge that he was the subject of criminal
26   investigation in Korea, and consequently fled to avoid being taken
27   into custody).   Froude further contends that he could not have
28   intended "to avoid custody or confinement" because he had been

released from prison before he left the PCCC (id.).  The evidence
described above permits the inference that Froude left the PCCC and
fled Canada with the intent to avoid custody or confinement at a
Community Correctional Centre owned and operated by the CSC.  For
purposes of the dual criminality requirement, Froude's "substantive
conduct" in fleeing from the PCCC is "functionally identical" to that
proscribed by 18 U.S.C. section 1073.

    Therefore, because the relevant laws of Canada and the United
States are "directed to the same basic evil" and the "essential
nature" of the acts of escape and flight criminalized by both
countries are the same, the dual criminality requirement is satisfied
as to the first ground for extradition based on violation of the LTSO,
i.e., failing to reside at a Community Correctional Centre or
Community-Based Residential Facility approved by CSC.  See Man-Seok
Choe v. Torres, 525 F.3d at 738.  Accordingly, the Court will certify
extradition on this charge.

          **b.   Alleged Failure to Remain at All Times in Canada Within
                the Territorial Boundaries Fixed by the Parole
                Supervisor**

    The Government also seeks certification of extradition based on
Froude's alleged violation of the LTSO condition requiring him to
"remain at all times in Canada within the territorial boundaries fixed
by the parole supervisor."  The Government again argues an analogy to
the federal escape statutes, 18 U.S.C. sections 751(a) and 4082(a).

Escape from the territorial boundaries fixed by a parole supervisor is not analogous to escape from the custody of the Attorney General or custody imposed by court order.  Rather, an escape from boundaries fixed by a parole supervisor is analogous to a violation of a United States supervised release order fixing similar territorial boundaries.  And, in the United States, "[a] violation of supervised release is not necessarily criminal."  United States v. Jensen, 705 F.3d 976, 978 (9th Cir. 2013) (citations omitted); see United States v. Woodard, 675 F.3d 1147, 1152 (8th Cir. 2012) ("There is no support for the proposition that a supervised release violation is an offense.") (quoting United States v. Smith, 500 F.3d 27, 31 (1st Cir. 2007)) (internal quotations and brackets omitted); United States v. Marvin, 135 F.3d 1129, 1138 n.14 (7th Cir. 1998) ("An individual's violation of the conditions of his supervised release is not a crime, but the violative conduct can constitute criminal behavior if it satisfies the elements of a particular offense."); see also Johnson v. United States, 529 U.S. 694, 700 (2000) (sentence imposed upon revocation of supervised release is not punishment for the violation of the supervised release condition, but "part of the penalty for the initial offense").

Although Froude's "substantive conduct" in failing to remain in Canada is not "functionally identical" to a violation of the federal escape statutes, such conduct is "functionally identical" to a flight "to avoid custody or confinement" within the meaning of 18 U.S.C. section 1073.  Accordingly, the Court will certify extradition on this charge.

///

1            **c.**   **Alleged Failure to "Obey the Law and Keep the Peace"**

2

3        The Government does not identify any specific United States

4 criminal analog to the Canadian offense of violating a term of an LTSO

5 requiring a defendant to "obey the law and keep the peace."  The

6 Government merely argues generically that one who violates the United

7 States escape statutes assertedly fails to "obey the law and keep the

8 peace" (Government's Supplemental Brief, pp. 3-4).

9

10        The Court will decline to certify extradition based on Froude's

11 alleged violation of the LTSO condition requiring him to "obey the law

12 and keep the peace."  Extradition based on such a vague and

13 generalized charge would effectively eviscerate the dual criminality

14 requirement embodied in the Treaty and mandated by law.  See United

15 States v. Khan, 993 F.2d 1368, 1372-73 (9th Cir. 1993) (rejecting the

16 government's argument "that as long as the underlying conduct is

17 criminal, dual criminality is satisfied"); Robertson, 2012 WL 5199152

18 at *17-18 (finding "wholly unpersuasive" the Government's argument

19 that "dual criminality is satisfied" because the Canadian statute

20 criminalizing violation of an LTSO and the United States statute

21 requiring sex offender registration are "both generally intended to

22 serve important public safety purposes").

23

24                   **ORDERS AND CERTIFICATION**

25

26        Based on the above findings, and pursuant to 18 U.S.C. section

27 3184, this Court certifies that it has found Kenneth Wayne Froude

28 extraditable to Canada with respect to the following:

1.   Completion of service of the Long-Term Supervision Order;

2.   Failure to reside at a Community Correctional Centre or Community-Based Residential Facility approved by the Correctional Service of Canada in violation of Canada Criminal Code section 753.3(1); and

3.   Failure to remain at all times in Canada within the territorial boundaries fixed by the parole supervisor.

A warrant may issue for the surrender of Kenneth Wayne Froude upon the requisition of the proper authorities of the Government of Canada, according to the terms of the Treaty.

IT IS FURTHER ORDERED that Kenneth Wayne Froude shall remain committed to the custody of the United States Marshal, to be confined without bail until he is surrendered to the Government of Canada pursuant to the applicable provisions of the Treaty.

IT IS FURTHER ORDERED that the attorney for the United States forthwith shall obtain transcripts of all proceedings before this Court and deliver those transcripts to the Clerk of the Court.  The Clerk of the Court shall forward to the Secretary of State a copy of this Extradition Certification and Order of Commitment, together with the transcripts and copies of documents received as evidence.  The

///
///
///

Clerk of the Court also shall file herein a copy of the transcripts of all proceedings before this Court.


     IT IS SO ORDERED.


          DATED: June 17, 2016.


                                    _____/S/_____
                                    CHARLES F. EICK
                                    UNITED STATES MAGISTRATE JUDGE